UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

AMBER DANIELS and ANTHONY WADE,

                              Plaintiffs,

                -against-

CITY OF NEW YORK, NYPD DETECTIVE
JON GLADSTONE, Shield No. 5165, individually,
NYPD DETECTIVE JAMES BAEZ, Shield No.
7011, individually, NYPD SERGEANT
ALEXANDRU ANGHEL, Tax No. 934403,
individually, and NYPD JOHN DOE POLICE
OFFICERS 1-10, individually,

                              Defendants.

---------------------------------------------------------------- x

**FIRST AMENDED COMPLAINT**

Jury Trial Demanded

16 Civ. 190 (PKC) (JO)

## NATURE OF THE ACTION

1.     This is an action to recover money damages arising out of the violation of Plaintiff Amber Daniel's and Plaintiff Anthony Wade's ("Plaintiffs") rights under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

2.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

3.     This Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343.

4.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c). The incident in question took place in this District in Kings County.

## JURY DEMAND

5.     Plaintiffs demand a trial by jury in this action pursuant to Federal Rule of Civil Procedure ("FRCP") 38.

## PARTIES

6.     At the time of the herein described incident Plaintiffs were residents of Kings County and both Plaintiffs remain residents of Kings County.

7.     Defendant City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

8.     The City of New York maintains the New York City Police Department (hereinafter "NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the aforementioned municipal corporation, the City of New York.

9.     Defendant NYPD Detective Jon Gladstone, Defendant NYPD Detective James Baez, Defendant Sergeant Alexandru Anghel, and Defendants NYPD John Doe Police Officers 1-10 were duly sworn officers, employees and agents of said department at all times relevant herein and were acting under the

supervision of said department and according to their official duties.  Officer

Defendants are sued in their individual capacities.

10.     That at all times hereinafter mentioned Defendants, either personally or

through their employees, were acting under color of state law and/or in compliance

with the official rules, regulations, laws, statutes, customs, usages and/or practices of

the State of New York and/or the City of New York.

11.     Each and all of the acts of the Defendants were done by said

Defendants while acting within the scope of their employment by the City of New

York.

## STATEMENT OF FACTS

### Mr. Wade's Residence At Apartment 12B, And His Intentions To Take Over The Lease For Apartment 12B From Gloria O'Connor

12.     At all times relevant to this action, Plaintiff Anthony Wade lived at 192

Sands Street, Apartment 12B ("Apartment 12B").

13.     192 Sands Street is a building managed by the New York City Housing

Authority ("NYCHA") and forms part of the Farragut Houses complex.

14.     At the time of the incident at issue in this action, which occurred on July

14, 2014, Mr. Wade had been living as the tenant of Apartment 12B for a number of

months.

15.     Prior to Mr. Wade's tenancy, Mr. Wade's aunt Gloria O'Connor was the

tenant.  Ms. O'Connor also formally held the lease.

16.      Ms. O'Connor began living in Apartment 12B and took over the lease starting in late 2013, when a family member named Laverne Wilkinson, who had been living there with her chronically ill daughter, died.  Ms. O'Connor moved in and began to care for the chronically ill relative.

17.      In or around the middle of 2014, Ms. O'Connor found that the chronically ill relative's accessibility needs were such that the two women could not continue living in Apartment 12B.

18.      This is when Mr. Wade began his tenancy in Apartment 12B, after telling Ms. O'Connor that he wanted to take over the lease.  Ms. O'Connor and Mr. Wade spoke to the on-site NYCHA management office about the necessary steps that they would have to take for Mr. Wade to succeed Ms. O'Connor as Apartment 12B's formal leaseholder.

19.      NYCHA management indicated that the lease transfer to Mr. Wade could likely be realized by the end of 2014.

20.      Ms. O'Connor agreed to continue leasing Apartment 12B until Mr. Wade could directly lease it, so long as Mr. Wade paid the rent.  Mr. Wade agreed.

21.      As Mr. Wade grew up in the building and had family living there, including his mother, Emma Wilkinson, who lived in Apartment 10G, he was pleased with the arrangement and the opportunity.

**Ms. Daniels's Residence At Farragut Houses**

22.     Plaintiff Amber Daniels lived at 237 Nassau Street, Apartment 5E ("the Daniels Apartment"), which is also part of the Farragut Houses complex adjacent to 192 Sands Street.

23.     Ms. Daniels was separated from her husband David at all times relevant to this action, but Ms. Daniels and David continued to live together at the Daniels Apartment for financial and family reasons.

**Mr. Wade and Ms. Daniels's Burgeoning Relationship And Their Day Care Business**

24.     Ms. Daniels and Mr. Wade were an item at all times relevant to this action, which David knew and which caused great tension at the Daniels Apartment.

25.     Ms. Daniels worked in child care.  At the time of the incident, Ms. Daniels had been running her own small business offering day care services out of the Daniels Apartment.

26.     As Ms. Daniels's relationship with Mr. Wade became more serious, Ms. Daniels and Mr. Wade began to make future plans together, including a plan to move Ms. Daniels's day care business from the Daniels Apartment to Apartment 12B, where they could run it together.  Ms. Daniels was pleased at the prospect of moving the day care business from the Daniels Apartment to Apartment 12B, as this would provide her respite from the tension of the Daniels Apartment.  Ms. Daniels made an

appointment for Social Services to visit Apartment 12B for an inspection connected to the intended business.

