The Law Office of Ryan Lozar, P.C.
305 Broadway, 10th Floor, New York, NY 10007
Tel: (310) 867-1562; Fax 1-877-666-4456
ryanlozar@gmail.com



Dear Judge Orenstein:

I represent Plaintiffs in this action and I write to submit this letter motion to compel Defendants to produce certain discovery.  The Parties have attempted to resolve the matter ourselves through lengthy discussion of a document created by Plaintiffs detailing perceived discovery deficiencies.  Exh. A.  Mr. Cooper and I have successfully resolved 75% of these issues but cannot agree about Defendants' obligation to produce photo array records, PRBM records, lab reports relating to crack-cocaine evidence, and Defendants' and other NYPD members' memo books relating to the dates of the unsuccessful buys, the successful buys and the ruse visit.  Finally, I ask that the Court please excuse me for exceeding its three-page limit.  I edited this various times to focus on the most necessary facts.

###### I.        Factual Background Drawn From Complaint And Fact Discovery To Date

In or around March 2014, Mr. Wade, who lived with his mother Emma Wilkinson in Apt 10G of 192 Sands Street most of his life, moved into his aunt Gloria O'Connor's apartment in the same building, Apt 12B.  Ms. O'Connor had been taking care of a deceased family member's disabled daughter, M.S., in that apartment since the girl's mother had died.  When Ms. O'Connor and M.S. moved from Apt 12B to a house, Ms. O'Connor gave Mr. Wade permission to move in, which he did.  That same month, a NYCHA official visited Mr. Wade in Apt 12B to ask about his tenancy.  At around the same time, Ms. O'Connor and Ms. Wilkinson met with that same NYCHA official and one of her colleagues, about transferring the Apt 12B lease to Mr. Wade's name when Ms. O'Connor's lease expired.

Also around this same time, someone allegedly wrote an anonymous complaint stating that Apt 12B housed sex trafficking and drug trafficking operations, which involved "unknown drugs."  ACS investigated the sex trafficking charge involving M.S., found no information to credit the report, and refused to open a case.  Exh. B.

Defendants began an investigation into the "unknown drugs" half of the anonymous complaint.  NYPD databases showed no other complaints about Apt 12B, although there was a great deal of narcotics and other criminal activity in the building generally.  Exh. C.  For example, there were 21 NITRO complaints for the 140-unit building, 110 possible warrant hits, and more.  An NYPD officer conducting a long-term narcotics investigation at Farragut Houses did not have the matter on his radar, either.

Defendants began to direct a CI to attempt controlled buys of crack cocaine from Apt 12B.  It is not clear why Defendants concluded that the "unknown drug" was crack cocaine.

On the morning of April 23, 2014, Defendants sent the CI to Apt 12B with PRBM.  A sleepy man answered the CI's knock at the door.  The CI asked for "krills."  The sleepy man said

he "wasn't up" and to go away and come back. Krills is allegedly a slang term for crack cocaine. It is not clear whether Defendants viewed this encounter as corroborating the anonymous complaint. Others might say that this sounds like nothing more than a sleepy man shooshing a stranger who wasn't talking sense from his door. Exh. D. (Hereinafter "the krills visit.")

On May 20, 2014, the CI tried again. No one answered the door. Id. at 2.

On June 4, 2014, Defendants paid a ruse visit to Apt 12B to see what they might learn about the crack cocaine trafficking operation by pretending they had received a complaint about a domestic dispute. Ms. Daniels answered the door. She was alone at the time and called Ms. Wilkinson, who came up from Apt 10G. Four officers questioned the women. The four officers left after Ms. Daniels provided her absent boyfriend's name and birth date. Defendants used Mr. Wade's name and birth date to pull a photo of him from a government database ("the Wade photo"). Exh. E.[1]

On June 10 and 17, 2014, there were two more failed buy attempts. Exh. F.

It stands to reason that by this time, three months since the anonymous written complaint had been made, and after many unsuccessful buy attempts, the CI might have thought that Defendants at least implicitly expected him to eventually report a positive buy. In light of the record evidence that there was a great deal of narcotics activity at 192 Sands, the CI could have easily met this implicit expectation at many places besides Apt 12B. Exh. C. In fact, one of Defendants' reports reveals how they randomly encountered a man inside of 192 Sands who looked to them like he dealt contraband and frisked him. Exh. G

On July 2, 2014, Defendants sent the CI into 192 Sands's front doors with PRBM and directions to try Apt 12B again. The CI allegedly reported that a man answered the door and sold him crack cocaine ("the Man"). Exh. H. On July 10, 2014, Defendants sent the CI into 192 Sands's front doors with PRBM and directions to try Apt 12B again. The CI allegedly reported that a woman answered the door and sold him crack cocaine ("the Woman"). Exh. I. On both occasions the seller said the same phrase: "What you need?" and it seemed on both occasions to be understood that the CI could have only been asking for crack, because on both occasions the CI simply asked how much he could get for X amount of money. As described by the CI, the Woman was physically similar to Ms. Daniels. As for the Man, Defendants placed the Wade photo that they had secured as a result of the ruse visit in a photo array, and the CI allegedly positively identified Mr. Wade as the Man. Exh. J.

Defendants applied to a magistrate for a search warrant. The four-page application omitted facts about ACS viewing the sex-trafficking charges in the original complaint to be unsupported; the krills visit; the four unsuccessful buys over the course of three months; the records showing that Apt 12B had never been the subject of any other narcotics complaint, ever; the long-term investigator saying that Apt 12B and Mr. Wade were not under surveillance; and more. Exh. K. All of these facts bear upon the reliability of the CI's alleged reports of two successful buys. The application focused on the two successful buys. It does not appear that Defendants gave the court any additional details orally, either, as a line on the application which

---

[1] Defendants seemed unconcerned that crack cocaine dealers might equate a dubious four-officer house call with a pending bust, jeopardizing the officers' and the CI's safety.

would have incorporated an oral examination into the application is crossed out, and no court reporter was present to take minutes.

