UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------

AMBER DANIELS, et al.,

                                    Plaintiffs,

                    -against-

CITY OF NEW YORK, et al.,

                                    Defendants.

------------------------------------------------------------------

**MEMORANDUM OF LAW AND FACT**

**IN SUPPORT OF PLAINTIFF ANTHONY WADE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON HIS MALICIOUS PROSECUTION CLAIM AGAINST DEFENDANT JON GLADSTONE, AND HIS RELATED FAILURE TO INTERVENE CLAIM AGAINST DEFENDANT ALEXANDRU ANGHEL AND DEFENDANT JAMES BAEZ**

No. 16 Civ. 190 (PKC) (JO)

Plaintiffs Amber Daniels and Anthony Wade commenced this Section 1983 lawsuit against Defendant City of New York, Defendant NYPD Detective Jon Gladstone, Defendant NYPD Sergeant Alexandru Anghel and Defendant Detective James Baez, alleging that Defendants violated their rights under the United States Constitution.  See Am. Compl.  In this motion and related papers, Mr. Wade moves for partial summary judgment on his malicious prosecution claim against Defendant Gladstone, and on his related failure-to-intervene claim against Defendants Anghel and Baez.  As to the balance of Plaintiffs' claims, they believe that

1

they present genuine issues of material fact for a jury to decide, and this motion for partial summary judgment thus does not address those other claims.[1]

## I.  Statement of Facts

In 2013 and 2014, Plaintiffs both resided at Farragut Houses, a NYCHA housing development.  Exh. 1 at 26:16; Exh. 2 at 17:24.  Mr. Wade's mother, Emma Wilkinson, lived at 192 Sands Street, Apartment 10G, for decades and Mr. Wade lived with her there for most of his childhood and adult life.  Exh. 2 at 23:7-13.  He attended school at New York City College of Technology and worked for a moving company.  Exh. 2 at 37:7-38:6.  Ms. Daniels, who has a bachelor's degree in early childhood education, lived at 237 Nassau Street (the building next door) in Apartment 5E with her husband and children for approximately three years, where she owned and operated a licensed, year-round daycare for the families of Farragut Houses.  Exh. 1 at 16:23-25, 20:7-21:10, 24:1-26:5.

Mr. Wade's aunt Lavern Wilkinson and her special needs daughter Macalia also lived at 192 Sands Street, in Apartment 12B.  Exh. 2 at 16:21-17:5.  In 2013, Lavern Wilkinson died, and another family member, Gloria O'Connor, who lived in her own home nearby, assumed the lease and she and Emma Wilkinson cared for Macalia there.  Exh. 2 at 20:4-25.  In or around December 2013, Ms. O'Connor found it preferable to care for Macalia at her own home; Mr. Wade began to live in Apartment 12B and make improvements; and Emma Wilkinson, Gloria O'Connor and Mr. Wade took steps with NYCHA for Mr. Wade to take over the lease from O'Connor when it came up for renewal.  Exh. 2 at 18:13-20:25, 21:20-23.

---

[1] Insofar as Defendants file their own summary judgment motion relating to the balance of the claims, Plaintiffs will respond in opposition according to the Court's related scheduling order. These papers are submitted in support of Mr. Wade's partial summary judgment motion only.

Also in 2013, Mr. Wade and Ms. Daniels met and began a relationship. Exh. 2 at 15:19. By that time, Ms. Daniels and her husband had separated but continued to live together in Apartment 5E for reasons relating to finances and children. In late 2013/early 2014, Mr. Wade and Ms. Daniels began to plan to live together and move the daycare to Apartment 12B. Exh. 1 at 20:7-21:10, 24:1-26:5; Exh.2 at 43:21-45:4. They began to renovate Apartment 12B in anticipation of the related license inspection, for example, putting foam on hard pipes so that they would not be hot to the touch of children's hands, installing new tiles on the floors, installing a washing machine, etc. Exh. 1 at 33:3-24; Exh. 2 at 44:13-22.

In May 2014, Ms. Daniels suspended full-time daycare operations at Apartment 5E and spoke to Children and Family Services about setting the inspection for the daycare to operate at Apartment 12B. Exh. 1 at 26:5-16, 27:1-13; Exh. 2 at 44:14-45:4.

Ms. Daniels would often spend the night at Apartment 12B and, on July 17, 2014, at approximately 7:00 a.m., Ms. Daniels and Mr. Wade were sleeping in the rear bedroom of Apartment 12B at 192 Sands Street, with their children asleep in the adjacent kids' bedroom, when armed Defendants and other NYPD Officers burst into the home. Exh. 1 at 39:1-43:14, 54:12-57:12; Exh. 2 at 44:7-59:20; Exh. 22-26 (memo books noting 6:30am to 7:00am execution). Ms. Daniels and Mr. Wade awoke to guns in their faces and their childrens' screams of distress. Exh. 1 at 54:12-21; Exh. 2 at 49:1-11, 50:20-51:11. Defendants claimed to have a no-knock search warrant for Apartment 12B authorizing them to search for evidence of a crack cocaine trafficking operation.[2] Exh. 1 at 60:15-20. After searching the home for hours, at times with dogs, Defendants found no evidence of crack cocaine trafficking.

---

[2] Again, Plaintiffs' case also contains claims alleging, among other things, that the fact and manner of Defendants' search of Apt. 12B violated their rights. These claims are not the subject

However, Defendants did find a single marijuana cigarette in the rear bedroom of Apartment 12B where Wade and Daniels were sleeping. Exh. 1 at 57:10-58:19; Exh. 2 at 59:19-20; Exh. 3 at 122:3-5, 137:21, 138:7; Exh. 10 at DEF83. Defendants claim it was sitting on the windowsill, while Plaintiffs claim it was in an ashtray under the bed, but all Parties agree that Defendants found a single marijuana cigarette in the rear bedroom. Exh. 1 at 57:13-58:16; Exh. 2 at 124:11-125:9; Exh. 3 at 122:3-5.

