UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
AMBER DANIELS and ANTHONY WADE,

                Plaintiffs,

      -against-                              **MEMORANDUM & ORDER**
                                             16-CV-190 (PKC)(JO)
CITY OF NEW YORK, NYPD DETECTIVE
JON GLADSTONE, Shield No. 5165,
individually, NYPD DETECTIVE JAMES
BAEZ, Shield No. 7011, individually, NYPD
SERGEANT ALEXANDRU ANGHEL, Tax
No. 934403, individually, and NYPD JOHN
DOE POLICE OFFICERS 1-10, individually,

                Defendants.
----------------------------------------------------------X
PAMELA K. CHEN, United States District Judge:

       Plaintiffs Amber Daniels and Anthony Wade bring this action against Defendants

Detective Jon Gladstone, Detective James Baez, Sergeant Alexandru Anghel, and Police Officers

John Doe 1-10 of the New York City Police Department ("NYPD"), as well as the City of New

York, alleging numerous violations of 42 U.S.C. § 1983 in connection with their July 17, 2014

arrests and subsequent prosecution.  Before the Court is Defendants' motion for summary

judgment and Plaintiffs' cross-motion for partial summary judgment.  For the reasons stated below,

Defendants' motion is granted in part and denied in part, and Plaintiffs' cross-motion is denied in

its entirety.

# BACKGROUND

## I.    Relevant Facts[1]

### A.  Initial Investigation

On October 22, 2013, the New York City Housing Authority ("NYCHA") received an anonymous complaint about criminal activity allegedly occurring in a NYCHA-owned apartment, 192 Sands Street, Apartment #12B, in Brooklyn, New York (the "Apartment").  (Dkt. 99-2, at 27-31.)[2]  The complaint stated that: "unknown drugs [were] being sold out of apt. #12B . . . by [an] unknown perp"; the Apartment's tenant of record, Lavern Wilkinson, was deceased; Wilkinson's sister "apparently rent[ed] the apartment to a drug dealer"; and "there is prostitution being conducted in the building in unknown apartments."  (*Id.* at 25, 30.)  One week later, NYCHA determined that it would "not . . . take investigative action at this time."  (*Id.* at 27.)  On March 27, 2014, NYCHA forwarded the anonymous complaint to the NYPD's Housing Bureau, and the NYPD launched an investigation to verify the complaint.  (Defendants' 56.1 Statement ("Defs.' 56.1"), Dkt. 90, at ¶¶ 1-2, 11; Plaintiffs' 56.1 Counterstatement ("Pls.' 56.1 Counter"), Dkt. 97, at ¶ 107.)

Two days later, the investigating officer, non-party Detective Pedro Abreu, performed various agency background checks "in an attempt to find any validity to the [October 22, 2013] complaint."  (Pls.' 56.1 Counter, ¶ 108.)   In early April 2014, the checks revealed that the Apartment was not the subject of any other investigations by the NYPD or any other agency.  (*Id.*

---

[1] Unless otherwise noted, a standalone citation to Defendants' 56.1 Statement, Plaintiffs' 56.1 Statement, or Plaintiffs' 56.1 Counterstatement, denotes that this Court has deemed the underlying factual allegation undisputed.  Any citations to Defendants' 56.1 Statement, Plaintiffs' 56.1 Statement, or Plaintiffs' 56.1 Counterstatement incorporate by reference the documents cited therein.  Where relevant, however, the Court may cite directly to the underlying document.

[2] Except for deposition transcripts, page numbers refer to the pagination generated by the court's CM/ECF docketing system, and not the document's internal pagination.

at ¶ 112; *see also* Dkt. 99-2, at 17.)  The checks further indicated that Lavern Wilkinson had indeed

died, that Gloria O'Connor and Macalia Squires were listed as the Apartment's authorized tenants,

and a telephone number for Emma Wilkinson, living at 192 Sands Street, Apartment #10G, was

listed as Apartment #12B's contact.  (Pls.' 56.1 Counter, ¶¶ 111, 113.)  The NYPD later determined

that Macalia Squires was Lavern Wilkinson's daughter, Gloria O'Connor was Squires's aunt and

legal guardian, and Emma Wilkinson was Lavern Wilkinson's sister and Plaintiff Wade's mother.

(Defs.' 56.1, ¶¶ 6-10.)  Although O'Connor and Squires were the tenants of record, Plaintiff Wade

had resided at the Apartment since December 2013 or January 2014, and his girlfriend, Plaintiff

Daniels, lived with him in the Apartment.  (*Id.* at ¶¶ 3-4.)  However, Wade and Daniels had not

signed a lease agreement with NYCHA regarding the Apartment.  (*Id.* at ¶ 5.)[3]

### B.  Controlled Buys[4]

On April 8, 2014, Defendant Detective Jon Gladstone took over the investigation from

Abreu.  (Pls.' 56.1 Counter, ¶ 114.)  According to Defendants, as part of the investigation, they,

along with other non-party NYPD officers, subsequently performed seven controlled buys at the

Apartment using confidential informants ("CIs") and undercover officers ("UCs"):[5]

---

[3] According to Wade, he and O'Connor had a written agreement that he "[w]as going to fix up the [A]partment and as long as [he] could manage paying for the rent and . . . didn't have no outrageous situation happen", he could stay in the Apartment.  (Deposition of Anthony Wade ("Wade Dep."), Dkt. 98-5, 21:4-15.)   Additionally, according to Wade's mother, Emma Wilkinson, she and O'Connor went to a NYCHA housing management office in late 2013 and spoke to a woman named "Ms. Morgan" about transferring the Apartment's lease to Wade.  (Affidavit of Emma Wilkinson ("Wilkinson Aff."), Dkt. 98-3, at ¶ 10.)

[4] A "controlled buy" is when a confidential informant or undercover officer is given money by police officers and "asked to go to a particular location" to attempt to purchase drugs as part of an investigation.  (Deposition of Jon Gladstone ("Gladstone Dep."), Dkt. 98-6, at 32:10-20, 56:6-7.)

[5] (Dkt. 99-1, at ¶ 3 ("Several buy attempts using CIs and UCs were performed with negative results through the months of April and May [2014]: On [redacted][,] positive buys for crack cocaine were achieved using CI 6.").)