27.     Mr. Wade and Ms. Daniels began to take concrete steps to preparing Apartment 12B for the day care business.  For example, they bought a washing machine for childrens' soiled clothes; they began to repair the floor where it had deteriorated; and they began to accumulate toys for their charges.

**Two Defendant Detectives Visit Ms. Daniels At Apartment 12B On June 4, 2014**

28.     On June 4, 2014, at approximately 6:00 p.m., Ms. Daniels was at Apartment 12B.  Mr. Wade had been out all day and Ms. Daniels had no company the whole day through.

29.     Two male Defendant Detectives knocked at Apartment 12B's door. They were in plain clothes but identified themselves as detectives.  On information and belief, Defendant Detective Gladstone and Defendant Detective Baez may have been these men.

30.     Ms. Daniels opened the door and the Defendant Detectives told her that they were responding to a 911 call about domestic violence in Apartment 12B.

31.     Ms. Daniels explained that no such incident had occurred in Apartment 12B because she had been home alone all day.

32.     The Defendant Detectives asked if they could come in and look around. Ms. Daniels asked if she could first call Mr. Wade's mother, Emma Wilkinson, from

Apartment 10G.  As Ms. Daniels did not actually live at Apartment 12B, Mr. Wade's mother was the more appropriate person to ask to search the apartment.

33.     Ms. Daniels called Ms. Wilkinson, and Ms. Wilkinson came up to Apartment 12B from her home in Apartment 10G.  Ms. Wilkinson corroborated to Defendant Detectives that Mr. Wade had not been there all day.

**Defendants' July 17, 2014 Search Of Apartment 12B**

34.     On the morning of July 17, 2014, Mr. Wade and Ms. Daniels were sleeping in one room of Apartment 12B.  Ms. Daniels's son slept in the adjoining room, as did Mr. Wade's son and an eight-year-old Wade family member who was visiting New York from Pennsylvania for part of that summer ("the children").

35.     At approximately 7:00 a.m., approximately eight Individual Defendants woke up Mr. Wade and Ms. Daniels with firearms pointed at them.

36.     On information and belief, Defendant Detective Gladstone, Defendant Detective Baez and Defendant Sergeant Anghel were among the Individual Defendants.

37.     Defendants were executing a search warrant which a magistrate had issued in response to papers prepared by Defendant Detective Gladstone and Detective Baez.

38.     One of the Defendants shouted, in sum and substance, "[w]here are the guns, where are the drugs?"

39.     There were no firearms or drugs in the apartment.

40.     Ms. Daniels had slept in a nightie made of large-hole fishnet fabric that revealed much of her naked body through the holes.  Ms. Daniels asked Defendants for permission to put another layer of clothing on top of the fishnet in order to cover what was a clear view of her otherwise naked body.

41.     Defendants refused Ms. Daniels's request.  Individual Defendants stated that they would not permit Ms. Daniels to cover herself unless a female officer was present, which at the time there was not.

42.     Thus the purported policy of requiring a female officer to be present before allowing an exposed female arrestee—here, Ms. Daniels—to cover herself, had the effect of depriving Ms. Daniels of that opportunity.

43.     Individual Defendants stated that they would have brought a female police officer to aid Ms. Daniels had they known that there would be a woman in Apartment 12B, but that they had not known that Ms. Daniels would be there.  This was not true.  Defendants knew from the June 4, 2014 visit that a woman would likely be in Apartment 12B.  In addition, the search warrant application relating to Apartment 12B, the search warrant execution plan relating to Apartment 12B and the search warrant itself for Apartment 12B all stated that a woman would be there that morning.

44.     As Defendants searched Apartment 12B, Ms. Daniels saw the same

Defendant Detectives who had come to Apartment 12B on June 4, 2014 to investigate the alleged domestic violence incident.  When one of these Defendant Detectives noticed Ms. Daniels looking at him and they locked eyes, Ms. Daniels said, in sum and substance, "I remember you."  "I remember you, too," Defendant Detective responded.

45.    This led Ms. Daniels to rethink the Defendant Detectives' June 4, 2014 visit to Apartment 12B.  Ms. Daniels came to believe that Defendant Detectives used the alleged domestic violence call as a ruse to look around Apartment 12B in connection with their cocaine trafficking investigation.  However, Ms Daniels thought this strange, as it seemed highly incautious for narcotics detectives to openly visit actual drug traffickers on such obvious dubious pretense.

46.    Defendants did not find any cocaine or related paraphernalia in Apartment 12B.

47.    Defendants notified Ms. Wilkinson of the police search and Ms. Wilkinson came to Apartment 12B from Apartment 10G in order to collect and watch the children.  Defendants told Ms. Wilkinson that they were inclined to keep custody of the children but that they would release them to her care if she would first consent to Defendants searching the room that Mr. Wade stayed in when he slept at Ms. Wilkinson's home in Apartment 10G.  Ms. Wilkinson, who did not want the children kept in state custody, consented to Defendants' coercive request to search

only Mr. Wade's room in Apartment 10G.  Defendants found no contraband in Mr. Wade's room in Apartment 10G, either.