On July 17, 2014, Defendants executed the warrant.  Ms. Wilkinson learned what was happening, and she walked upstairs from Apt 10G and asked to take Plaintiffs' children.  Defendants agreed but only if Ms. Wilkinson first consented to their search of Mr. Wade's bedroom in Apt 10G.  Ms. Wilkinson, who saw no other alternative, agreed, and Defendants conducted the search of Apt 10G.  Exh. L (highlighted excerpt from Defendant memo book).

Defendants found no evidence of a crack cocaine trafficking operation in Apt 12B.  A report written days later concluded that "there is no narcotic activity being conducted at the subject location."  Exh. M.

During the search, Defendants allegedly found a small remnant of a marijuana roach.  On this basis, Defendants took Mr. Wade and Ms. Daniels to the precinct to charge them for jointly possessing it.  Defendants gave Ms. Daniels a summons for violating 221.05, but formally arrested Mr. Wade (fingerprints, photo, etc.) for committing a misdemeanor under 221.10 on the same facts.  Compare Exh. N with Exh. O.

Defendants' overcharge of Mr. Wade is curious.  Subsection one of 221.10 criminalizes possession of marijuana in a public place.  Mr. Wade's apartment was not a public place.  In 2011, NYPD Commissioner Ray Kelly's Operations Order 49-11 cautioned against misuse of the public-possession charge.  Exhibit P.  Subsection two of 221.10 criminalizes possession of over 25 grams of marijuana.  The alleged roach does not qualify.  NYPD Patrol Guide § 209-16 offers a joints-to-grams conversion tip:  "Usually 129 marijuana cigarettes DO NOT EXCEED 25 grams."  Exhibit Q at 2 (a copy of Section 209-16 with capital letters in original)).

Mr. Wade's formal arrest required Defendants to deliver Case for Legal Action ("CFLA") paperwork to NYCHA.  CRLA papers can provide the basis for eviction.  Exh. S (copy of Mr. Wade's CFLA cover sheet); Exh. T (copy of NYPD PG § 214-07 with some discussion of CFLA).  Apt 12B was padlocked and remained locked for months.  Mr. Wade never lived there again.[2]

## II.    Plaintiffs Are Entitled To Investigation-Related Discovery

The Parties dispute Plaintiffs' entitlement to certain investigation-related documents.[3]  In particular, the Parties dispute whether Defendants must produce photo array records, PRBM records, NYPD lab reports relating to the crack cocaine allegedly bought at Apt 12B, and Defendants' and other NYPD members' memo books corresponding to the dates of the unsuccessful buys, the successful buys and the ruse visit.

---

[2] In contrast, Ms. Daniels's summons did not require CFLA paperwork (she continues to live in a NYCHA apartment).  Not only that, but Defendants never filed Ms. Daniels's summons at all.  In August 2016, the criminal court, in response to an inquiry made in connection with this litigation, stated that it never received the Daniels summons.  Exhibit R.

[3] These investigation-related records requests do not seek CI identity or records relating to the CI's work history.  Plaintiffs may seek these records eventually, but in light of case law Plaintiffs believe it is more appropriate to approach CI discovery incrementally.

Defendants have argued to Plaintiffs that they are not obligated to produce these records because they pertain to Plaintiffs' judicial-deception claim and Defendants doubt the viability of that claim.  Plaintiffs respectfully disagree.

Plaintiffs principally argue that if Defendants wish to challenge the viability of any particular claim in Plaintiffs' operative pleading, the proper context for such a challenge is in a dispositive motion.  At the same time, Plaintiffs dispute that their challenge to the lawfulness of the search warrant is not viable.  In civil cases challenging the lawfulness of a search warrant, courts apply the same standards as in the context of criminal proceedings.  See Calderon v. City of N.Y., 138 F. Supp.3d 593, 604 (S.D.N.Y. 2015).  Thus, a civil rights plaintiff must show that "(1) the affiant knowingly and intentionally, or with a reckless disregard of the truth, made false statements or omissions in his application for a warrant, and (2) such statements or omissions were necessary to the finding of probable cause."  Id. (citing Franks v. Delaware, 438 U.S. 154 (1978)).

Here, Plaintiffs argue here that the allegations and facts show, in keeping with Franks, that Defendants made omissions in the search warrant application with a reckless disregard for the truth, and that those omissions permitted the probable cause finding.  Plaintiffs allege and the record shows that Defendants omitted facts about ACS viewing the sex-trafficking charges in the original complaint to be unsupported; the krills visit; the four unsuccessful buys over the course of three months; records showing that Apt 12B had never been the subject of any other narcotics complaint, ever; the long-term investigator saying that Apt 12B and Mr. Wade had never come onto his radar; and more.  In the event that the Court wishes to explore whether and to what extent Plaintiffs' allegations and the record satisfy the Franks standard in greater detail, Plaintiffs respectfully request a formal briefing schedule.

### III.    Conclusion

In light of the foregoing, Plaintiffs respectfully request that the Court compel Defendants to produce the photo array records, PRBM records, NYPD lab reports relating to the alleged crack cocaine, and Defendants' and other NYPD members' memo books relating to the dates of the unsuccessful buys, the successful buys and the ruse visit.

Thank you,

Ryan Lozar

Ryan Lozar