Defendant Gladstone performed a field test on the single marijuana cigarette, and estimated that the one marijuana cigarette weighed less than 1/8 of an ounce. Exh. 10 at DEF83. Defendant Anghel approved the field test report with that estimate. Id. Defendants transported Ms. Daniels and Mr. Wade to the precinct to charge them both for possessing the marijuana cigarette. Exh. 1 at 68:6-9.

Defendant Gladstone issued Ms. Daniels a violation summons for simple possession of the single marijuana cigarette under Section 221.05, but did not fingerprint or photograph her. Exh. 9; N.Y. Pen. L. § 221.05. Defendant Gladstone did fingerprint and photograph Mr. Wade, and charged him with something different on the same facts—an aggravated marijuana possession misdemeanor under Section 221.10(1). See N.Y. Pen. L. § 221.10(1) (stating it is unlawful to possess marijuana in a public place); Exh. 6 (Mr. Wade's arrest report); Exh. 7 (Mr. Wade's OLPA); Exh. 8 (Mr. Wade's Desk Appearance Ticket); Exh. 12 (Mr. Wade's Kings County DA's Office file); Exh. 13 (Mr. Wade's Case for Legal Action file relating to NYCHA's qualifying-crime eviction program); Exh. 14 (Mr. Wade's Kings County Criminal Court file);

---

of this motion for partial summary judgment. To the extent that Defendants move to dismiss these and other claims brought by Plaintiffs in a defense summary judgment motion, Plaintiffs will respond in opposition separately and according to the Court's schedule.

Exh. 17 (evidence vouchers for Mr. Wade's mail with Apartment 12B address, and keys for the padlock placed on Apartment 12B's door).

Simple marijuana possession is a violation under New York Penal Law § 221.05, and is not a fingerprintable or photographable offense. See N.Y. Pen. L. § 221.05; N.Y. Crim. P. L. § 160.10(1) (stating that arresting officers must take fingerprints for listed offenses which do not include violations like Section 221.05). Aggravated marijuana possession is a class B misdemeanor under New York Penal Law § 221.10, and misdemeanors are fingerprintable and photographable offenses. See N.Y. Pen. L. § 221.10; N.Y. Pen. L. § 160.10(1). Marijuana possession is aggravated and can be a misdemeanor when it occurs in a public place, see N.Y. Pen. L. § 221.10(1), but "rooms or apartments designed for actual residence" are not public places, N.Y. Pen. L. § 240.00(1). Marijuana possession can also be aggravated and a misdemeanor when the weight of the marijuana exceeds twenty-five grams. See N.Y. Pen. Law § 221.10(2).

In 2011, the NYPD issued Operations Order 49 to guide "the processing of certain marihuana arrests" and provides, for example, that if an individual does not possess marijuana in a public place, "it is a violation of Penal Law section 221.05—Unlawful Possession of Marihuana, a violation[,] not Penal Law section 221.10(1)—Criminal Possession of Marihuana in the 5th degree, a class B misdemeanor[,]" Exh. 15 (emphasis in original), and directs that under such circumstances "uniformed members of the service must charge the violation[,]" id. (emphasis added). Operations Order 49-11 further notes that, "[a]s a general matter, the defendant is entitled to a criminal court summons for the violation Unlawful Possession of Marihuana." Id. NYPD Patrol Guide Procedure Number 208-03 for "Arrests-General Processing" also cautions that an individual should not be charged with aggravated marijuana

possession in a public place under Section 221.10(1) if the individual did not, in fact, possess marijuana in a public place; cites to New York Penal Law § 240.00's definition of a public place; directs officers to conform their arrest charges to Operations Order 49-11; and indicating that compliance with Operations Order 49-11 should be verified in the precinct command log. Exh. 19 at PL69.

In terms of weight-based aggravated possession, NYPD Patrol Guide Procedure Number 209-16 for "Service of Summons-Special Procedure" stresses that officers must hew to Section 221.10(2)'s threshold of twenty-five grams to qualify, and explaining that "marijuana gram content of each cigarette determines cumulative weight. Usually 129 marijuana cigarettes DO NOT EXCEED 25 grams." Exh. 16 at PL37 (emphasis in original).

Despite knowing that the single joint was recovered in the rear bedroom of a private apartment, Defendant Gladstone fingerprinted, photographed and charged Mr. Wade with a Section 221.10 misdemeanor anyway. Exh. 8; Exh. 10 at DEF83. Defendant Gladstone testified that he was Mr. Wade's arresting officer and was responsible for forwarding the Section 221.10(1) charge against Mr. Wade to the District Attorney's Office. Exh. 3 at 138:17-139:2; Exh. 6 at DEF4. At deposition, Gladstone testified that it was not proper to charge Mr. Wade under Section 221.10(1), Exh. 3 at 139:17-140:16, and that he knew this and forwarded it to the Kings County District Attorney's Office anyway, Exh. 3 at 140:22-141:6. Gladstone testified that he did not correct the incorrect Section 221.10(1) overcharge against Mr. Wade because it would have taken time to void and re-do and he did not want to cause Mr. Wade delay. Exh. 3 at 169:24-172:7; Exh. 7 (Wade OLPA). Strangely, though, Mr. Wade's command log entry states that the issuance of the DAT already constituted a revision from something else. Exh. 11 ("revision to DAT 243"); see Exh. 8 (copy of DAT 243).