Buy #1:   In April 2014,[6] Defendants James Baez and Alexandru Anghel used a confidential informant ("CI-7") to attempt a controlled buy at the Apartment, with negative results.   (*Id.* at ¶ 117.)   According to Defendants, CI-7 told the man who answered the door that CI-7 "was looking for 'krills' (street term for crack cocaine) at which time the male replied he 'wasn't up right now, come back later.'"  (Dkt. 99-2, at 18.)

Buy #2:   In May 2014, Defendants Gladstone and Anghel used another confidential informant ("CI-A") to attempt another controlled buy at the Apartment, with negative results. (Pls.' 56.1 Counter, ¶ 118; *see also* Dkt. 99-2, at 16 ("The CI . . . repeatedly knocked on apartment 12B with no answer.").)

Buy #3:   In a report dated June 10, 2014, Defendant Gladstone reported that an UC attempted a controlled buy, with negative results. (Dkt. 99-2, at 14 ("[The undercover] knocked on the door repeatedly however there was no answer."); Dkt. 99-11, at 3.)

Buy #4:   In a report dated June 17, 2014, Defendant Gladstone reported that CI-A attempted another controlled buy at the Apartment, with negative results. (Pls.' 56.1 Counter, ¶ 138; Dkt. 99-2, at 13 ("CI #A . . . states upon entering the building that there was a group of people standing by the elevator stating that it was broken.").)

Buy #5:   On June 30, 2014, Defendant Baez and non-party Detective Bourne used a third confidential informant ("CI-6") to perform a controlled drug buy at the Apartment.   CI-6 returned with "four twists of a rocky white substance" that were vouchered by Gladstone as cocaine.  (Pls.' 56.1 Counter, ¶ 151.)  According to Defendants, "[a] male black . . . answered the door and asked 'what you need?' The CI responded that he/she was 'looking for $40 worth.'  At that time JD 'Black' reached into his pants pocket and retrieved a quantity of twists containing a white rocky substance and counted out four. The CI then gave JD 'Black' $40 . . . and JD 'Black' gave the CI four twists of a white rocky substance. . . .  The CI further informed Detective Baez that there was a strong odor of marijuana emanating from the apartment and approximately four other male blacks were observed hanging out inside the apartment.  The CI stated that JD 'Black' refused to give a name or phone until the CI returned a second time.  Following the controlled buy, Detective Baez performed a field test of the recovered rocky substance at which time it did test positive for crack cocaine."  (Dkt. 99-2, at 12, 42; *see also* Dkt. 98-31.)  The substance was then submitted to the NYPD Laboratory (Defs.' 56.1, ¶ 30), and two years later, the NYPD Laboratory stated that the substance submitted by Baez had "No Controlled Substance Identified" (Dkt. 89-31).

---

[6] Due to concerns about protecting the identity of the agents and informants, most of the exact dates and times of the alleged controlled buys were redacted by Defendants.  (*See* Dkt. 68.)

Buy #6:  In a report dated July 10, 2014, Defendant Gladstone reported that CI-6 did another controlled buy at the Apartment.  According to Gladstone, "[a] female black . . . answered the door and asked, 'What you need?' The CI responded he/she 'was looking for $20 worth.' At that time, JD 'Girl' closed the door and opened it a short time later:  The CI then gave JD 'Girl' $20, and JD 'Girl' handed the CI two twists containing a white rocky substance. . . . Following the controlled buy, [Gladstone] performed a field test of the recovered white rocky substance at which time it did test positive for crack cocaine."  (Dkt. 99-2, at 8; Dkt. 98-33, at 3-4.)  On November 29, 2016, the NYPD Laboratory determined that two twists submitted by Gladstone were "[c]ocaine [b]ase".  (Dkt. 89-30.)

Buy #7[7]:  In a report dated July 20, 2014—three days after the search of the Apartment—Defendant Gladstone reported that he and non-party Lieutenant Whitaker had previously done a third controlled buy operation with CI-6.  According to Gladstone, "'JD 'Black' answered the door and asked 'what you need?'  The CI responded he/she was 'looking for $20 worth.'  At that time, JD 'Black' closed the door and opened it a short time later.  The CI then gave JD 'Black' $20 and JD 'Black' handed the CI two twists containing a white rocky substance. . . . Following the controlled buy, [Gladstone] performed a field test of the recovered white rocky substance at which time it did test positive for crack cocaine." (Dkt. 99-2, at 5.)

In addition to the controlled buys, on June 2, 2014, Defendants Gladstone and Anghel, along with other NYPD officers, went to the Apartment "under a ruse of [investigating] a noise complaint and possible fight".  (Defs.' 56.1, ¶ 13; Dkt. 99-2, at 15.)[8]  The officers spoke to Plaintiff Daniels, who gave the officers her full name and date of birth, and Emma Wilkinson, who stated that Plaintiff Wade lived in the Apartment.   (Defs.' 56.1, ¶ 15; Pls.' 56.1 Counter, ¶ 128.)  According to Defendants, Daniels "seemed very vague and guarded of the apartment although she claimed to be the only person there.  It seemed as if there was someone else, possibly Anthony Wade in the apartment that she didn't want us to see."  (Dkt. 99-2, at 15; *see also* Deposition of

---

[7] Neither party addresses this incident in their briefing.

[8] However, a report by Gladstone, dated August 4, 2014, incorrectly indicates that this ruse visit occurred on April 12, 2014.  (Dkt. 99-2, at 15.)

Alexandru Anghel ("Anghel Dep."), Dkt. 98-7, 75:8-16, 77:7-15.)[9]  The following day, on June 3, 2014, Gladstone showed Wade's photograph to an undercover officer working in Plaintiffs' housing project.  The officer did not recognize Wade.  (Dkt. 99-2, at 10.)  On July 9, 2014, Gladstone allegedly showed CI-6 a photo array containing Wade's photograph.  Gladstone alleges that CI-6 identified Wade from the photo array as "JD Black" from the June 30, 2014 controlled buy.  (Pls.' 56.1 Counter, ¶ 185; Dkt. 99-2, at 9.)

### C.  Search Warrant

On July 14, 2014, the Honorable Alex Calabrese of the Kings County Criminal Court authorized a "no-knock" search warrant for the Apartment based on an affidavit by Defendant Gladstone.  (Defs.' 56.1, ¶ 32.)  Gladstone's warrant application stated that based on the positive controlled buys for crack cocaine by CI-6, as well as CI-6's identification of Wade as "JD Black", Plaintiffs were using the Apartment "to store crack cocaine."  (Dkt. 98-33; Dkt. 99-2, at 6.)  Gladstone's affidavit did not describe any of the negative buys or the positive buy described in his July 20, 2014 report.