48.    Defendants removed Ms. Daniels and Mr. Wade from the apartment and placed them in a police vehicle as they continued to search Apartment 12B.

49.    Even as Defendants removed Ms. Daniels from Apartment 12B, they did not permit her to clothe herself further or even drape herself with a sheet or other cover-up.  As a result, Defendants took Ms. Daniels down the hallway, down the elevator, through the lobby and from 192 Sands Street to a police vehicle, with her body largely visible to others through the negligee's large fishnet holes.

50.    Ms. Daniels and Mr. Wade then sat in a police vehicle outside 192 Sands Street for a number of hours while Defendants continued their search of Apartment 12B using canines.  Defendants' search damaged Mr. Wade's and Ms. Daniels's property inside Apartment 12B.  For example, Defendant Doe Officers broke the washing machine.  They also pulled up the floor work that was underway.

**Defendants Physical Detention Of Mr. Wade And Ms. Daniels For Their Alleged Joint Possession Of A Marijuana Cigarette, And Defendants' Malicious Prosecution Of Mr. Wade For A Criminal Offense Without Probable Cause**

51.    Defendants completed their search of Apartment 12B without finding any contraband relating to alleged cocaine trafficking which, based upon Defendant Detective Gladstone's and Defendant Detective Baez's investigation and representations to the magistrate issuing the search warrant was the contraband likely

to be found.

52.     Defendant Detective Gladstone eventually stated that as a result of the execution of the search warrant one single piece of alleged contraband was found:  an alleged marijuana cigarette from a windowsill in Mr. Wade's bedroom.

53.     On information and belief, it may be true that Defendant Detective Gladstone found the alleged single marijuana cigarette.  However, Plaintiffs dispute Defendant Detective Gladstone's claim that he found it in plain view of Mr. Wade and Ms. Daniels such that Defendants had cause to believe that either, let alone both of them, possessed it.  Mr. Wade had only just moved into Apartment 12B in recent months, after Ms. O'Connor and a chronically ill relative moved out.  Even if Defendants were to argue that possession of an alleged marijuana cigarette found somewhere in Apartment 12B could be attributed to Mr. Wade by virtue of his tenancy, Defendants knew from their conversation with Ms. Daniels on June 4, 2014 that she did not live in Apartment 12B.  Defendants also knew this from looking at Ms. Daniels's ID during the July 17, 2014 raid.  When one of the Defendants looked at Ms. Daniels's ID during the July 17, 2014 raid, Doe Defendant noted that the address listed on the ID was the Daniels Apartment address, and responded, in sum and substance, "Hm, well maybe then that's where you should be."

54.     After falsely stating that the alleged marijuana cigarette was in plain view of both Mr. Wade and Ms. Daniels, Defendant Detective Gladstone directed that they

both be taken to the precinct to be charged with possession.

55.     Defendants took both Ms. Daniels and Mr. Wade to the 84th precinct despite the fact that the NYPD Patrol Guide 209-16 states that unlawful possession of a marijuana cigarette pursuant to N.Y. Pen. Law § 221.05 is normally handled by issuing a summons.

56.     Once at the precinct, Defendants placed Ms. Daniels in a cell and still did not allow her to add any clothing atop the see-through netting.  It was only after a significant period of time that someone at the precinct gave Ms. Daniels a sweater.

**Defendant Narcotics Detective Gladstone Maliciously And Unjustifiably Issued Mr. Wade A DAT Charging Him With Misdemeanor Possession Of Marijuana In A Public Place Under New York Penal Law § 221.10(1), While Issuing Ms. Daniels A Summons For An Unlawful Marijuana Possession Violation Under New York Penal Law § 221.05 Based Upon The Same Facts**

57.     Defendants took Mr. Wade and Ms. Daniels to the 84th Precinct to bring charges against them for the exact same thing—alleged unlawful possession of a single marijuana cigarette, yet Defendant Detective Gladstone charged Mr. Wade on a Desk Appearance Ticket a Class B misdemeanor, i.e., Criminal Possession of Marijuana in a Public Place, N.Y. Pen. Law 221-10(1), and Ms. Daniels on a summons with a violation, i.e., Unlawful Possession of Marijuana, N.Y. Pen. Law 221-.05.

58.     Defendant Detective Gladstone, who was a member of a specialized narcotics division of the NYPD, knew that he did not have cause to charge Mr. Wade with that more serious offense because there was no public element to the factual

allegations against him.  In fact, Defendant Detective Gladstone did not even

supporting deposition paperwork relating to a Section 221.10(1) charge in charging

Mr. Wade with that offense.  Instead, he used supporting deposition paperwork

relating to either a Section 221.05 violation or a Section 221.10(2) (not 221.10(1))

misdemeanor.[1]

59.     Defendant Sergeant Alexand approved Defendant Detective Gladstone

charging Mr. Wade with possession of marijuana in a public place despite the fact that

Defendant Alexand knew or should have known that the facts alleged did not support

probable cause for such a charge.