6

About an hour before Defendant Gladstone issued Mr. Wade a Section 221.10(1) DAT, Defendant Baez vouchered the single marijuana cigarette as evidence of a Section 221.10 misdemeanor. He also entered Mr. Wade's arrest report for a Section 221.10(1) misdemeanor into the NYPD system. Exh. 5 at 164:11-166:10, 168:18-170:4; Exh. 6 at 4; Exh. 10 at DEF859-860. Baez testified that he had been trained that Section 221.10(1) was a proper charge on such facts, Exh. 5 at 166:6-7; Exh. 24 at DEF200 (Baez writing 221.10 next to Mr. Wade's name in his memo book), but in any event denied that he had any obligation to flag an overcharge, stating "I'm not a supervisor—supervisor is in charge of the charges." Exh. 5 at 177:24-25.

Gladstone's and Baez's supervisor that day was Defendant Anghel, who testified that he was responsible for checking paperwork to ensure it was properly completed. Yet he approved all the paperwork improperly charging Mr. Wade with the Section 221.10 misdemeanor. Exh. 4 at 18:23-19:13, 164:15-19; Exh. 6 at DEF4; Exh. 12 at DEF753-754 (copy of DAT investigation forwarded to DA's Office). Defendant Anghel testified that Mr. Wade was properly charged for possession in a public place under Section 221.10(1) because "[a]t the time we went to the apartment, it was in public view"; that Operations Order 49-11 "has nothing to do with the penal law charge" because "[i]t is basically giving you a different guide than the penal law how to charge people"; and that the only reason Ms. Daniels received a violation summons was because she benefitted from Defendants' use of their discretion to be lenient with her. Exh. 4 at 167:3-168:1, 169:11-20; Exh. 6 at DEF4; Exh. 10 at DEF860. Defendant Anghel also endorsed the command log entries corresponding to Mr. Wade's receipt of the DAT charging him with the 221.10 misdemeanor DAT, Exh. 11, where NYPD Patrol Guide No. 208-03 indicates he should have verified compliance with Operations Order 49-11, Exh. 19 at PL69.

After Mr. Wade and Ms. Daniels were released from the precinct, they found Apartment 12B to be padlocked. Exh. 2 at 80:23-24. The keys were vouchered by the NYPD, and not released for four to five months. Exh. 2 at 88:15-23; Exh. 3 at 126:16-17; Exh. 17. A NYCHA maintenance man took pity on Wade and Daniels and allowed them to undo the metal plate on the door to which the padlock was affixed so that they could retrieve their most basic personal possessions. Exh. 1 at 75:21-77:2. The door was re-secured, and Wade and Daniels were homeless. Exh. 1 at 78:1-23; Exh. 2 at 27:11-27. Homeless services placed them at different shelter facilities; the planned daycare enterprise died; and their relationship ended. Exh. 1 at 77:14-25, 79:1-3; 88:1-19; 88:22-89:5; Exh. 2 at 16:2-12, 27:11-25.

Defendant Gladstone commenced the Section 221.10 criminal overcharge against Mr. Wade by sending the arrest and DAT paperwork to the DA's Office. Exh. 12 (copy of the Wade DA's Office file). This in turn caused a Case for Legal Action (CFLA) to be filed with NYCHA notifying the agency that Mr. Wade had been arrested on July 17, 2014, and charged with a Section 221.10 misdemeanor. Exh. 13 (copy of CFLA filing showing supporting evidence vouchers printed on August 8, 2014). The CFLA program targets NYCHA residents who have been arrested for qualifying crimes for possible eviction. Exh. 27 at PL47-48; see Exh. 19 at DEF65 (stating that the arresting officer complies with CFLA if applicable).

On October 12, 2014, Ms. Daniels went to court for the return date on her summons, and found that Gladstone failed to submit the summons altogether, or submitted deficient paperwork. Either way, Ms. Daniels was told she had no charge to answer for. Exh. 1 at 80:5-24; Exh. 9. No CFLA action was filed against Ms. Daniels in connection with her violation summons despite the fact that her address was at 257 Nassau Street right next door, also a NYCHA property. Exh. 27 (noting that the CFLA applied to NYCHA residents regardless of whether the triggering event

occurred in their own apartment).  On August 9, 2016, in the context of this litigation, Kings

County Criminal Court issued a form letter in response to an inquiry stating that no legally

acceptable accusatory instrument had been filed against Ms. Daniels.  Exh. 9 at DEF108.

Despite testifying that he could have voided the overcharge against Mr. Wade, Defendant

Gladstone never corrected the overcharge despite having ample opportunity to do so.  Exh. 3 at

172:1-3; see Exh. 18 at PL35 (providing a template letter for providing notice of summons

correction).  For example, after releasing Mr. Wade on July 17, 2014, Gladstone worked another

four hours but did not fix the overcharge.  Exh. 22 at DEF60.  On July 20, 2014, three days after

the knowing overcharge, Defendant Gladstone wrote a report about the events of July 17, 2014,

and again recorded that Mr. Wade was charged under Section 221.10, but did not fix the error.

Exh. 28.  Although Defendant Gladstone was required to report to the court relating to the search

warrant results within ten days of executing the warrant, he instead waited for more than a year,

and on that paperwork he again noted that Mr. Wade had been the subject of full arrest.  Exh. 20.

On or about October 28, 2014, the DA's Office declined to prosecute the Section 221.10

charge commenced against Wade by Gladstone and drafted a complaint with just a Section

221.05 violation charge.  Exh. 12 at DEF761 (showing that the screening was printed on Oct. 28,

2014); id. at DEF763 (Oct. 28, 2014, charging instrument for a Section 221.05 violation); Exh.