### D.  July 17, 2014 Search and Arrest

On July 17, 2014, at around 7:00 a.m., detectives from the NYPD's Narcotics Borough Brooklyn North squad executed a search warrant for the Apartment.  (Defs.' 56.1, ¶ 33.)  Plaintiffs Daniels and Wade were asleep when the officers[10] entered the Apartment.  (*Id.* at ¶¶ 34-35.)  According to Plaintiffs, the officers put "guns in [Plaintiffs'] face[s]" (Daniels Dep., 43:1-4, 54:12-21), and searched the apartment with drug-sniffing dogs (Daniels Aff., ¶ 6).  Ultimately, a

---

[9] According to Daniels, however, she was "calm" and had the door "wide open."  (Daniels Dep., 48:15-18, 49:19-22.)

[10] According to Daniels, there were fifteen to twenty detectives in the Apartment (Daniels Dep., 43:12-14); however, Wade stated at his deposition that there were only six officers (Wade Dep., 49:12-15).

marijuana joint was found inside the bedroom[11] where Plaintiffs were sleeping; Plaintiffs "[b]oth . . . knew that the marijuana was in the bedroom."  (Defs.' 56.1, ¶¶ 36-37.)  They were arrested and taken out of the Apartment.  (*Id.* at ¶ 38.)  No evidence of a crack cocaine trafficking operation was found.  (*Id.* at ¶ 8.)  According to Plaintiff Wade, the apartment was "destroyed" during the execution of the search warrant, including, but not limited to, broken shades, window fixtures, electronics, and household appliances.  (Affidavit of Anthony Wade ("Wade Aff."), Dkt, 98-2, ¶¶ 19-24.)

Daniels was wearing a negligee and no underwear when she was escorted from the Apartment.  (Defs.' 56.1, ¶ 39; Affidavit of Amber Daniels ("Daniels Aff."), Dkt. 98-1, ¶ 11.)  According to Daniels, she made "repeated requests to cover [her] largely unclothed body during the search and arrest" because her "breasts and [] pubic region" were exposed, but the officers rejected her requests because there were no female officers to take her to get changed.  (Daniels Aff., ¶¶ 11-13; Daniels Dep., 41:20-42:13, 67:1-2, 67:7-68:5; *see also* Wade Dep. 52:16-19, 56:7-12, 64:5-10.)  At the precinct, Daniels was eventually given a black sweatshirt to wear.  (Defs.' 56.1, ¶¶ 39, 42.)  By contrast, Wade, who alleges that he was naked when the police entered the Apartment, was given a pair of shorts to wear because the officers were "tired of seeing his penis." (Wade Dep., 51:18-20, 51:25-53:1.)

According to Plaintiffs, they sat handcuffed in the Apartment for approximately two hours, then sat in a police van outside of their apartment building for two more hours, and were thereafter at the precinct for thirty minutes.  (*Id.* at 56:13-24, 65:9-10, 72:2-7, 76:11-13; Daniels Dep., 61:18-22, 65:24-66:2, 68:22-24.)  At approximately 11:40 a.m. on July 17, 2014, Plaintiffs were released

---

[11] Plaintiffs argue that the marijuana joint was on the floor between the bed and the wall, whereas Defendants argue that it was on the windowsill.  (*Compare* Wade Dep., 58:10-14 *with* Dkt. 98-15, at 3; Dkt. 98-12, at 2.)  For the reasons discussed *infra*, the location of the joint is irrelevant to the Court's analysis.

from custody.  They were in custody for a total of approximately four hours and forty minutes. (Defs.' 56.1, ¶¶ 41, 44.)  Wade was issued a desk appearance ticket for criminal possession of marijuana in the fifth degree under New York Penal Law Section 221.10, a class B misdemeanor. (Plaintiffs' 56.1 Statement ("Pls.' 56.1"), Dkt. 85, ¶ 15); N.Y. Penal Law § 221.10 ("A person is guilty of criminal possession of marijuana in the fifth degree when he knowingly and unlawfully possesses: 1. marijuana in a public place . . . or 2. [marijuana] of an aggregate weight of more than twenty-five grams.").  Daniels was issued a summons for unlawful possession of marijuana under New York Penal Law Section 221.05, a violation.[12]  (Pls.' 56.1, at ¶¶ 13, 43); N.Y. Penal Law § 221.05 ("A person is guilty of unlawful possession of marijuana when he knowingly and unlawfully possesses marihuana.").  Because Wade was charged with a misdemeanor, he was fingerprinted and photographed; Daniels was not.  (Defs.' 56.1, ¶¶ 14, 16.)

### E. Post-Arrest Events

When Plaintiffs returned to the Apartment on July 17, 2014, it had been padlocked by a NYCHA employee (Defs.' 56.1, ¶¶ 45-46), who had given the keys to Defendants to voucher (Dkt. 98-15, at 8, 15; Wade Aff., ¶ 10; Dkt. 89-21).  According to Wade, the NYCHA employee was told by the NYPD "to put the padlock on the door . . . for the time that [the NYPD] retained [Plaintiffs].  That way nobody's going to go into the apartment and steal [their] valuables."  (Wade Dep., 85:12-13, 86:3-10.)  After he was released from custody, Wade alleges that he asked Defendants for the padlock keys, but was told that he had to get them from NYCHA.  (Wade Aff., ¶ 11 ("Defendants had the keys but would not give them to me."); *but see* Wade Dep., 86:16-23 (Wade testifying that NYCHA had keys to the padlock).)  Wade alleges that he then went to

---

[12] A violation is a less serious offense than a misdemeanor and is punishable by imprisonment of up to fifteen days, N.Y. Penal Law § 70.15; whereas, a class B misdemeanor is punishable by imprisonment of up to three months, *id.*

NYCHA as instructed, "but they told [him] that since NYPD officers took the keys, they would have to be the ones to return them." (Wade Aff., ¶¶ 12-15; Wilkinson Aff., ¶ 21.) Wade ultimately was able to get back into the Apartment on July 17 because either he or a NYCHA maintenance unscrewed the padlock from the door. (*Compare* Wade Aff., ¶ 18 *with* Wade Dep., 81:6-17, 82:4-9.) Plaintiffs retrieved some of their belongings and clothes. (Defs.' 56.1, ¶ 52.) Wade also took a video of the condition of the Apartment. (Dkt. 98-35.) A second padlock was put on the Apartment door in August 2014, but Plaintiffs do not know whether NYCHA or the NYPD installed it. (Wade Aff., ¶ 17.) In November 2014, the second padlock was removed from the Apartment door by NYCHA. (Defs.' 56.1, ¶ 54.) On July 20, 2014, Defendant Gladstone wrote a report stating that, in his opinion, "there is no narcotic activity being conducted at the subject location" and that the case should be closed. (Pls.' 56.1 Counter, ¶¶ 272-73.)