60.     It was not until Mr. Wade appeared in court on October 28, 2014 that

the D.A. corrected this mistake and downgraded the charge against Mr. Wade to a

violation.

61.     However, by then, Defendant Gladstone's disparate treatment of Mr.

Wade as compared to Ms. Daniels, and Defendant Gladstone's incorrect handling of

---

[1] Section 221.10(2) requires that the defendant have possessed marijuana in excess of twenty-five grams, which amount would require well over one hundred marijuana cigarettes.  N.Y. Patrol Guide 209-16; see Caroline Bankoff, What Does 25 Grams of Weed Look Like, Anyway? A Guide To NYC's New Marijuana Policy, November 11, 2014, at http://nymag.com/daily/intelligencer/2014/11/guide-to-nycs-new-marijuana-policy.html# (last accessed May 22, 2016).  Here, Defendants only claim to have found a single marijuana joint.  Defendant Detective Gladstone does not appear to have noted the weight of that alleged marijuana material in any of the paperwork relating to Plaintiffs' arrests.

Mr. Wade by arresting him for the misdemeanor offense for which there was no probable cause, had had significant consequences.

62.     Because Mr. Wade was charged with a misdemeanor instead of a violation, he was subject to formal arrest proceedings, which included being fingerprinted and photographed.  Generally speaking, an individual faces more serious consequences as a result of formal arrest than receipt of a summons.  For example, the formal arrest process facilitates NYCHA's swift discovery of the incident.  See, e.g., Ari Rosmarin, The Phantom Defense: The Unavailability Of The Entrapment Defense In New York City "Plain View" Marijuana Arrests, 21 J.L. & Pol'y 189, 209-10 ("Under federal law, individuals in New York City arrested for marijuana possession and their families can be evicted from NYCHA housing as a result of their arrests.").

63.     In the past, the frequency with which some police officers erroneously charged individuals with marijuana possession in a public place achieved such renown, it prompted then-NYPD Commissioner Ray Kelly, in September 2011, to issue an internal department order telling officers to stop arresting people for small amounts of marijuana possession, if the marijuana was never in public view.  See NYPD Internal Operations Order No. 49, at http://marijuana-arrests.com/docs/NYPD-ORDER-RE-MARIJUANA-ARRESTS-SEPT-19-2011.pdf (last accessed May 22, 2016).

64.     The seriousness of being arrested as opposed to receiving a summons is also demonstrated by a 1996 Memorandum of Understanding between the NYPD and NYCHA in which the NYPD agreed to provide NYCHA with all arrest reports and complaint reports concerning criminal activity taking place at NYCHA or committed by NYCHA residents.  See New York City Department of Investigation Press Release #41-2015, DOI Issues Report Finding Problems With NYPD And NYCHA's Roles In Controlling Violent And Narcotics Crime And Removing Criminal Offenders From Public Housing, December 2015, at http://www.nyc.gov/html/doi/downloads/pdf/2015/Dec15/pr41nycha_nypd_mou_120815.pdf (last accessed May 22, 2016).

65.     In addition, NYPD Patrol Guide 214-07 holds that whenever any member of the service "effects an arrest of a [NYCHA] resident sixteen years or older pursuant to the execution of a search warrant where contraband is recovered," a Case For Legal Action ("CFLA") Report is prepared in furtherance of NYCHA initiating its "Expedited Eviction Program."  N.Y. Patrol Guide Procedure No. 214-07.

66.     In contrast, because Ms. Daniels received a summons, NYCHA would not have been notified that she was arrested pursuant to the execution of a search warrant during which contraband was found.  That is because a summons is not an

arrest.[2]

67.     Even supposing that NYCHA could learn about the summons written for Ms. Daniels relating to unlawful possession of marijuana, which it appears is not practice or custom, it is also peculiar to note that the Daniels summons was never fully completed.  For example, Defendant Detective Gladstone never fully completed and submitted it with the necessary supporting deposition that Defendant Detective Gladstone completed for Mr. Wade.  In addition, when Defendant Detective Gladstone vouchered the alleged marijuana joint, he failed to mention that Ms. Daniels was found in possession of that evidence and received a summons for it as well.

## Mr. Wade And Ms. Daniels Are Released And Apartment 12B Is Padlocked For Months

68.     Eventually, Defendants released Mr. Wade and Ms. Daniels from the 84th Precinct.  Defendants released Mr. Wade and Ms. Daniels both at the same time. An officer apologized for their trouble and suggested, in sum and substance, that they

---

[2] It should be noted that, for the purposes of considering why Defendant Gladstone treated Mr. Wade and Ms. Daniels so differently, it is irrelevant that the search warrant was executed at Apartment 12B and not the Daniels Apartment, as the New York Patrol Guide Procedure No. 214-07 expressly states that "[f]or the purposes of [preparing the CFLA] it should be noted that a resident of public housing can still be subject to the provisions of this program even though . . . the 'triggering incident' (i.e., arrest pursuant to the execution of a search warrant where contraband is recovered . . .) occurs in a housing development other than the one in which the resident lives." N.Y. Patrol Guide Procedure No. 214-07.