14 (criminal court file).  But by the time the DA's Office declined to prosecute the misdemeanor,

Apartment 12B had been padlocked for months.  Exh. 2 at 78:14-15, 83:17, 87:19-24.

On November 12, 2014, Mr. Wade appeared in Kings County Criminal Court expecting

to respond to the Section 221.10 charge, and learned that the DA's Office abandoned it and filed

a Section 221.05 violation instead.  Exh. 14 (Wade criminal court file).  Mr. Wade was arraigned

on the Section 221.05 violation.  The judge asked questions and set a new court date.  Exh. 3 at

90:13-20; Exh. 14 at DEF918.  On December 12, 2014, Mr. Wade appeared in court again and

the Section 221.05 violation charge was "dismissed forthwith" under N.Y. C.P.L. § 170.55.

Exh. 14 at DEF913.

It was around this time that the keys to the padlock on Apartment 12B were released to

Mr. Wade.  Exh. 2 at 88:15-23; Exh. 12.  However, NYCHA had already commenced housing

court proceedings to collect back rent for Apartment 12B during the period it was padlocked and

vacant.  Exh. 21.  In addition to the back rent, Mr. Wade also owed money for Apartment 12B

services like cable that were provided during the time of the padlocking.  Exh. 2 at 98:20-21.

Altogether, Mr. Wade accrued thousands of dollars in debt.  Id.

## II. Summary Judgment Standard

Summary judgment may be granted where there is no genuine issue as to any material

fact and the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c).

In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all

factual inferences in favor of the nonmoving party.  See McClellan v. Smith, 439 F.3d 137, 144

(2d Cir. 2006).  "To grant the motion, the court must determine that there is no genuine issue of

material fact to be tried." Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  A

genuine factual issue exists where the "evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some

metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986), or by a factual argument based on "conjecture or

surmise," Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "[What] is required [from a

nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to

require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). "Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).

### III. Argument

#### a. Mr. Wade is entitled to summary judgment against Detective Gladstone on the malicious prosecution claim.

To prevail on a malicious prosecution claim, a plaintiff must prove that "(1) the defendant either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted with actual malice." Posr v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991). The record in this case establishes all four of these elements as a matter of law, entitling Mr. Wade to summary judgment against Detective Gladstone. In terms of damages arising from the malicious prosecution, Mr. Wade suffered substantial interference with his person and property. As described in his complaint and the evidentiary record as stated herein, the misdemeanor overcharge caused him extended homelessness, loss of his personal possessions while his home was unduly padlocked, loss of liberty as he had to report to court on a charge that the DA's Office had by that time declined to prosecute, loss of liberty because his homelessness required him to waste significant time arranging for shelter housing and housing with friends while his home was unduly padlocked, loss of property in the form of money he had to pay in back rent and other bills relating to the padlocked home that the overcharge triggered, as well as the months-long anxiety induced by the

prospect of jail time on misdemeanor overcharge for which there was no probable cause.  Mr.

Wade herein discusses the elements of his malicious prosecution claim in turn.

### i. The criminal proceeding that Detective Gladstone commenced against Mr. Wade terminated in Mr. Wade's favor.

"Favorable termination is not so much an element of a malicious prosecution claim as it

is a prerequisite to commencement of the action." Janetka v. Dabe, 892 F.3d 187, 190 (2d Cir.

1989) (citing Halberstadt v. N.Y. Lif. Ins. Co., 194 N.Y. 1 (1909)).  For the purposes of a

malicious prosecution claim, "New York law does not require a malicious prosecution plaintiff

to prove her innocence, or even that the termination of the criminal proceeding was indicative of

innocence." Rothstein v. Carriere, 373 F.3d 275, 286 (2d Cir.2004) (citing Smith–Hunter v.

Harvey, 95 N.Y.2d 191, 198–99, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000)).  "Rather, the

plaintiff's burden is to demonstrate a final termination that is not inconsistent with

innocence." Id. (quotation omitted).

Under this standard, it is well-settled in the Second Circuit that a prosecutor's declination

to prosecute a particular criminal charge "suffices to establish termination in the plaintiff's favor

notwithstanding that the prosecutor is theoretically capable of resurrecting the prosecution."

Stampf v. LIRR, 761 F.3d 192, 201 (2d Cir. 2014); see McCrary v. Cty of Nassau, 493 F.

Supp.2d 581, 589 n.6 (E.D.N.Y. 2007) ("Under New York law, prior to criminal charges being

filed with a local criminal court, a district attorney may decline to prosecute, in which case, the

action is deemed terminated in favor of the accused and the records are sealed."); Minasian v.

Lubow, 49 A.D.3d 1033, 1035 (3d Dep't 2008) (stating that the prosecutor's refusal to prosecute

a criminal charge was not inconsistent with the plaintiff's innocence and thus constituted a

termination in her favor); Sosa v. City of N.Y., 50 Misc.3d 1203(A), at *6 (N.Y. Sup. Ct., Bronx

Cty., Dec. 22, 2015) (noting that "a prosecutor's declination to prosecute is—for purposes of a

malicious prosecution claim—a favorable disposition on the merits"); see also Janetka, 892 F.2d at 190 (holding that "terminations less favorable than an acquittal have been found to be favorable for purposes of a malicious prosecution claim"); Keller v. Butler, 246 N.Y. 249, 253-54 (1927) (finding favorable termination of a extradition petition where the New York governor refused to extradite an arrestee to Florida on charges); Reit v. Meyer, 160 A.D. 752 (1st Dep't 1914) (finding that a dismissal for failure to prosecute was favorable termination).