On October 12, 2014, Plaintiff Daniels appeared for her court date and was told "that her case was not on the list of cases to be heard that day", and then released. (Defs.' 56.1, ¶¶ 56-57.) Daniels did not return to court on the summons again. (*Id.* at ¶ 58.) On November 12, 2014, Wade appeared in response to his desk appearance ticket and was charged by the Kings County District Attorney's Office with a violation of New York Penal Law § 221.05, the same violation charge as Daniels. (*Id.* at ¶¶ 59-61.) On December 12, 2014, Wade's case was resolved and he received an adjournment in contemplation of dismissal ("ACD"). (*Id.* at ¶ 62.)

## II.   Procedural History

Plaintiffs filed their initial complaint on January 13, 2016 (Dkt. 1) and their amended complaint on May 23, 2016 (Dkt. 18). The parties' cross-motions for summary judgment were fully briefed on September 21, 2017. (Dkts. 83, 88.)

**LEGAL STANDARD**

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party.  *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).  Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial.  *Spinelli v. City of N.Y.*, 579 F.3d 160, 166-67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation omitted; alteration in original).  In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quotation omitted).  In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  The Court also construes any disputed facts in the light most favorable to the nonmoving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970).  However, "the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.

The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009) (internal citations omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is under consideration. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## DISCUSSION

Defendants move for summary judgment as to Plaintiffs' claims for: (1) unreasonable search, (2) right to bodily privacy, (3) unreasonable detention, (4) malicious prosecution, (5) violation of Plaintiff Wade's right to a fair trial, (6) procedural due process, (7) failure to intervene, and (8) municipal liability. Plaintiffs cross-move for summary judgment on their claims for malicious prosecution and failure to intervene.

### I.   Unreasonable Search

Plaintiffs argue that Defendants' search of the Apartment was unreasonable for two reasons. First, Plaintiffs allege that Defendant Gladstone's affidavit in support of the search warrant omitted material information. Second, Plaintiffs contend that the search itself was conducted in an overly destructive manner. The Court will address each of these claims in turn.

### A.   Search Warrant Affidavit

Plaintiffs allege that Defendant Gladstone's warrant affidavit was defective because it "reported the 'positive buys' made by CI-6 as supporting probable cause, but neglected to mention the investigation's larger history (aged anonymous complaint, negative computer checks, long-

term investigators' statements that Wade and Apt. 12B were not subjects, etc.) or Defendants' divergence from virtually all safeguards designed to ensure the veracity and integrity of their use of CI-6." (Plaintiffs' Opposition Brief ("Pls.' Opp. Br."), Dkt. 96, at 16.)

A Section 1983 plaintiff challenging a warrant on the ground that it deliberately or recklessly misled the issuing judge regarding the basis of probable cause "must make the same showing that is required at a suppression hearing" under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994). Specifically, a plaintiff must make a "substantial preliminary showing", *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991), that "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause [or necessity] finding," *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (quoting *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000)). "The ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, 'there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause [or necessity].'" *Canfield*, 212 F.3d at 718 (quoting *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)). To be sure, "[t]he *Franks* standard is a high one." *Rivera*, 928 F.2d at 604.

The Court finds that even if Plaintiffs could meet the first part of the *Franks* analysis, they cannot meet the second. In this case, Plaintiffs' claims "fail under the 'corrected affidavit' doctrine because a hypothetical warrant affidavit, deleting the purported misstatements and including the challenged omissions, would not affect the probable cause determination." *Coderre v. City of Wallingford*, 668 F. App'x 399, 399-400 (2d Cir. 2016). Here, even if the information that Plaintiff argues was improperly omitted from Gladstone's affidavit are added in, "the hypothetical corrected

affidavit still establishes probable cause." *United States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013).

Plaintiffs do not dispute that the rocky white substances CI-6 brought to Defendants following Buys #5 and #6 field-tested positive for cocaine. Excluding Buy #5—based on Plaintiffs assertion that Defendant Baez "[threw] the positive field test in the garbage" and thus the positive field test should be disregarded (Pls.' Opp. Br., at 18)[13]—there would still be probable cause for the search warrant based on the other positive controlled buy, Buy #6. *Green v. Webster*, 359 F. App'x 249, 251 (2d Cir. 2010) ("A reasonably trustworthy field test that returns a 'positive' result for the presence of cocaine is a sufficient basis for probable cause."); *Pickering v. DeFrance*, No. 3:14-CV-01207 (VLB), 2016 WL 5799293, at *9 (D. Conn. Sept. 30, 2016) ("[A] later negative lab result does not retroactively compromise probable cause to make an arrest when a 'reasonably trustworthy' field test result was positive."), *appeal dismissed*, No. 16-3651(L), 2017 WL 5125623 (2d Cir. Mar. 7, 2017).[14]   Given the generosity of the probable cause standard, to survive Defendants' summary judgment motion, Plaintiffs have to "demonstrate that a material question of fact existed as to whether the field test's result was 'reasonably trustworthy information,' . . . *i.e.,* whether [Defendants] had a basis for believing, at the time of [Plaintiffs'] arrest, that the 'positive' field test result was inaccurate or unreliable." *Green*, 359 F. App'x at 251.

Plaintiffs can make no such showing. They argue that even if the results of the field test

---

[13] Plaintiffs overstate the record when they argue that Defendant Baez purposely threw out the field test kit as an act of "convenient evidence spoliation." (Pls.' Opp. Br., at 18.) Defendant Anghel testified at his deposition that it was standard procedure to throw out the actual field test kit (Anghel Dep., 204:7-205:10), and Plaintiffs present no evidence to rebut this contention. The record is silent as to whether the field test kit for Buy #6 was also thrown out.