"look out for whoever is out to get them."  On information and belief, this was meant to be an allusion to the fact that an "anonymous phone call" had triggered the investigation that Mr. Wade and Ms. Daniels were running a cocaine trafficking operation out of Apartment 12B.

69.    When Mr. Wade and Ms. Daniels returned to Apartment 12B late on July 17, 2014, they found a NYCHA padlock on the door.  On information and belief, this was not because NYCHA had at that moment already begun an eviction proceeding against Mr. Wade and Ms. O'Connor due to the perceived drug-related activity, although NYCHA's knowledge of Mr. Wade's arrest did prejudice him later.[3] Instead, on information and belief, NYCHA had padlocked Apartment 12B for the simple reason that Defendants had broken Apartment 12B's door with the battering ram and the door would have otherwise been left wide open.  Then, after affixing the padlock for this purpose, NYCHA gave the padlock keys to Defendants to voucher as Defendants took Mr. Wade and Ms. Daniels away, which Defendant Detective Gladstone allegedly did.

70.    Mr. Wade immediately asked NYCHA management to let him in.

---

[3] Indeed, on information and belief NYCHA never initiated such an eviction proceeding.  In or around September 2014, NYCHA initiated legal action against Ms. O'Connor seeking to terminate her tenancy for her and Mr. Wade's failure to pay NYCHA hundreds, then thousands, of dollars in back rent during the period that Apartment 12B was padlocked.

NYCHA management told Mr. Wade that the padlock keys were with the NYPD as per NYCHA policy and that he should retrieve them from the 84th Precinct.

71.     Mr. Wade returned to the 84th Precinct (this was still July 17, 2014) and asked for the padlock keys which had not been given to him upon his release earlier that day.  Mr. Wade was told that NYCHA was responsible for the keys and that they keys were not in the precinct's property room.

72.     Mr. Wade returned to NYCHA again, but NYCHA repeated the message that NYCHA gave Defendants the padlock keys.

73.     Mr. Wade returned to the 84th Precinct and explained in greater detail his situation.  They told him to seek the keys at Narcotics, triangulating the confusion still further.  Mr. Wade went to Narcotics at Lafayette Gardens as instructed, and they sent him back at various times to the 84th Precinct, NYCHA or both.  As best that Mr. Wade can recollect, he paid roughly ten visits altogether to these three entities and never got an answer about the padlock keys.

74.     Mr. Wade learned much, much later that Defendant Detective Gladstone did voucher the padlock keys.  However, they were not left at the 84th precinct desk which would have allowed Mr. Wade to re-enter Apartment 12B after his release.  On information and belief, Defendant Detective Gladstone vouchered the padlock keys along a telephone and some money which had been seized from Mr. Wade's apartment during the search.

75.     It was not until December 2014, after the charges were wholly dismissed against Mr. Wade, that Mr. Wade was able to successfully request the return of his telephone and $926.  Mr. Wade does not recollect the padlock keys being returned to him even at that late date.

76.     On September 22, 2015, more than one year after the search was executed, Defendant Detective Gladstone filed a "public inventory" of the property seizued during the search with the Kings County Criminal Court.  This was well beyond the requirement noted at the bottom of the public inventory form that it be filed within ten days of the search warrant's execution.  The delay impeded Mr. Wade's criminal defense attorney from being able to help him recover the keys.

77.     By September 22, 2015, Mr. Wade's charges had long been dismissed and NYCHA had already taken Apartment 12B from Ms. O'Connor and transferred it into the possession of an entirely different family.

78.     As an immediate consequence of the lockout, on July 17, 2014, Mr. Wade was rendered homeless and without access to his possessions.

79.     Ms. Daniels was also displaced from Apartment 12B and rendered without access to her possessions there.  Mr. Wade and Ms. Daniels also suffered damages relating to their business.

80.     In or around September 2014, NYCHA initiated a lawsuit against Ms. O'Connor seeking to seize Apartment 12B from her and also to collect back rent

which she and Mr. Wade had not paid during the time Apartment 12B was padlocked.
Mr. Wade owed Ms. O'Connor this back rent as per their agreement, but was unable
to pay it in timely fashion.

81.    On October 28, 2014, the D.A.'s Office reduced the charge against Mr.
Wade to an unlawful marijuana possession violation under N.Y. Penal Law § 221.05.

82.    On December 12, 2014, the state court, on the D.A.'s motion, altogether
dismissed the unlawful marijuana possession violation charges in a favorable
termination to Mr. Wade.

83.    It was around this same time that NYCHA finally removed the padlock
from Apartment 12B.  It is unclear whether or how NYCHA cleared removal of the
padlock with the NYPD after having long taken the position that the padlock could
only be removed once the NYPD released the padlock key.  By that time, NYCHA
claimed that Ms. O'Connor (and thus Mr. Wade by extension) owed nearly $3,000 in
back rent, having failed to pay rent during the many months Apartment 12B was
padlocked and unavailable to them.