Although "[a] termination is not favorable . . . where a prosecution ends because of a compromise with the accused[,]" here, there was no such compromise between Mr. Wade and the prosecutor.  Martinez v. City of Schenectady, 97 N.Y.S.2d 78, 84 (2001).  In October 2014, the District Attorney's Office declined to prosecute the improper Section 221.10 overcharge that Defendant Gladstone commenced without probable cause against Mr. Wade.  Exh. 12.  On November 12, 2014, Mr. Wade appeared in court to find that the Section 221.10 misdemeanor had been abandoned by the prosecutor without having engaged in any negotiation with the government.  See U.S. v. Child & Co., 79 U.S. 232, 239 (1870) (defining a compromise as "an agreement between two or more persons who, to avoid a lawsuit, settle their differences on such terms as they can agree upon").

In many ways Mr. Wade's case calls to mind Janetka v. Dabe, 892 F.2d 187, 188 (2d Cir. 1989), in which the Second Circuit held that the plaintiff's acquittal of resisting arrest (a Class A misdemeanor) was a favorable termination even though he was convicted of the lesser offense of disorderly conduct (a violation).  "To hold that an acquittal does not constitute a favorable termination would be particular inappropriate [on such facts], where the charge for which [the plaintiff] was acquitted was more serious than the one for which he was convicted."  Id. at 190.  "Allowing police officers to add unwarranted misdemeanor charges to valid violation charges

may force an accused to go to trial on the misdemeanor when he otherwise would plead to the violation." Id. In Janetka, the Second Circuit went on to say that the district court's favorable-termination analysis on the acquittal charge incorrectly treated as dispositive whether "the charge resulting in acquittal arose out of events that occurred on the same occasion." Id. According to Janetka, if that were the case, "then police officers could add unsupported serious charges to legitimate minor charges with impunity." Id.; see Posr v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991) (encouraging thoughtful handling of favorable-termination analyses in cases with so-called split verdicts, lest the law permit "an officer with probable cause as to a lesser offense [to] tack on more serious, unfounded charges which would support a high bail or a lengthy detention, knowing that the probable cause on the lesser offense would insulate him from liability for malicious prosecution" on the greater offense); Manbeck v. Micka, 640 F. Supp.2d 351, 374 (S.D.N.Y. 2009) (noting that "a finding of probable cause to arrest as to one charge does not necessarily defeat a claim of malicious prosecution as to other criminal charges that were resolved in the plaintiff's favor," but finding that principle inapplicable in a case in which the charges being compared were of equivalent seriousness).

Here, as in Janetka, the Section 221.05 violation charge and the Section 221.10 misdemeanor charge are not only markedly different in terms of seriousness, they have different elements. The below table makes this point in relatively succinct fashion:

| Penal Law Section | N.Y. Pen. L. § 221.05 | N.Y. Pen. L. § 221.10(1) | N.Y. Pen. L. § 221.10(2) |
|---|---|---|---|
| "A person is guilty of . . ." | "unlawful possession of marihuana when he knowingly and unlawfully possesses marihuana." | "criminal possession of marihuana in the fifth degree when he knowingly and unlawfully possesses . . . marihuana in a public place, as defined in section 240.00 of this chapter, and such marihuana is burning or open to public view[.]" | "criminal possession of marihuana in the fifth degree when he knowingly and unlawfully possesses . . . one or more preparations . . . containing marihuana and the preparations . . . are of an aggregate weight of more than twenty-five grams." |
| Classification. | Violation, which is a non-criminal offense. | Class B misdemeanor. | Class B misdemeanor. |
| Penalties. | Punishable only by a fine, typically not to exceed $100.  N.Y. Pen. L. § 221.05. | Punishable by up to three months' incarceration, N.Y. Pen. L. § 70.15(2), and a fine not exceeding $500, N.Y. Pen. L. § 80.05(2). | Punishable by up to three months' incarceration, N.Y. Pen. L. § 70.15(2), and a fine not exceeding $500, N.Y. Pen. L. § 80.05(2). |

In addition to Mr. Wade experiencing needless, months-long emotional distress knowing that the police brought an improper misdemeanor charge against him for which he faced potential jail time, the comparative seriousness of the misdemeanor overcharge to the violation is highlighted by the months-long seizure of Mr. Wade's apartment that that overcharge triggered.  See Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10, 605 F.2d 1228, 1249-50 (2d Cir. 1979) (It is not just the "inconvenience and expense of appearing in court" on an inflated charge that is concerning, but "perhaps more important, . . . the anxiety induced" and the fact "if others learn that charges have been lodged against the accused," his character is at stake.).  The record demonstrates at least three ways why this damage to Mr. Wade likely would not have occurred, or at least not to the degree that Mr. Wade suffered it, had it not been for Gladstone's overcharge.  First, Ms. Daniels resided at NYCHA, too, but she suffered no adverse action relating to her formal residence at 237 Nassau Street relating to the Section 221.05 violation.  Second, and relatedly, a CFLA and/or padlocking occurs when someone is arrested for

possession of contraband found during search warrant execution, and receiving a summons is not an arrest. Exh. 27; Kargbo v. Furno, No. 15 Civ. 7101 (ERK) (VMS), 2016 WL 4179367, at *1 (E.D.N.Y. Aug. 5, 2016) (noting that the plaintiff "was not arrested and that he simply received a criminal summons") (emphasis in original); People on Complaint of James v. Powell, 40 Misc.2d 593, 556 (N.Y.C. Crim. Ct. Oct. 4, 1963) ("A summons in a criminal case is not an arrest.  It is a forcefully worded 'invitation to attend.'").  Indeed, a Section 221.05 violation is not even a fingerprintable offense.  Exh. 15 ¶ 4; see N.Y. Crim. P. L. § 160.10(1).  Third, had Mr. Wade received a Section 221.05 violation summons, he could have resolved it and regained access to Apartment 12B on a more expedited basis because the return date on summonses issued on July 17, 2014, was one month sooner that the return date for Mr. Wade's DAT.  Exh. 8; Exh. 9.