[14] The Court, therefore, rejects Plaintiffs' argument that "[f]ield testing is prohibited" and that Defendants should have waited for the NYPD Laboratory to test the substances. (Pls.' Opp. Br., at 13.)

were reliable, Defendants should have known that the *source* of the drugs—namely CI-6—was unreliable because: (1) Defendants allegedly failed "to employ any of the required investigative safeguards" for using confidential informants; (2) the photo identification with CI-6 never actually occurred; (3) paid confidential informants are inherently unreliable; and (4) Defendants fabricated the existence of CI-6.  (Pls.' Opp. Br., at 17-22.)  Plaintiffs' first argument fails as a matter of law because "local agency-established policies, such as the Patrol Guide, do not establish constitutional standards[,]" such that even if Defendants fail to follow the Patrol Guide's safeguards for using CIs, that would not establish a constitutional violation.  *Cerbelli v. City of N.Y.*, No. 99-CV-6846 (ARR)(RML), 2008 WL 4449634, at *10 (E.D.N.Y. Oct. 1, 2008) ("Holding otherwise would create varying liability standards in different localities and eviscerate the objective reasonableness test used to evaluate Fourth Amendment claims.").[15]  The remainder of Plaintiffs' arguments are merely conclusory and speculative, with no factual support in the record.  On summary judgment, Plaintiffs "must support vague accusation[s] and surmise with concrete particulars."  *Applegate v. Top Assocs., Inc.*, 425 F.2d 92, 96 (2d Cir. 1970).  Therefore, Defendants' motion for summary judgment is granted as to Plaintiffs' unlawful search claim based on the search warrant affidavit.

**B.  Unduly Destructive Search**

Next, Plaintiffs allege that the NYPD searched the Apartment in an unduly destructive manner.  Specifically, they argue that the search should have been performed more methodically, instead of "ransacking" the premises "with no apparent restraint."  (Pls.' Opp. Br., at 24.)

It is "well recognized that 'officers executing search warrants on occasion must damage property in order to perform their duty.'"  *Cody v. Mello*, 59 F.3d 13, 16 (2d Cir. 1995) (quoting

---

[15] Moreover, as Defendants correctly state, "Plaintiffs point to [and took] no Rule 30(b)(6) testimony that would support their allegations regarding NYPD policies in confidential informant cases."  (Defendants' Brief ("Defs.' Br."), Dkt. 91, at 22.)

*Dalia v. United States*, 441 U.S. 238, 258 (1979)).  Indeed, "it is settled that some disarray in conducting a search, including the tangential destruction of items that could not contain the object of the search, does not state a claim of constitutional magnitude." *Dockery v. Tucker*, No. 97-CV-3584 (ARR), 2008 WL 2673307, at *10 (E.D.N.Y. June 26, 2008) (collecting cases).  To prevail on a claim for excessive or unnecessary destruction of property, Plaintiffs must establish that Defendants acted "unreasonably or maliciously in bringing about the damage." *Cody*, 59 F.3d at 16; *Vaher v. Town of Orangetown, N.Y.*, 133 F. Supp. 3d 574, 592 (S.D.N.Y. 2015).

Defendants' motion for summary judgment is denied as to this claim.[16]  "Determining whether a particular instance of property damage was 'unreasonable or malicious' is ordinarily not amenable to resolution at the summary judgment stage." *Vaher*, 133 F. Supp. 3d at 592.  Unlike the cases cited by Defendants (*see* Defs.' Br., 23-25) in which a plaintiff "relie[d] entirely on allegations" and could not "produce[] any documentary evidence to support his [or her] allegations", *Smith v. City of N.Y.*, No. 04-CV-3286 (TPG), 2010 WL 3397683, at *13 (S.D.N.Y. Aug. 27, 2010), *aff'd sub nom. Smith v. Tobon*, 529 F. App'x 36 (2d Cir. 2013); *Vaher*, 133 F. Supp. 3d at 592, here, Plaintiff Wade took a video within hours of the July 17, 2014 search of the Apartment documenting and explaining the alleged damage to the Apartment and Plaintiffs' belongings (*see* Dkt. 98-35).  Therefore, there is a genuine dispute of material fact as to whether Defendants' actions were unreasonable or malicious that cannot be resolved on summary judgment.

---

[16] However, the Court rejects Plaintiffs' argument that the search was impermissible because Defendants did not announce themselves before forcibly entering the Apartment.  (Pls.' Br., at 22-23.)  Plaintiffs' recitation of the law would undermine the existence of no-knock warrants, particularly since "[t]he officers' unannounced entry into the apartment at night was authorized by the warrant and approved by the magistrate." *Lewis v. City of Mount Vernon, Mount Vernon Police Dep't*, 984 F. Supp. 748, 756 (S.D.N.Y. 1997); *see also United States v. Brown*, 52 F.3d 415, 420-24 (2d Cir. 1995).

## II.    Right to Privacy Claim

Plaintiff Daniels argues that her Fourth Amendment right to privacy was violated when Defendants refused to give her clothes to cover her negligee, "compel[ing] Daniels to remain with her nipples, pubic region, butt[,] and vagina for officers and later the general public to see" for nearly five hours.  (Pls.' Opp. Br., at 27.)  Defendants' motion for summary judgment is denied as to this claim as well.

The Second Circuit has held that "there is a right to privacy in one's unclothed or partially unclothed body, regardless whether that right is established through the auspices of the Fourth Amendment or the Fourteenth Amendment."   *Poe v. Leonard*, 282 F.3d 123, 138-39 (2d Cir. 2002) ("We cannot conceive of a more basic subject of privacy than the naked body.  The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.") (citation omitted).  "Let us be clear: a police officer violates a person's constitutional right to bodily privacy when that officer manipulates the circumstances to view, to photograph, to videotape or otherwise to record that person's unclothed or partially unclothed body without his or her consent where . . . there is no conceivable investigative or otherwise proper law-enforcement interest advanced by such a viewing."  *Id.* at 139.  Here, there is a genuine dispute of material fact as to whether there was a "proper law-enforcement interest" advanced by Defendants' denial of Daniels's alleged repeated requests to change or retrieve more clothing after Defendants entered the Apartment.  According to Daniels, Defendants told her that she could not retrieve additional clothing during the search because there were no female officers to escort her to get changed.  (Daniels Dep., 67:1-15.) However, Wade testified at his deposition that the officers gave him a pair of shorts—without escorting him to a separate location to change—because they were "tired of seeing his penis."