84.    By the time NYCHA removed the padlock, Mr. Wade and Ms. Daniels
had had to buy replacements for various possessions that had been trapped inside.  In
addition, Mr. Wade incurred months of utilities-related debt.  For example, Verizon
would not turn off its service to Apartment 12B without being able to enter to
retrieve its fixtures, which the padlock prevented.

85.     After removing the padlock and permitting Mr. Wade to remove his things, NYCHA gave Apartment 12B to other tenants.

**The Search Warrant**

86.     On information and belief, Defendant Detective Gladstone and Defendant Detective Baez fabricated evidence when they obtained the search warrant from a magistrate.

87.     Defendants repeatedly told Mr. Wade and Ms. Daniels that the investigation into their alleged cocaine trafficking operation began when they received an "anonymous call."  Whatever the origin of Defendant Detective Gladstone's and Defendant Detective Baez's efforts to obtain the search warrant, Mr. Wade and Ms. Daniels believe that Defendants did not adequately assure that they had credible, reliable and corroborated evidence about a cocaine trafficking operation being run out of Apartment 12B, and/or that Defendants unreasonably exaggerated the existence of evidence demonstrating such reliability, credibility and truthfulness to the magistrate reviewing the warrant application.

88.     In addition to the fact that the search failed to uncover cocaine trafficking evidence, Mr. Wade and Ms. Daniels allege that the presence of the following facts in support of their allegation that Defendant Detective Gladstone and Defendant Detective Baez improperly obtained the search warrant in this case. Among other things, Mr. Wade and Ms. Daniels allege:

a.  Defendant Detectives' clumsy June 4, 2014 visit to Apartment 12B to investigate an invented domestic violence call would not have been particularly protective of the confidential informant's safety if true cocaine traffickers were running a drug operation at that address.

b.  Defendant Detectives' June 4, 2014 visit revealed Apartment 12B as a place being readied for an inspection to operate as a day care, and not a drug den.

c.  Defendants unreasonably refused to allow Ms. Daniels to cover herself during the search; during her public transport to the precinct; and during her time sitting in a precinct cell.  This seemed to Ms. Daniels to be an intentional attempt to embarrass her.

d.  After Defendant Detectives failed to discover cocaine trafficking contraband in Apartment 12B pursuant to the warrant, they coerced Mr. Wade's mother into consenting to allow them to search the room where Mr. Wade stayed in Apartment 10G "to assure the childrens' safety," yet Defendants were not concerned with the safety of Apartment 10G more generally.

e.  Defendant Detective Gladstone charged Mr. Wade with a misdemeanor marijuana offense for which Defendant Detective Gladstone knew there was no supporting probable cause.  This

erroneous charge required Mr. Wade's formal arrest. Then, Defendant Detective Gladstone properly charged Ms. Daniels with a violation summons based on the same facts.

f.  Defendant Detective Gladstone took the NYCHA padlock keys to Mr. Wade's home, then failed to leave them at the precinct desk/property room for Mr. Wade to pickup and failed to file required paperwork which would have enabled Mr. Wade to track the keys down in a timely fashion.

**Damages**

89.   Plaintiffs suffered damages as a result of Defendants' actions, including deprivation of their liberty, damage to their reputations, abrogation of Ms. Daniels's bodily privacy, loss of shelter without due process to reinhabit the seized premises and related economic damages, back rent owed to Ms. O'Connor, money owed to utility companies like Verizon which would not disconnect services without access to their fixtures, money paid to replace belongings such as telephones and whatever was locked inside Apartment 12B, the damaged washing machine, the damaged floor, a damages couch, emotional trauma, deprivation of a fair trial, and more.

90.   All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of New York, including, without limitation, the inadequate screening, hiring, retaining, training and supervising of its employees,

and due to a custom, policy and/or practice of: arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

91.    The aforesaid incident is not an isolated incident.  The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York as well as in New York State courts.  As a result, Defendant City of New York is aware (from said lawsuits as well as notices of claims and complaints filed with the NYPD's Internal Affairs Bureau and the CCRB) that many NYPD officers, including the Defendants, arrest individual persons in order to meet productivity goals and arrest quotas; arrest individuals for professional advancement, overtime compensation and/or other objectives outside the ends of justice; and/or falsely arrest individuals and engage in a practice of falsification of evidence in an attempt to justify the false arrest.

92.    The Honorable Jack B. Weinstein, United States District Judge for the Eastern District of New York, has written that

> [i]nformal inquiry by the [C]ourt and among judges of this
> [C]ourt, as well as knowledge of cases in other federal and
> state courts, has revealed anecdotal evidence of repeated,
> widespread falsification by arresting police officers of the
> [NYPD] . . . [T]here is some evidence of an attitude among
> officers that is sufficiently widespread to constitute a
> custom or policy by the [C]ity approving illegal conduct of
> the kind now charged.

Colon v. City of N.Y., Nos. 9 Civ. 8, 9 Civ. 9, 2009 WL 4263362, at *2 (E.D.N.Y.

November 25, 2009).

93.     Former Deputy Commissioner Paul J. Browne, as reported in the press

on January 20, 2006, stated that NYPD commanders are permitted to set

"productivity goals," permitting an inference of such a custom or policy encouraging

deprivations of individuals' constitutional rights in cases such as this one.