Exploring for the sake of argument that the Section 221.05 possession violation could theoretically have been brought in one charging instrument as a lesser included offense of the Section 221.10 aggravated possession misdemeanor, this fact still does not remove Mr. Wade's case from Janetka's application because the charges were never in fact brought together in the same proceeding.  See Ostroski v. Town of Southold, 443 F. Supp.2d 325, 337 (E.D.N.Y. 2006) (discussing whether to perform a charge-specific favorable-termination analysis is a fact-specific inquiry guided by whether a case raises concerns about malicious overcharging); Goree v. Gunning, 738 F. Supp. 79, 82 (E.D.N.Y. 1990) (recognizing that performing a charge-specific favorable-termination analysis should be informed by policy concerns against malicious overcharging, but denying favorable termination because, among other things, the charges under review were prosecuted on a single charging instrument before the jury).  Under New York Criminal Procedure Law § 40.40(1), the DA's Office's declination to prosecute the Section 221.10 misdemeanor, and to proceed only on the Section 221.05 violation, is important because

in New York State "[w]here two or more offenses are joinable in a single accusatory instrument against a person by reason of being based upon the same criminal transaction," they must be joined together because the un-joined charge cannot later be brought in a separate prosecution. N.Y. Crim. Pro. L. § 40.40(1); see DiBlasio v. City of N.Y., 102 F.3d 654, 659 (2d Cir. 1996) (discussing how "[i]n joining [greater and lesser included offenses] against [the plaintiff] in one [charging instrument], the prosecution was following a practice approved, if not required, by the State"); People v. Abbamonte, 43 N.Y.2d 74, 81 (1977) (noting the general rule established by New York Criminal Procedure Law that a person "may not be separately prosecuted for two offenses based upon the same act or criminal transaction"); People v. Mercado, 181 Misc. 2d 614, 679 (N.Y. Sup. Ct., Bronx Cty., July 6, 1999) (noting that in New York, if a prosecutor has multiple joinable offenses arising out of the same criminal transaction, he must bring them in a single prosecution).

### ii. Detective Gladstone commenced a criminal proceeding against Mr. Wade.

The Second Circuit has long held that under New York law, "the issuance of a DAT sufficiently initiates a criminal prosecution to sustain a claim of malicious prosecution." In Stampf v. LIRR, 761 F.3d 192, 199 (2d Cir. 2014) (citing Rosario, 605 F.2d at 1249-50). In Rosario, the Second Circuit reasoned that

> [when a DAT is issued], the accused bears the inconvenience and expense of appearing in court and, perhaps more important, is subject to the anxiety induced by a pending criminal charge. Moreover, if others learn that charges have been lodged against the accused, his character is no less traduced because the accusation is contained in an Appearance Ticket[.]"

Rosario, 605 F.2d at 1250; see Sosa v. City of N.Y., 50 Misc.3d 1203(A), at *6 (N.Y. Sup. Ct., Bronx Cty., Dec. 22, 2015) ("[C]learly federal law fails to support defendants' position that the

issuance of a DAT is insufficient to initiate a criminal proceeding for purposes of a malicious

prosecution claim."). Here, when Gladstone issued the Wade DAT with the misdemeanor

overcharge and forwarded it to the DA's Office, he commenced a criminal proceeding with that

overcharge. Exh. 8.

> ### iii.   Detective Gladstone's sworn deposition testimony establishes that even as he commenced the criminal proceeding against Mr. Wade, he knew that it was unsupported by probable cause.

On the question of whether Defendant Gladstone lacked probable cause to charge Mr.

Wade under Section 221.10, there is no issue of fact here, as Defendant Gladstone testified under

oath that he did not properly charge the Section 221.10 misdemeanor; that the proper charge

would have been a Section 221.05 violation; that he knew this on the morning of July 17, 2014,

even as he did it; and that he forwarded the overcharge to the DA's Office anyway. Exh. 3 at

138:17-139:2, 140:22-141-6, 169:24-172:7 ; Exh. 6 at DEF4; Exh. 12; see Aguilar v. Imm. &

Customs Enforce. Div. of U.S. Dep't of Homeland Sec., 255 F.R.D. 350, 361 (S.D.N.Y. 2008)

(stating that the defendants' admission that they did not have probable cause for a search "largely

eviscerates any need to consider whether the officers had probable cause"). Even without the

Gladstone admission, it is beyond cavil that the uncontested facts in this case show there was no

probable cause to charge Mr. Wade with any Section 221.10 misdemeanor. For example,

Defendants found the marijuana cigarette in the back bedroom of Apartment 12B. Exh. 3 at

122:3-5. The interior of a twelfth-floor residential apartment's rear bedroom is not a public place

for the purposes of a Section 221.10(1) charge. Exh. 15; Exh. 19 at PL69; N.Y. Pen. L. §

221.10(1); N.Y. Pen. L. 240.00(1); People v. Santos, 46 Misc.3d 1217(A), 2015 WL 521627, at

*5 (N.Y.C. Crim. Ct. Feb. 10, 2015) (noting that the need to dismiss a Section 221.10(1)

aggravated possession charge "seems fairly obvious" on facts where the marijuana cigarette was

"within the confines of the bedroom where both [the arrestee] and the marijuana were found").[3]

Next, the one single marijuana cigarette seized by Defendants didn't support a Section 221.10(2)

charge for aggravated possession of more than twenty-five grams of marijuana, either.