(Wade Dep., 51:18-20, 51:25-53:1.)  Defendants provide no explanation as to why they could not have done the same for Daniels, *i.e.*, give Daniels a piece of clothing to put *over* her negligee (which would not have required her to change or disrobe), and why they waited nearly five hours to provide her with any clothing.  Therefore, Defendants' motion for summary judgment regarding Daniels's right to privacy claim is denied.[17]

The Court also rejects Defendants' argument that they are entitled to qualified immunity on this claim.  "Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits."  *Hartline v. Gallo,* 546 F.3d 95, 102 (2d Cir. 2008) (internal quotation marks omitted).  "As qualified immunity is an affirmative defense, the defendants bear the burden of proof."  *Matthews v. City of N.Y.*, 889 F. Supp. 2d 418, 432-33 (E.D.N.Y. 2012) (quoting *Lore v. City of Syracuse,* 670 F.3d 127, 149 (2d Cir. 2012)).  In order to deny qualified immunity to a government official, a court must find both that (1) the plaintiff has alleged facts that comprise a violation of a constitutional right, and (2) that the violated constitutional right was "clearly established" at the time of the official's alleged misconduct.  *Pearson v. Callahan,* 555 U.S. 223, 232, 236 (2009).

Defendants argue that they are entitled to qualified immunity because Daniels's right to

---

[17] *See Gonzalez v. City of N.Y.*, No. 01-CV-5584 (JG), 2006 WL 8435010, at *16 (E.D.N.Y. Jan. 3, 2006) ("The refusal of the officers to allow [the plaintiff] to cover her exposed body during her detention, when she asked permission to do so, violated [her] Fourth Amendment right.  While it is true that the police are authorized to detain the occupants of the premises where a search warranted is executed, any actions which interfere with those detainees' constitutional rights must be reasonably related to accomplishing the search and/or legitimate law enforcement objectives. . . .  Here, the record does not reveal a single reason why the officers could not have handed [the plaintiff] a robe, or some other item to cover her body, at any time during the [time] she alleges she was detained."); *but see Crosby v. Hare*, 932 F.Supp. 490, 494-95 (W.D.N.Y. 1996) (finding no constitutional violation when a female plaintiff was required to remain in a bathroom, naked, under the supervision of a female officer but within view of male officers, for fifteen to twenty minutes until a protective sweep of the house was completed).

bodily privacy is not "clearly established."  (Defs.' Br., at 15-18.)  But, as the Second Circuit said

in *Poe*,

> [a]lthough our prior cases have not presented exactly the same facts and the
> Supreme Court has advised that for qualified immunity purposes the right must be
> established "in a more particularized, and hence more relevant sense," we conclude,
> as we did in *Johnson*, that "for claims based on intentionally tortious harmful
> conduct employed in the absence of any legitimate government interest, the
> requisite degree of particularity is lessened."  Our cases have sufficiently detailed
> the existence of such a privacy right and we independently find that [defendant's]
> alleged behavior is shocking enough to qualify as a violation of [plaintiff's]
> substantive due process rights.  Thus, it would be objectively unreasonable for a
> police officer to believe that [defendant's] misconduct did not violate [plaintiff's]
> clearly established rights.

282 F.3d at 139 (quoting *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir.

2011)); *see also Gonzalez*, 2006 WL 8435010, at *14-18; *Reed v. Powers*, No. 97-CV-7152

(DLC), 2002 WL 472026, at *7 (S.D.N.Y. Mar. 28, 2002) (denying qualified immunity to

defendant-officers where plaintiff alleged "that the officers forced him to travel to the precinct

unclothed after he was arrested" because the "claim involve[d] the violation of law that was clearly

established").  At this stage, the facts alleged do not support a finding that Defendants' actions

were "objectively reasonable" with respect to Plaintiff Daniels's Fourth Amendment bodily

privacy claim.  Therefore, Defendants are not entitled to qualified immunity as matter of law with

respect to this claim.

### III.   Unreasonable Detention Claim

Plaintiffs argue that their almost five-hour detention constituted an unreasonable detention

in violation of the Fourth Amendment.  (Pls.' Opp. Br., at 27-28.)  Defendants' motion for

summary judgment is granted as to this claim.

It is "well settled that a probable cause determination within 48 hours of the arrest may be

unconstitutional if such determination was 'delayed unreasonably.'"  *Lyde v. New York City*, 145

F. Supp. 2d 350, 355 (S.D.N.Y. 2001) (quoting *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)). "Examples of unreasonable delays are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Cnty. of Riverside*, 500 U.S. at 56. The "burden of showing that the delay was unreasonable" is "squarely on the plaintiff." *Horvath v. City of N.Y.*, No. 12-CV-6005 (RJD) (JMA), 2015 WL 1757759, at *5 (E.D.N.Y. Apr. 17, 2015) (quoting *Mazza v. City of N.Y.*, No. 98-CV-2343 (ILG), 1999 WL 1289623, at *10 (E.D.N.Y. July 13, 1999)).

Plaintiffs have failed to establish that their approximately five-hour detention was unreasonable. They argue that "Defendants unreasonably detained Plaintiffs for purposes unrelated to Defendants' need to process the charging instruments they issued them for simple marijuana possession." (Pls.' Opp. Br., at 27-28.) However, even if Defendants detained Plaintiffs longer than necessary for a charge of marijuana possession, Plaintiffs' argument ignores the fact that Defendants were not at the Apartment to arrest Plaintiffs for marijuana possession. As Defendant Gladstone stated in his search warrant affidavit, Defendants were attempting to determine whether Plaintiffs were using the Apartment "to store crack cocaine." (Dkt. 98-33.) Therefore, Defendants had "the authority to detain [the] occupants of [the] premises while an authorized search [was] in progress, regardless of individualized suspicion." *Rivera*, 928 F.2d at 606; *Lewis*, 984 F. Supp. at 756. Although Plaintiffs allege that they were handcuffed in the Apartment for one-and-a-half to two hours and then "held in handcuffs in a dark, hot van for two hours", Plaintiffs do not allege that the search had concluded at that time such that their onsite detention was unreasonable delayed. (Pls.' Opp. Br., at 27.) The Court also finds that the thirty minutes that Plaintiffs spent at the precinct was not unreasonable.[18]

---

[18] The Court also rejects Plaintiffs' argument that Defendants demonstrated ill will through Defendants' "cruel refusal to permit Daniels to cover her body, and their threatened seizure of

### IV.    Malicious Prosecution Claim

Plaintiff Wade argues that Defendants incorrectly charged him with a misdemeanor under New York Penal Law § 221.10, rather than Section 221.05, and that this constituted malicious prosecution.  (*Id.* at 28-29.)  Defendants' motion for summary judgment is granted, and Plaintiffs' cross-motion for summary judgment is denied, as to this claim.