94.     Defendant City of New York is thus aware that its improper training and

customs and policies have often resulted in a deprivation of individuals' constitutional

rights.  Despite such notice, Defendant City of New York has failed to take corrective

action.  This failure caused Individual Defendants in this case to violate Plaintiffs'

constitutional rights.

95.     Moreover, on information and belief, Defendant City of New York was

aware, prior to the incident, that the Individual Defendants lacked the objectivity,

temperament, maturity, discretion and disposition to be employed as police officers.

Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train and supervise them.

96.     All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

97.     All of the aforementioned acts deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

98.     The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as police officers, with the entire actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYPD, all under the supervision of ranking officers of said department.

99.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

100.    As a result of the foregoing, Plaintiffs are entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## FIRST CLAIM
## 42 U.S.C. § 1983

101.    Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

102.    Defendants, by their conduct toward Plaintiffs alleged herein, violated Plaintiffs' rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

103.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

104.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

105.    Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

## SECOND CLAIM
## UNREASONABLE SEARCH

106.    Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

107.    Considering the facts of this case as presently known and upon further discovery, on information and belief, it would not appear to an objectively reasonable police officer that there was a fair probability that the item or category of items identified for seizure would be in the apartment.   As a consequence, Defendants violated Plaintiffs' Fourth Amendment right to be free from unreasonable search.

108.    In particular, an objectively reasonable police officer visiting Apartment 12B on June 4, 2014, and observing the space, which was being prepared for a visit by Social Services, would not have believed that there was a fair probability that cocaine trafficking evidence was inside.

109.    Also, an objectively reasonable police officer who had diligently monitored the comings and goings of other people from Apartment 12B separate and apart from the CI's purported controlled visits, would not have believed that there was a fair probability that cocaine trafficking evidence would have been uncovered, as there was no traffic to and from Apartment 12B that would have supported a belief that a drug operation of any size was running out of it.

110.    On information and belief, Defendant Detective Gladstone and Defendant Detective Baez unreasonably looked past some of the clear facts before

them, or unreasonably failed to adequately observe aspects of Apartment 12B and its occupants that would have provided them with the minimum amount of evidence necessary to properly corroborate the CI's alleged reports about controlled buys of cocaine, and misrepresented them when making a warrant application to a neutral magistrate.

111.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with deliberate indifference, recklessly, and/or maliciously with the specific intent to deprive Plaintiffs of their constitutional rights.

112.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## THIRD CLAIM
## UNREASONABLE MANNER OF SEARCH/DUE PROCESS/CRUEL AND UNUSUAL PUNISHMENT STANDARDS (BUT NOT THE EIGHTH AMENDMENT ITSELF)

113.    Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

114.    Defendants' violated Ms. Daniels's rights under the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution by violating her right to privacy in her unclothed or partially unclothed body.

115.    Under one constitutional theory, a police officer demonstrates an unreasonable manner of conducting a search under the Fourth Amendment, even if that search is otherwise justified due to probable cause or reasonable suspicion, when the exposure of a searched or seized person's is arbitrary and thus abrogates the searched or seized person's elementary/fundamental notions of personal dignity and/or self-respect.  It is not just police officers whose viewing of a seized or searched person's body violates that person's interests in this respect, it is also third parties' involuntarily viewing of the person who those officers expose knowing that circumstances are such that that is likely to happen.

116.    Under another constitutional theory, a police officer violates due process of law when he deprives an individual of one's privacy by virtue of an arbitrary intrusion.  To the extent that Ms. Daniels's claim relating to Defendants' violation of her constitutional right to bodily privacy rests upon due process principles, it is true that there is some interplay between the due process discussion and Fourth Amendment principles relating to her reasonable expectation of privacy which I have just discussed.  That is because the security of one's privacy against arbitrary intrusion is basic to a free society and thus "implicit in the concept of ordered liberty" embraced by the Fourteenth Amendment's Due Process Clause.

117.    Yet another constitutional theory supports Ms. Daniels's complaint regarding Defendants' refusal to let her cover herself, leaving her body exposed for a

significant length of time to Defendants' and third parties' eyes.  Although the Eighth

Amendment's standards relating to cruel and unusual punishment do not directly

apply to detainees like Ms. Daniels, those standards are often incorporated by

reference to protect detainees pursuant to due process principles.  In this respect,

Defendants' actions in refusing Ms. Daniels's repeated requests to cover her body

occasioned an unconstitutionally deliberate, gratuitous exposure of Ms. Daniels as a

nude detainee to Defendants themselves and third parties.  Although it is true that a

detainee's privacy interests, like a convicted inmate's privacy interests, must bend to

legitimate state interests, here Defendants had no claim to any such interest being

furthered.

118.    Defendants' unlawful actions in violating Ms. Daniels's bodily privacy, as

explained herein, were committed under color of state law, were done willfully,

knowingly, with deliberate indifference, recklessly, and/or maliciously with the

specific intent to deprive Plaintiff Ms. Daniels of her constitutional rights.

119.    As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs sustained the damages hereinbefore all

## FOURTH CLAIM
## MALICIOUS PROSECUTION

120.    Plaintiffs repeat and re-allege each of the preceding allegations contained

in this Complaint with the same force and effect as if fully set forth herein.