According to the NYPD Patrol Guide, Defendants' seizure of one marijuana cigarette left them

129 marijuana cigarettes shy of meeting the statutory weight threshold. Exh. 16 at PL37

("Usually 129 marijuana cigarettes DO NOT EXCEED 25 grams.") (emphasis in original); see

N.Y. Pen. L. § 221.10(2).  Even without reference to the Patrol Guide's 129-cigarette test,

Defendant Gladstone stated with Defendant Anghel's approval that the cigarette weighed less

than one-eighth of an ounce. Exh. 10 at DEF83.  The Court may take judicial notice that this

means it weighed less than 3.54 grams, which is of course less than 25 grams.[4]  See People v.

Murdough, 20 Misc.3d 1137(A), 2008 WL3877172, at *2 (N.Y.C. Crim. Ct. Aug. 21, 2008)

(dismissing a Section 221.10(2) charge as inapplicable when police field test showing recovery

of less than 3.54 grams of marijuana).

---

[3] Defendant Anghel, the Defendants' supervising officer, seemed to suggest at deposition that if the cigarette was in plain view to officers executing a warrant in the rear bedroom of the twelfth-floor apartment, the cigarette was in a public place pursuant to Section 221.10(1). Exh. 4 at 167:25-168:2.  If this is what Defendant Anghel meant, Plaintiffs contend that this is a novel theory without legal or logical foundation.

[4] See Fed. R. Evid. 201(b); U.S. v. Colquitt, No. 09 Crim. 109 (WHR), 2012 WL 2953062, at *4 n.2 (S.D. Ohio July 19, 2012) (taking judicial notice of ounce-to-gram conversion in drug measurement); U.S. v. Lake, 229 F. Supp.2d 163 (E.D.N.Y. 2002) (same); U.S. v. Goode, No. 88 Crim. 22 (CRR), 1988 WL 13295 (D.D.C. Feb. 2, 1988) (same); see, e.g., U.S. Census Bureau Foreign Trade Statistics Web site, at https://www.census.gov/foreign-trade/www/sec9.html (last accessed July 5, 2017) (stating that the ounce-to-gram conversion multiplier is 28.35, thus .125 ounces is 3.54); Rapid Tables Conversion Calculator, at http://www.rapidtables.com/convert/weight/ounce-to-gram.htm (last accessed July 5, 2017).

### iv. Detective Gladstone commenced the baseless criminal proceedings against Mr. Wade with actual malice.

Showing malice under New York law "does not require a plaintiff to prove that the defendant was motivated by spite or hatred, . . . [r]ather, it means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." Rounseville v. Zahl, 13 F.3d 625, 630 (2d Cir. 1994) (citing Nardelli v. Stamberg, 44 NY2d 500, 502-03 (1978)); Torres v. Jones, 26 NY3d 742, 761 (2016). Stated differently, "a plaintiff need not demonstrate the defendant's intent to do him or her personal harm, but need only show a reckless or grossly negligent disregard for his or her rights." Armatas v. Maroulleti, No. 08 Civ. 310 (SJF) (RER), 2010 WL 4340437, at *15 (E.D.N.Y. Oct. 19, 2010) (citing Ramos v. City of N.Y., 285 A.D.2d 284, 300 (1st Dep't 2001)). "[I]n practice, 'malice' as here conjoined with 'prosecution' often comes to mean conscious falsity.'" Munoz v. City of N.Y., 18 NY2d 6, 9 (1966).

Defendant Gladstone's admission that he knowingly commenced the Section 221.10 misdemeanor overcharge against Mr. Wade with no factual support for it is direct evidence of the "conscious falsity" marking his commencement of the proceeding. See Crews v. Cty of Nassau, No. 06 Civ. 2610 (JFB) (WDW), 2007 WL 4591325, at *10 (E.D.N.Y. Dec. 27, 2007) (noting the direct nature of the plaintiffs' allegation that the defendants knowingly filed a felony complaint containing wrong information). On the same note, New York law considers the lack of probable cause and the presence of malice closely related such that "[a] lack of probable cause generally creates an inference of malice." Boyd v. City of N.Y., 335 F.3d 72, 78 (2d Cir. 2003); see Rentas v. Ruffin, 816 F.3d 214, 219-220 (2d Cir. 2016). Here the relationship between these elements is uniquely powerful due to Gladstone's admission that he knew there was a total lack of probable cause for the misdemeanor overcharge, and a reasonable jury could not conclude that

this falls short of "conscious falsity" or a "reckless or grossly negligent disregard" for Mr.

Wade's rights.  See Cardoza v. City of N.Y., 139 A.D.3d 151, 164 (1st Dep't 2016) ("Actual

malice may also be inferred from a total lack of probable cause, or from defendant's intentionally

providing false information to law enforcement authorities.") (emphases added and citations

omitted); Armatas v. Maroulleti, 2010 WL 4340437, at *15; Munoz , 18 NY2d at 9.

Gladstone's claimed motive for knowingly commencing the misdemeanor overcharge

against Mr. Wade was that it would have taken time to void and re-do it as a violation, and he did

not want to delay Mr. Wade, who he would have had to re-fingerprint.  Exh. 3 at 169:24-172:7.

Setting aside that this makes no sense because a Section 221.05 violation is not a fingerprintable

offense, Gladstone's explanation amounts to an admission of "a wrong [and] improper motive"

for commencing the misdemeanor overcharge without cause because wanting to save a few

minutes in lieu of sparing Mr. Wade months of undue overcharge consequences cannot be said to

show "a desire to see the ends of justice served."  Rounseville, 13 F.3d at 630; Nardelli, 44

NY2d at 502-03.  Black's Law Dictionary defines "justice" as "1. The fair treatment of people.