To sustain a Section 1983 claim for malicious prosecution, a plaintiff "must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law."  *Manganiello v. City of N.Y.*, 612 F.3d 149, 160–61 (2d Cir. 2010).  A plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."  *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (quoting *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995)).  Plaintiff must also demonstrate some "post-arraignment deprivation of liberty" that is made "pursuant to legal process."  *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 116-17 (2d Cir. 1995).

---

Plaintiffs' children if they did not provide answers to Defendants' interrogations or permit Defendants the right to search premises not covered by the warrant."  (Pls.' Br., at 28.)  While this behavior, if proven, is clearly improper, it does not demonstrate *delay* motivated by ill will.  This conclusion is supported by the cases cited by Plaintiffs.  (*Id.*); *see, e.g.*, *Bernshtein v. City of N.Y.*, No. 08-CV-2906 (AKH), 2010 WL 2541617, at *1 (S.D.N.Y. June 22, 2010), *aff'd*, 496 F. App'x 140 (2d Cir. 2012) (denying summary judgment where "a police officer state[d] that Plaintiff would be detained as long as possible"); *Pesola v. City of N.Y.*, No. 15-CV-1917 (PKC)(SN), 2016 WL 1267797, at *9 (S.D.N.Y. Mar. 30, 2016) (denying summary judgment where Plaintiffs alleged "that the 15 and 24 hour delays were punishments for refusing to submit to a [iris] scan"); *Allen v. City of N.Y.*, No. 03-CV-2829 (KMW)(GWG), 2007 WL 24796, at *15 (S.D.N.Y. Jan. 3, 2007) (denying summary judgment where the average "arrest-to-arraignment time" for plaintiff-arrestees was almost double that of non-plaintiff-arrestees, "suggesting that the police wanted to punish them for protesting").  In each of those cases—unlike here—"there was affirmative evidence of ill will or delay for its own sake."  *Lumpkin v. Brehm*, No. 15-CV-839 (KPF), 2018 WL 2768641, at *10 (S.D.N.Y. June 8, 2018).

Plaintiff concedes that his marijuana possession charge pursuant to Section 221.05 was not favorably terminated and, therefore, cannot form the basis of his malicious prosecution claim. *See Singleton v. City of N.Y.,* 632 F.2d 185, 193 (2d Cir. 1980) ("The district court reasoned that an 'adjournment in contemplation of dismissal' pursuant to N.Y. Crim. Proc. Law § 170.55 did not constitute a termination in favor of appellant. Despite [the plaintiff]'s protestations to the contrary, the district court's conclusion is correct[.]"); *Worytko v. Cty. of Suffolk*, No. 03-CV-4767 (DRH)(ARL), 2007 WL 1876503, at *2 (E.D.N.Y. June 28, 2007) ("An ACD is not a favorable termination because it leaves open the question of the accused's guilt and thus precludes a claim of malicious prosecution."). However, Plaintiff argues that the *initial* charge of criminal possession of marijuana in the fifth degree under New York Penal Law § 221.10 was favorably terminated because "the District Attorney's Office declined to prosecute the improper Section 221.10 overcharge." (Plaintiffs' Brief, Dkt. 84, at 11-22.)

The Court rejects this argument for three reasons. First, even assuming *arguendo* that the District Attorney's Office declined to prosecute the 221.10 charge because it was not factually supported, that would still not constitute a favorable termination for purposes of a malicious prosecution claim. "[S]ome terminations are not deemed favorable for malicious prosecution claims: among them are ACDs [and] dismissals pursuant to N.Y. Crim. P. L. § 170.30(l)(a) for failure to allege sufficient facts to support the charge[.]'" *Coleman v. City of N.Y.*, No. 11-CV-2394 (ENV)(RLM), 2016 WL 4184035, at *3 (E.D.N.Y. Feb. 25, 2016) (citing *Murphy*, 118 F.3d at 948-49), *aff'd*, 688 F. App'x 56 (2d Cir. 2017). Second, the same would be true if the Court construed the Section 221.10 charge as being withdrawn. *Poventud v. City of N.Y.*, 750 F.3d 121, 131 (2d Cir. 2014) ("A termination is not favorable to the accused . . . if the charge is withdrawn. . . . Indeed, it is hornbook law that where charges are withdrawn[,] . . . there is no sufficient

termination in favor of the accused.") (citation and internal quotation marks omitted).  Third, Plaintiffs misstate the record.  The District Attorney's Office did not "decline to prosecute" Wade, it simply "determined that the appropriate charge for Wade in the criminal action was a violation charge" under Section 220.05, rather than a misdemeanor under Section 220.10.  (Defendants' Opposition Brief, Dkt. 95, at 7); *see Hartman v. Moore*, 547 U.S. 250, 263 (2006) ("[W]here an allegation of misconduct is directed at police, a malicious-prosecution claim cannot stand if the decision made by the prosecutor to bring criminal charges was independent of any pressure exerted by police.") (citation omitted).  Therefore, Defendants' motion for summary judgment as to Plaintiff Wade's malicious prosecution claim is granted, and Plaintiff's corresponding motion as to this claim is denied.[19]

## V.      Right to a Fair Trial Claim

Plaintiff Wade argues that his right to a fair trial was violated "as a result of Defendants' forwarding false information"—specifically the Section 221.10 overcharge—to prosecutors.  (Pls.'

---

[19] In light of this holding, Plaintiffs' related failure to intervene claim, *i.e.*, that Defendants Anghel and Baez failed to intervene in Defendant Gladstone's malicious prosecution of Wade, is dismissed.  *Matthews*, 889 F. Supp. 2d at 443-44 ("[A] failure to intervene [ ] claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim[.]").  The Court does note with concern, however, that Defendants Baez and Anghel testified at their depositions that the Section 221.10 charge was correct, despite the fact that Wade neither possessed the marijuana in a public place, nor possessed more than twenty-five grams of marijuana, one of which is necessary to sustain a claim under Section 221.10.  (*See* Deposition of James Baez, Dkt. 86-5, 165:23-166:10 (stating that he was "trained to charge" under Section 221.10 for a single marijuana cigarette); Anghel Dep., 164:15-169:20 (stating that Wade was not overcharged, but that Daniels was instead given leniency).)