31

121.    Defendants, by their conduct toward Plaintiffs alleged herein, violated Mr. Wade's rights guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States.

122.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Mr. Wade of his constitutional rights.

123.    Defendant Detective Gladstone maliciously commenced criminal proceedings against Mr. Wade knowing that he did not have corresponding probable cause, and knowing that the underlying facts could have only justified a lesser charge.

124.    Eventually, Mr. Wade obtained a favorable termination on the charges.

125.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## FIFTH CLAIM
## MALICIOUS PROSECUTION

126.    Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

127.    Defendants, by their conduct toward Plaintiffs alleged herein, violated Mr. Wade's rights guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States.

128.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Mr. Wade of his constitutional rights.

129.    Defendant Detective Gladstone maliciously commenced criminal proceedings against Mr. Wade knowing that he did not have corresponding probable cause, and knowing that the underlying facts could have only justified a lesser charge.

130.    Eventually, Mr. Wade obtained a favorable termination on the charges.

131.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## SIXTH CLAIM
## PROCEDURAL DUE PROCESS

132.    Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

133.    Defendants' violated Plaintiffs' Procedural Due Process rights.

134.    As herein described, Mr. Wade had a property interest in Apartment 12B as well as its contents.  Ms. Daniels had a property interest in the contents of Apartment 12B as well.   Among other things, not only was Mr. Wade an actual tenant of Apartment 12B and the owner of its contents, Mr. Wade had an expectation of a property interest in Apartment 12B by virtue of his, Ms. O'Connor's and

NYCHA's conversations that Mr. Wade could take over Ms. O'Connor's lease of Apartment 12B.

135.    Defendants' treatment and handling of the NYCHA padlock keys and Mr. Wade's inquiries with respect thereto, did not provide Plaintiffs with adequate process by which Defendants can claim to have constitutionally deprive them of the aforementioned interest.

136.    Defendants' unlawful actions in violating Plaintiffs' Procedural Due Process rights, as explained herein, were committed under color of state law, were done willfully, knowingly, with deliberate indifference, recklessly, and/or maliciously with the specific intent to deprive Plaintiffs of their constitutional rights.

137.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## SEVENTH CLAIM
## FABRICATION OF EVIDENCE AND DENIAL OF CONSTITUTIONAL RIGHT TO FAIR TRIAL

138.    Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

139.    The Individual Defendants created false evidence against Plaintiffs both in terms of the location of the alleged marijuana cigarette and also in terms of whether Mr. Wade possessed it in a public place.  This latter allegation is at least true in

Defendant Detective Gladstone's implicit representation, later disproved through examination of the supporting record, that Mr. Wade allegedly possessed the material in a public place.

140.    Defendants forwarded this fabricated evidence to prosecutors in the District Attorney's Office in the case of Mr. Wade.

141.    In creating false evidence against Plaintiffs likely to influence a jury's decision, and in forwarding false evidence to prosecutors, the Individual Defendants violated Plaintiffs' constitutional right to a fair trial under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

142.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

143.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## EIGHTH CLAIM
## FAILURE TO INTERVENE

144.    Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

145.    Individual Defendants actively participated in the aforementioned unlawful conduct but also observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

146.    Accordingly, Individual Defendants who failed to intervene violated the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

147.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

148.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## NINTH CLAIM
## MONELL CLAIM

149.    Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

150.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

151.    The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited

to, the inadequate screening, hiring, retaining, training and supervising of its employees that was the moving force behind the violation of Plaintiffs' rights as described herein.  As a result of the failure of the Defendant City of New York to properly recruit, screen, train, discipline and supervise its officers, including the Individual Defendants, Defendant City of New York has tacitly authorized, ratified and has been deliberately indifferent to, the acts and conduct complained of herein.

152.   The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to: arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

153.   The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City of New York and the NYPD constituted deliberate indifference to Plaintiffs' safety, well-being and constitutional rights.

154.   The foregoing customs, polices, usages, practices, procedures and rules of Defendant City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiffs as described herein.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiffs respectfully request the following relief:

A. An order entering judgment for Plaintiffs against Defendants on each of their claims for relief;

B. Awards to Plaintiffs for compensatory damages against all Defendants, jointly and severally, for their violation of the Fourth, Fifth, Sixth and Fourteenth Amendment rights of Plaintiffs, the amount to be determined at jury trial, which Plaintiffs respectfully demand pursuant to FRCP 38;

C. Awards to Plaintiffs of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to the constitutional rights and welfare of Plaintiffs, the amount to be determined at jury trial, which Plaintiffs respectfully demand pursuant to FRCP 38;

D. Awards to Plaintiffs of the costs of this action, including reasonable attorneys' fees;

E. Such further relief as this Court deems just and proper.

DATED:   May 23, 2016
         New York, New York


                                        _____/s_____
                                        Ryan Lozar
                                        305 Broadway, 10th Floor
                                        New York, New York 10007
                                        (310) 867-1562
                                        ryanlozar@gmail.com

                                        *Attorney for Plaintiffs*