2. The quality of being fair or reasonable.  3.  The legal system by which people and their causes

are judged; esp., the system used to punish people who have committed crimes.  4. The fair and

proper administration of laws."  Justice, Black's Law Dictionary (10th ed. 2014).   Or, in the

words of District Judge Charles Proctor Sifton of this Court, "both philosophically and

practically justice is defined as treating like cases in like fashion."  Graham v. U.S., No. 91 Civ.

4112 (CPS), 1992 WL 141998, at *7 (E.D.N.Y. June 4, 1992).  It is not possible to describe

Defendant Gladstone's knowing overcharge of Mr. Wade as furthering justice under any of these

constructions.  Here, Defendant Gladstone's failure to correct the overcharge did not promote

"the fair and proper administration of laws," nor did it assure that Mr. Wade was treated in like

fashion to Ms. Daniels. Ms. Daniels's identical case—both she and Mr. Wade were accused of

possessing the exact same cigarette—stands as a stark comparator proving that point.[5]

Furthermore, if Gladstone were truly concerned with stealing more of Mr. Wade's time, there

was nothing stopping Gladstone from later correcting the misdemeanor overcharge after

releasing Mr. Wade.

---

[5] Indeed, this case is unique in the fact that there is such a clean comparator against which to consider the state of mind motivating the Wade overcharge. There can be no credible claim that it was the result of a one-off typo or miscommunication, as Defendants' handling of Wade diverged in repeated, affirmative word and deed from their handling of Daniels. Consider the following ways in which Defendants handled Wade and Daniels differently:

| Defendants' handling of Daniels charge | Defendants' handling of Wade charge |
| --- | --- |
| Charges her with Section 221.05 violation. | Charges him with a Section 221.10 misdemeanor. |
| Does not perform a DAT investigation relating to Ms. Daniels, indicating that Defendants were not considering subjecting her to full custodial arrest. | Performs a DAT investigation to see if Mr. Wade is eligible for it, or whether he must be subjected to full custodial arrest. Exh. 12 at DEF753. |
| Does not complete an omniform arrest report. | Completes an omniform arrest report. |
| Does not fingerprint her. (Section 221.05 violation is not a fingerprintable offense.) | Fingerprints him. |
| Does not photograph her. (Section 221.05 simple possession violation is not a photographable offense.) | Photographs him. |
| Issues her a Section 221.05 simple possession violation summons. | Issues him a Section 221.10 aggravated possession misdemeanor DAT. |
| States on summons that Daniels possessed "one marijuana cigarette" | States vaguely on arrest report that Wade possessed "a quantity of marijuana" |
| Does not file a CFLA against Daniels. | Files a CFLA against Wade. |
| Does not file her Section 221.05 violation summons, or files a faulty one. | Files his Section 221.10(1) DAT and commences a criminal proceeding against him. |

### b. Mr. Wade is entitled to summary judgment against Sergeant Anghel and Detective Baez on Mr. Wade's failure to intervene claim relating to Gladstone's malicious prosecution.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." Id. "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Id.

Here, a reasonable jury could not possibly conclude that Defendant Baez did not have sufficient time to intercede to prevent Gladstone's commencement of the malicious prosecution against Mr. Wade, or that he was incapable of preventing it had he interceded. First, Baez vouchered the single marijuana cigarette as arrest evidence corresponding to the Section 221.10 misdemeanor overcharge against Mr. Wade at roughly 10:39 a.m. on July 17, 2014, one hour before Mr. Wade was issued the related DAT. Exh. 10 at DEF859. If Gladstone's testimony is taken as true that he did not want to void Mr. Wade's overcharge because it would have delayed his release, if Baez had brought the overcharge to Gladstone's or Anghel's attention at 10:39 a.m., there would have been one hour to take appropriate steps to, for example, write a two-page summons. Exh. 9. In addition, Baez entered Mr. Wade's arrest report for the Section 221.10(1) charge into the NYPD's computer. Exh. 6 at DEF4. Baez testified, contrary to Anderson, that it was not his responsibility to intervene, because "I'm not a supervisor—supervisor is in charge of charges." Exh 5 at 177:24-25.

Similarly, a reasonable jury could not possible conclude that Defendant Anghel did not have sufficient time to intercede, or that he was incapable of preventing it had he interceded. Anghel, who testified that it fell to him as supervisor to check that paperwork was properly completed, approved Baez's voucher of the single marijuana cigarette at 10:57 a.m., after having approved Gladstone's remark on the field test that it weighed less than one-eighth of an ounce. Exh. 4 at 18:23-19:13; Exh. 10 at DEF83, DEF860.  Anghel also approved the arrest report charging Wade under Section 221.10(1), Exh. 6 at DEF4, and signed the command log verifying the propriety of the DAT, Exh. 11; Exh. 15; Exh. 19 at PL69 (stating that command log entries verify compliance with marijuana possession charge compliance with Operations Order 49-11).

In light of the foregoing, and incorporating by reference all discussion in this brief regarding why Defendant Gladstone's malicious commencement of the Section 221.10 criminal aggravated marijuana possession misdemeanor against Mr. Wade was unsupported by probable cause and caused Mr. Wade damages to his person and property, Mr. Wade requests that the Court grant him summary judgment on his failure to intervene claims against Defendant Baez and Defendant Anghel as these pertain to his malicious prosecution claim against Defendant Gladstone.

## IV. Conclusion

In light of the foregoing, Mr. Wade respectfully requests that the Court grant his motion for partial summary judgment on his claims for malicious prosecution against Defendant Gladstone, and related failure-to-intervene claims against Defendant Anghel and Defendant Baez.

Dated:          July 6, 2017
                New York, New York


                                    Ryan Lozar
                                    *Attorney for Plaintiffs*
                                    305 Broadway, 10th Floor
                                    New York, New York 10007
                                    (310) 867-1562