Additionally, while the Amended Complaint appears to allege a failure to intervene claim in connection with each constitutional claim (Dkt. 18, at ¶¶ 144-48), Plaintiffs have only briefed this issue with respect to Wade's malicious prosecution claim (Dkt. 84).  Accordingly, the Court dismisses any remaining failure to intervene claims as abandoned.  *Collins v. City of N.Y.*, 295 F. Supp. 3d 350, 361 (S.D.N.Y. 2018) ("Federal courts may deem a claim abandoned when a party opposing summary judgment fails to address the [movant's] argument in any way.") (citation omitted).

Opp. Br., at 24.)  Defendants' motion for summary judgment is granted as to this claim.

A plaintiff proceeding on a denial of a right to a fair trial claim premised on false information must show that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result."  *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (citing *Ricciuti v. New York City Trans. Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).

Although Wade argues that Defendants "falsely represented that Wade committed aggravated marijuana possession," (Pls.' Opp. Br., at 29), Plaintiff cites no case law in support of his argument that submitting the wrong charge to the prosecutors, even knowingly, would have been "likely to influence a jury's verdict."  Plaintiff does not argue that any of the factual information contained in Defendant Gladstone's arrest report or supporting deposition (Dkt. 98-15, at 16-18) was fabricated, just that he charged Wade incorrectly.  Plaintiff "does not explain— and the Court can find no reason—why this fact would be likely to influence a jury's decision regarding Plaintiff['s] guilt or innocence" on a charge of unlawful possession of marijuana, particularly where Plaintiff does not dispute that he possessed the marijuana.  *Collins*, 295 F. Supp. 3d at 372 (citation and internal quotation marks omitted).  Therefore, Defendants' motion for summary judgment is denied as to this claim.[20]

## VI.    Procedural Due Process Claim

Plaintiffs argue that they were denied their right to due process when, after the search of the Apartment and Plaintiffs' subsequent arrests, Defendants allegedly refused to give them the keys to the padlock on the Apartment door.  (Pls.' Opp. Br., at 29-31.)

---

[20] If anything, this incorrect charge might have been used as impeachment evidence against Defendant Gladstone at trial to cast doubt on his competence or honesty.

To sustain a procedural due process claim under the Fourteenth Amendment, a plaintiff must allege that he or she: "(1) had a protected liberty or property interest and (2) was deprived of that interest without due process." *Johnson v. City of N.Y.*, No. 16-CV-2879 (PKC)(LB), 2018 WL 1175139, at *3 (E.D.N.Y. Mar. 5, 2018) (citation and internal quotation marks omitted); *Roman-Malone v. City of N.Y.*, No. 11-CV-8560 (PAC), 2013 WL 3835117, at *3 (S.D.N.Y. July 25, 2013) ("To state a claim for a violation of procedural due process, Plaintiff must allege that [she or] he was deprived a protected interest in liberty or property, without adequate notice or opportunity to be heard.").

Defendants' motion for summary judgment is granted as to this claim. "Deprivation of property by a state actor, whether intentional or negligent, does not give rise to a claim under § 1983 so long as the law of that state provides for an adequate post-deprivation remedy and the deprivation was the result of a 'random and unauthorized' act." *David v. N.Y.P.D. 42nd Precinct Warrant Squad*, No. 02–CV–2581 (DC), 2004 WL 1878777, at *5 (S.D.N.Y. Aug. 23, 2004) (collecting cases); *see also Davis v. N.Y.*, 311 F. App'x 397, 400 (2d Cir. 2009) (summary order); *Johnson*, 2018 WL 1175139, at *3. Here, Plaintiffs do not assert that their alleged deprivation was due to an established state procedure, and, therefore, "when a plaintiff brings a procedural due process claim '[b]ased on random unauthorized acts by state employees,' the state satisfies procedural due process requirements so long as it provides a meaningful post-deprivation remedy." *Ahmed v. Town of Oyster Bay*, 7 F. Supp. 3d 245, 254 (E.D.N.Y. 2014) (quoting *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 880 (2d Cir. 1996)). In this case, there existed adequate State post-deprivation remedies that Plaintiffs could have used to obtain the keys to the padlock or regain access to the Apartment, such as, bringing a state law claim in the Court of Claims. *See Davis*, 311 F. App'x at 400; *Wahid v. Mogelnicki*, No. 15–CV–2869 (LDH)(CLP),

2017 WL 2198960, at *2 (E.D.N.Y. May 17, 2017) ("New York has adequate state post-deprivation remedies" that allow "a plaintiff [to] bring a state law claim for negligence, replevin or conversion with the Court of Claims").  Thus, Plaintiff's deprivation of property claim fails as a matter of law and is dismissed.  *See, e.g.*, *Wahid*, 2017 WL 2198960, at *2 (dismissing plaintiff's deprivation of property claim, *inter alia*, given New York's adequate post-deprivation remedies); *Alloul v. City of N.Y.*, No. 09-CV-7726 (JSR)(FM), 2010 WL 5297215, at *6 (S.D.N.Y. Dec. 21, 2010) (dismissing plaintiff's deprivation of property interest claim based on the towing and subsequent destruction of plaintiff's car because "plaintiff failed to utilize a constitutionally adequate post-deprivation remedy, *i.e.*, pursue a State court action based on negligence or conversion").

### VII.   *Monell* Liability

Plaintiffs argue that the City of New York failed to train or supervise Defendants in the proper protocols for using CIs.  (Pls.' Opp. Br., at 31-36.)  Under Second Circuit case law, "a prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor.  '*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.'"  *Henry-Lee v. City of N.Y.*, 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010) (quoting *Segal v. City of N.Y.,* 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original)).  Once a "district court properly [finds] no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* [is] entirely correct."  *Segal*, 459 F.3d at 219.  In light of the Court's grant of Defendants' motion for summary judgment on Plaintiffs' claim of unreasonable search, Defendants' motion for summary judgment is granted as to Plaintiffs' *Monell* claim.

**CONCLUSION**

For the reasons stated herein, Defendants' motion for summary judgment is granted in part and denied in part.  Plaintiffs' cross-motion for summary judgment is denied in its entirety. Summary judgment is denied as to Plaintiffs' destructive search claim and Plaintiff Daniels's right to bodily privacy claim.  All other claims are dismissed.  The City of New York is terminated as a party in this action.

The parties shall submit a joint pre-trial order by September 28, 2018.  An initial pre-trial conference will be schedule thereafter.

SO ORDERED.


 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge


Dated: August 29, 2018
        Brooklyn, New York