UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
AMBER DANIELS and ANTHONY WADE,

                Plaintiffs,

          - against -

NYPD DETECTIVE JON GLADSTONE,
Shield No. 5165, NYPD DETECTIVE JAMES
BAEZ, Shield No. 7011, NYPD SERGEANT
ALEXANDRU ANGHEL, Tax No. 934403,
and NYPD JOHN DOE POLICE OFFICERS
1–10,

                Defendants.
------------------------------------------------------------x

**MEMORANDUM & ORDER**
16-CV-190 (PKC) (JO)

PAMELA K. CHEN, United States District Judge:

      Plaintiffs Amber Daniels and Anthony Wade ("Plaintiffs") brought this action against

Defendants Detective Jon Gladstone, Detective James Baez, Sergeant Alexandru Anghel, and

Police Officers John Doe 1–10 of the New York City Police Department ("NYPD") (collectively,

"Defendants"), as well as the City of New York, alleging numerous violations of 42 U.S.C. § 1983

in connection with their July 17, 2014 arrests and subsequent prosecutions. Following the close

of discovery, the parties cross-moved for summary judgment.[1] By Order of August 29, 2018, the

Court granted in part and denied in part Defendants' motion for summary judgment and denied in

full Plaintiffs' motion for partial summary judgment. (*See generally* Dkt. 106.) *See also Daniels*

*v. City of New York*, No. 16-CV-190 (PKC) (JO), 2018 WL 4119191 (E.D.N.Y. Aug. 29, 2018).

Pursuant to the Court's August 29, 2018 Order, the City of New York was dismissed as a

---

[1] Defendants moved for summary judgment as to each of Plaintiffs' respective claims (*see generally* Defendants' Summary Judgment Brief, Dkt. 91), while Plaintiffs' moved for summary judgment only as to Plaintiff Wade's malicious prosecution claim against Defendant Gladstone and related failure-to-intervene claims against Defendants Anghel and Baez (*see generally* Plaintiff's Summary Judgment Brief, Dkt. 84).

defendant, while Plaintiffs' destructive search claims and Plaintiff Daniels's right-to-bodily-privacy claim were allowed to proceed to trial. Currently before the Court is Plaintiffs' motion for reconsideration, asking that the Court reconsider its dismissal of Plaintiffs' claims for unreasonable search, unreasonable detention, malicious prosecution, and violations of procedural due process.[2] For the reasons stated herein, Plaintiffs' motion is denied as to Plaintiffs' unreasonable search, unreasonable detention, and procedural due process claims, but granted as to Plaintiff Wade's malicious prosecution claim, which will proceed to trial.

## BACKGROUND[3]

### I. Relevant Facts[4]

#### A. Initial Investigation

On October 22, 2013, the New York City Housing Authority ("NYCHA") received an

---

[2] On September 9, 2018, eleven days after the Court's summary judgment decision was issued, Plaintiffs filed a motion for a pre-motion conference in anticipation of filing a motion for reconsideration. (Plaintiffs' Reconsideration Brief ("Pls.' Recon. Br."), Dkt. 107.) Under Local Civil Rule 6.3 for the Southern and Eastern Districts of New York, a notice of motion for reconsideration of a court order must be served within 14 days after the entry of the Court's determination of the original motion. *See* Local Civ. R. 6.3. Accordingly, the pre-motion conference requirement of Rule 3.A of the Court's Individual Practices and Rules does not apply to motions for reconsideration. *See* Individual Rule 3.A ("Note that these provisions do *not* apply to motions other than those specifically enumerated." (emphasis in original)). Thus, Plaintiffs should have filed a motion for reconsideration, rather than a motion for a pre-motion conference. Nevertheless, the Court construed Plaintiffs' reconsideration motion as timely filed, set a supplemental briefing schedule, and adjourned the deadline for the parties to submit their Joint Pre-Trial Order. (*See* Sept. 21, 2018 Orders.) Plaintiffs' motion for reconsideration was fully briefed on October 29, 2018. (*See* Defendants' Supplemental Reconsideration Brief ("Defs.' Recon. Supp."), Dkt. 112.)

[3] For the sake of clarity and ease of reference, the Court recapitulates the undisputed facts of this case as previously detailed in its August 29, 2018 Order and supplements them herein.

[4] Unless otherwise noted, a standalone citation to any parties' 56.1 Statement or 56.1 Counterstatement denotes that this Court has deemed the underlying factual allegation undisputed. Such citations incorporate by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

anonymous complaint about criminal activity allegedly occurring in a NYCHA-owned apartment, 192 Sands Street, Apartment #12B, in Brooklyn, New York (the "Apartment"). (NYPD Investigation Documents ("NYPD Inv. Docs."), Dkt. 99-2, at ECF[5] 28–29.) The complaint stated that "unknown drugs [were] being sold out of apt. #12B . . . by [an] unknown perp"; the Apartment's tenant of record, Lavern Wilkinson, was deceased; Wilkinson's sister "apparently rent[ed] the [A]partment to a drug dealer"; and "there is prostitution being conducted in the building in unknown apartments." (*Id.* at ECF 25, 30.) One week later, NYCHA determined that it would "not . . . take investigative action at this time." (*Id.* at ECF 27.) On March 27, 2014, NYCHA forwarded the anonymous complaint to the NYPD's Housing Bureau, and the NYPD launched an investigation to verify the complaint. (Defendants' 56.1 Statement ("Defs.' 56.1"), Dkt. 90, ¶¶ 1–2, 11; Plaintiffs' 56.1 Counterstatement ("Pls.' 56.1 Counter."), Dkt. 97, ¶ 107.)

Two days later, the investigating officer, non-party Detective Pedro Abreu, performed various agency background checks "in an attempt to find any validity to the [October 22, 2013 anonymous] complaint." (Pls.' 56.1 Counter., Dkt. 97, ¶ 108.) In early April 2014, the checks revealed that the Apartment was not the subject of any other investigations by the NYPD or any other agency. (*Id.* ¶ 112; *see also* NYPD Inv. Docs., Dkt. 99-2, at ECF 17.) The checks further indicated that Lavern Wilkinson had indeed died, that Gloria O'Connor and Macalia Squires were listed as the Apartment's authorized tenants, and a telephone number for Emma Wilkinson, living at 192 Sands Street, Apartment #10G, was listed as the Apartment's contact. (Pls.' 56.1 Counter., Dkt. 97, ¶¶ 111, 113.) The NYPD later determined that Macalia Squires was Lavern Wilkinson's daughter, Gloria O'Connor was Squires's aunt and legal guardian, and Emma Wilkinson was

---

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

Lavern Wilkinson's sister and Plaintiff Wade's mother. (Defs.' 56.1, Dkt. 90, ¶¶ 6–10, 14.) Although O'Connor and Squires were the tenants of record, Plaintiff Wade had resided at the Apartment since December 2013 or January 2014, and his then-girlfriend, Plaintiff Daniels, lived with him in the Apartment. (*Id.* ¶¶ 34; Pls.' 56.1, Dkt. 85, ¶ 5.) However, Wade and Daniels had not signed a lease agreement with NYCHA regarding the Apartment. (Defs.' 56.1, Dkt. 90, ¶ 5.)[6]

### B. Controlled Buys[7]

On April 8, 2014, Defendant Detective Jon Gladstone took over the investigation from Abreu. (Pls.' 56.1 Counter., Dkt. 97, ¶ 114.) According to Defendants, as part of the investigation, they, along with other non-party NYPD officers, subsequently performed seven controlled buys at the Apartment using confidential informants ("CIs") and undercover officers ("UCs")[8]:

> Buy #1: In April 2014,[9] Defendants James Baez and Alexandru Anghel used a confidential informant ("CI-7") to attempt a controlled buy at the Apartment, with negative results. (*Id.* ¶ 117.) According to Defendants, CI-7 told the man who answered the door that CI-7 "was looking for 'krills' (a street term for crack cocaine) at which time the male replied he

---

[6] According to Wade, he and O'Connor had a written agreement that he "was going to fix up the [A]partment and as long as [he] could manage paying for the rent and [he didn't] have no outrageous situation happen," he could stay in the Apartment. (Deposition of Anthony Wade ("Wade Dep."), Dkt. 98-5, 21:4–15.) Additionally, according to Wade's mother, Emma Wilkinson, she and O'Connor went to a NYCHA housing management office in late 2013 and spoke to a woman named "Ms. Morgan" about transferring the Apartment's lease to Wade. (Affidavit of Emma Wilkinson ("Wilkinson Aff."), Dkt. 98-3, ¶ 10.)

[7] A "controlled buy" occurs when a confidential informant or undercover officer is given money by police officers and "asked to go to a particular location" to attempt to purchase drugs as part of an investigation. (Deposition of Jon Gladstone ("Gladstone Dep."), Dkt. 98-6, at 32:10–20, 56:6–7.)

[8] (NYPD Inv. Docs., Dkt. 99-1, ¶ 3 ("Several buy attempts using CIs and UCs were performed with negative results through the months of April and May [2014]: On [redacted dates,] positive buys for crack cocaine were achieved using CI[-]6.").)

[9] Due to concerns about protecting the identity of the agents and informants, most of the exact dates and times of the alleged controlled buys were redacted by Defendants. (*See* March 2, 2017 Minute Order, Dkt. 68.)

'wasn't up right now, come back later.'"  (NYPD Inv. Docs., Dkt. 99-2, at ECF 18.)

Buy #2:  In May 2014, Defendants Gladstone and Anghel used another confidential informant ("CI-A") to attempt another controlled buy at the Apartment, with negative results.  (Pls.' 56.1 Counter., Dkt. 97, ¶ 118; *see also* NYPD Inv. Docs., Dkt. 99-2, at ECF 16 ("The CI . . . repeatedly knocked on [the Apartment] with no answer.").)

Buy #3:  In a report dated June 10, 2014, Defendant Gladstone reported that a UC attempted a controlled buy, with negative results.  (NYPD Inv. Docs., Dkt. 99-2, at ECF 14 ("[The UC] knocked on the door repeatedly however there was no answer."); Complaint Follow-Up, Dkt. 99-11, at 3.)

Buy #4:  In a report dated June 17, 2014, Defendant Gladstone reported that CI-A attempted another controlled buy at the Apartment, with negative results.  (Pls.' 56.1 Counter., Dkt. 97, ¶ 138; NYPD Inv. Docs., Dkt. 99-2, at ECF 13 ("[CI-A] . . . states upon entering the building that there was a group of people standing by the elevator stating that it was broken.").)

Buy #5:  On June 30, 2014, Defendant Baez and non-party Detective Bourne used a third confidential informant ("CI-6") to perform a controlled drug buy at the Apartment.  CI-6 returned with "four twists of a rocky white substance" that were vouchered by Gladstone as cocaine.  (Pls.' 56.1 Counter., Dkt. 97, ¶ 151.)  According to Defendants, "[a] male black . . . answered the door and asked 'what you need?'  The CI responded that he/she was 'looking for $40 worth.'  At that time JD 'Black' reached into his pants pocket and retrieved a quantity of twists containing a white rocky substance and counted out four.  The CI then gave JD 'Black' $40 . . . and JD 'Black' gave the CI four twists of a white rocky substance. . . . The CI further informed Detective Baez that there was a strong odor of marijuana emanating from the [A]partment and approximately four other male blacks were observed hanging out inside the [A]partment.  The CI stated that JD 'Black' refused to give a name or phone until the CI returned a second time.  Following the controlled buy, Detective Baez performed a field test of the recovered rocky substance at which time it did test positive for crack cocaine."  (NYPD Inv. Docs., Dkt. 99-2, at ECF 12, 42; *see also* Dkt. 98-31.)  The substance was then submitted to the NYPD Laboratory (Defs.' 56.1, Dkt. 90, ¶ 30), and two years later, the NYPD Laboratory tested the substance submitted by Baez and determined that there was "No Controlled Substance Identified" (Controlled Substance Analysis, Dkt. 89-31, at ECF 10).

Buy #6:  In a report dated July 10, 2014, Defendant Gladstone reported that CI-6 did another controlled buy at the Apartment.  According to Gladstone, "[a] female black . . . answered the door and asked, 'What you need?'  The CI responded he/she 'was looking for $20 worth.'  At that time, JD 'Girl'

closed the door and opened it a short time later:  The CI then gave JD 'Girl' $20, and JD 'Girl' handed the CI two twists containing a white rocky substance. . . .  Following the controlled buy, [Gladstone] performed a field test of the recovered white rocky substance at which time it did test positive for crack cocaine."  (NYPD Inv. Docs., Dkt. 99-2, at ECF 8; Search Warrant Application, Dkt. 98-33, at ECF 3–4.)  On November 29, 2016, the NYPD Laboratory determined that the two twists submitted by Gladstone were "[c]ocaine [b]ase."  (Controlled Substance Analysis, Dkt. 89-30.)

Buy #7: In a report dated July 20, 2014—three days after the search of the Apartment—Defendant Gladstone reported that he and non-party Lieutenant Whitaker had previously done a third controlled buy operation with CI-6.[10]  According to Gladstone, "'JD 'Black' answered the door and asked 'what you need?'  The CI responded he/she was 'looking for $20 worth.'  At that time, JD 'Black' closed the door and opened it a short time later.  The CI then gave JD 'Black' $20 and JD 'Black' handed the CI two twists containing a white rocky substance. . . . Following the controlled buy, [Gladstone] performed a field test of the recovered white rocky substance at which time it did test positive for crack cocaine."  (NYPD Inv. Docs., Dkt. 99-2, at 5.)

In addition to these controlled buys, on June 2, 2014, Defendants Gladstone and Anghel, along with other NYPD officers, went to the Apartment "under a ruse of investigating a noise complaint and possible fight."[11]  (NYPD Inv. Docs., Dkt. 99-2, at ECF 15; Defs.' 56.1, Dkt. 90, ¶ 13.)  The officers spoke to Plaintiff Daniels, who gave the officers her full name and date of birth, and Emma Wilkinson, who stated that Plaintiff Wade lived in the Apartment.  (Defs.' 56.1, Dkt. 90, ¶ 15; Pls.' 56.1 Counter., Dkt. 97, ¶ 128.)  According to Defendants, Daniels "seemed very vague and guarded of the apartment although she claimed to be the only person there.  It seemed as if there was someone else, possibly Anthony Wade in the apartment that she didn't want us to see." (NYPD Inv. Docs., Dkt. 99-2, at ECF 15; *see also* Deposition of Alexandru Anghel ("Anghel

---

[10] Neither party addressed this incident in their original summary judgment briefing.

[11] However, a report by Gladstone, dated June 4, 2014, incorrectly indicates that this visit occurred on *April 12*, 2014.  (NYPD Inv. Docs., Dkt. 99-2, at ECF 15.)

Dep."), Dkt. 98-7, 77:7-15.)[12]  The following day, on June 3, 2014, Gladstone showed Wade's photograph to an undercover officer working in Plaintiffs' housing complex.  The officer did not recognize Wade.  (NYPD Inv. Docs., Dkt. 99-2, at ECF 10.)  On July 9, 2014, Gladstone showed CI-6 a photo array containing Wade's photograph.  Gladstone reported that CI-6 identified Wade from the photo array as "JD Black" from the June 30, 2014 controlled buy.  (Pls.' 56.1 Counter., Dkt. 97, ¶ 185; NYPD Inv. Docs., Dkt. 99-2, at 9.)

### C.  Search Warrant

On July 14, 2014, the Honorable Alex Calabrese of the Kings County Criminal Court authorized a "no-knock" search warrant for the Apartment based on an affidavit by Defendant Gladstone.  (Defs.' 56.1, Dkt. 90, ¶ 32; Search Warrant Application, Dkt. 98-33, at ECF 2.)  Gladstone's warrant application stated that, based on the positive controlled buys for crack cocaine by CI-6, as well as CI-6's identification of Wade as "JD Black," Plaintiffs were using the Apartment "to store and sell crack cocaine."  (Search Warrant Application, Dkt. 98-33, at ECF 7–8; NYPD Inv. Docs., Dkt. 99-2, at ECF 6.)  Gladstone's affidavit did not describe any of the negative buys or the positive buy described in his July 20, 2014 report, nor did it explain that NYPD lab testing had not yet been done to confirm the field test results.

### D.  July 17, 2014 Search and Arrest

On July 17, 2014, at around 7:00 AM, detectives from the NYPD's Narcotics Borough Brooklyn North squad executed a search warrant for the Apartment.  (Defs.' 56.1, Dkt. 90, ¶ 33.)

---

[12] According to Daniels, however, she was "calm" and had the door "wide open." (Deposition of Amber Daniels ("Daniels Dep.:), Dkt. 86-1, 48:14–16.)

Plaintiffs Daniels and Wade were asleep when the officers[13] entered the Apartment. (*Id.* ¶¶ 34–35.) According to Plaintiffs, the officers put "guns in [Plaintiffs'] face[s]" (Daniels Dep., Dkt. 86-1, 43:1–4, 54:12–21), and searched the apartment with drug-sniffing dogs (Affidavit of Amber Daniels ("Daniels Aff."), Dkt. 98-1, ¶ 6). Ultimately, a marijuana joint was found inside the bedroom[14] where Plaintiffs were sleeping; Plaintiffs "[b]oth . . . knew that the marijuana was in the bedroom." (Defs.' 56.1, Dkt. 90, ¶¶ 36–37.) They were arrested and taken out of the Apartment. (*Id.* ¶ 38.) No evidence of a crack cocaine trafficking operation was found. (Pls.' 56.1, Dkt. 85, ¶ 8.) According to Plaintiff Wade, the apartment was "destroyed" during the execution of the search warrant, including, but not limited to, broken shades, window fixtures, electronics, and household appliances. (Affidavit of Anthony Wade ("Wade Aff."), Dkt. 98-2, ¶¶ 19–24.)

Daniels was wearing a negligee and no underwear when she was escorted from the Apartment. (Defs.' 56.1, Dkt. 90, ¶ 39; Daniels Aff., Dkt. 98-1, ¶ 11.) According to Daniels, she made "repeated requests to cover [her] largely unclothed body during the search and arrest" because her "breasts and . . . pubic region" were exposed, but the officers rejected her requests because there were no female officers to take her to get changed. (Daniels Aff., Dkt. 98-1, ¶¶ 11–13; Daniels Dep., Dkt. 86-1, 41:20–42:13, 67:1–2, 67:7–68:5; *see also* Wade Dep., Dkt. 98-5, 52:16–19, 56:7–12, 64:5–10.) At the precinct, Daniels was eventually given a black sweatshirt to wear. (Defs.' 56.1, Dkt. 90, ¶¶ 39, 42.) By contrast, Wade, who alleges that he was naked when

---

[13] Daniels testified in her deposition that there were fifteen to twenty detectives in the Apartment. (Daniels Dep., Dkt. 86-1, 43:12–14.) Wade, however, stated at his deposition that there were only six officers. (Wade Dep., Dkt. 98-5, 49:12–15.)

[14] Plaintiffs argue that the marijuana joint was on the floor between the bed and the wall, whereas Defendants argue that it was on the windowsill. (*Compare* Wade Dep., Dkt. 98-5, 58:10–14, *with* Misdemeanor Fact Sheet, Dkt. 98-15, at 3; Daniels Summons, Dkt. 98-12, at ECF 2.)

the police entered the Apartment, was given a pair of shorts to wear because the officers were "tired of seeing his penis." (Wade Dep., Dkt. 98-5, 51:18–20, 51:25–53:6.)

According to Plaintiffs, they sat handcuffed in the Apartment for approximately two hours, then sat in a police van outside of their apartment building for two more hours, and were thereafter at the precinct for thirty minutes. (*Id.* at 56:13–24, 65:9–10, 72:2–7, 76:11–13; Daniels Dep., Dkt. 86-1, 61:18–22, 65:24–66:2, 68:22–24.) At approximately 11:40 AM on July 17, 2014, Plaintiffs were released from custody. They were in custody for a total of approximately four hours and forty minutes. (Defs.' 56.1, Dkt. 90, ¶¶ 41, 44.) Wade was issued a desk appearance ticket ("DAT") for criminal possession of marijuana in the fifth degree in violation of New York Penal Law § 221.10(1), a class B misdemeanor. (Plaintiffs' 56.1 Statement ("Pls.' 56.1"), Dkt. 85, ¶ 15.) *See also* N.Y. Penal Law § 221.10(1) ("A person is guilty of criminal possession of mari[j]uana in the fifth degree when he knowingly and unlawfully possesses mari[j]uana in a public place, as defined in [§] 240.00 of this chapter, and such mari[j]uana is burning or open to public view . . . ."). Daniels was issued a summons for unlawful possession of marijuana in violation of New York Penal Law § 221.05, a violation.[15] (Pls.' 56.1, Dkt. 86, ¶¶ 13.) *See also* N.Y. Penal Law § 221.05 ("A person is guilty of unlawful possession of mari[j]uana when he knowingly and unlawfully possesses mari[j]uana."). Because Wade was charged with a misdemeanor, he was fingerprinted and photographed; Daniels was not. (Pls.' 56.1, Dkt. 86, ¶¶ 14, 16.)

### E. Post-Arrest Events

When Plaintiffs returned to the Apartment on July 17, 2014, it had been padlocked by a NYCHA employee (Defs.' 56.1, Dkt. 90, ¶¶ 45–46), who had given the keys to Defendants to

---

[15] A violation is punishable by imprisonment of up to fifteen days and a fine of up to $250, whereas a class B misdemeanor is punishable by imprisonment of up to three months and a fine of up to $500. N.Y. Penal Law §§ 70.15, 80.05.

voucher (Gladstone Notes, Dkt. 98-15, at 8, 15; Wade Aff., Dkt. 98-2, ¶ 10; Property Invoice, Dkt. 89-21). According to Wade, the NYCHA employee was told by the NYPD "to put the padlock on the door . . . for the time that [the NYPD] retained [Plaintiffs]. That way nobody's going to go into the [A]partment and steal [their] valuables." (Wade Dep., Dkt. 98-5, 85:12–13, 86:3–10.) After he was released from custody, Wade alleges that he asked Defendants for the padlock keys, but was told that he had to get them from NYCHA. (Wade Aff., Dkt. 98-2, ¶ 11 ("Defendants had the keys but would not give them to me.") *But see* Wade Dep., Dkt. 98-5, 86:16–23 (Wade testifying that NYCHA had keys to the padlock).) Wade alleges that he then went to NYCHA as instructed, "but they told [him] that since NYPD officers took the keys, they would have to be the ones to return them." (Wade Aff., Dkt. 98-2, ¶¶ 12–15; Wilkinson Aff., Dkt. 98-3, ¶ 21.) Wade ultimately was able to get back into the Apartment on July 17, 2014 because either he or a NYCHA maintenance worker unscrewed the padlock from the door. (*Compare* Wade Aff., Dkt. 98-2, ¶ 18, *with* Wade Dep., Dkt. 98-5, 81:6–17, 82:4–9.) Plaintiffs retrieved some of their belongings and clothes. (Defs.' 56.1, Dkt. 90, ¶ 52.) Wade also took a video of the condition of the Apartment. (Wade Video, Dkt. 98-35.) A second padlock was put on the Apartment door in August 2014, but Plaintiffs do not know whether NYCHA or the NYPD installed it. (Wade Aff., Dkt. 98-2, ¶ 17.) On July 20, 2014, Defendant Gladstone wrote a report stating that, in his opinion, "there is no narcotic activity being conducted at the subject location," and that the case should be closed. (Pls.' 56.1 Counter., Dkt. 97, ¶¶ 272–273.). In November 2014, the second padlock was removed from the Apartment door by NYCHA. (Defs.' 56.1, Dkt. 90, ¶ 54.)

On October 12, 2014, Plaintiff Daniels appeared for her court date and was told "that her case was not on the list of cases to be heard that day"; she was then released. (Defs.' 56.1, Dkt. 90, ¶¶ 56–57.) Daniels did not return to court on the summons again. (*Id.* ¶ 58.) On November

12, 2014, Wade appeared in response to his DAT and was charged by the Kings County District Attorney's Office ("KCDA" or "DA's Office") with a violation of New York Penal Law § 221.05, the same violation charge as Daniels and a lesser charge than the one listed on Wade's DAT. (*Id.* ¶¶ 59–61.) On December 12, 2014, Wade's case was resolved, and he received an adjournment in contemplation of dismissal ("ACD"). (*Id.* ¶ 62.)

## STANDARD OF REVIEW

A motion for reconsideration pursuant to Local Civil Rule 6.3 "is the proper vehicle for bringing to the Court's attention matters it may have overlooked in its initial ruling or [O]rder." *Pall Corp. v. 3M Purification, Inc.*, Nos. 97-CV-7599 (PKC), 03-CV-92 (PKC), 2015 WL 5009254, at *1 (E.D.N.Y. Aug. 20, 2015). Reconsideration is an extraordinary remedy that will not be granted simply because a party is dissatisfied with the Court's previous decision. *See Salveson v. JP Morgan Chase & Co.*, 166 F. Supp. 3d 242, 249 (E.D.N.Y. 2016). Accordingly, a motion for reconsideration "is not a vehicle for re[-]litigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)). Rather, in order to prevail on a motion for reconsideration, "the moving party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion," *Lichtenberg v. Besicorp Grp. Inc.*, 28 F. App'x 73, 75 (2d Cir. 2002) (summary order) (citations and internal quotation marks omitted), and that those matters "might reasonably be expected to alter the conclusion reached by the [C]ourt," *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

## DISCUSSION

Plaintiffs move the Court to reconsider four discrete aspects of its August 29, 2018 Order. First, Plaintiffs argue that the Court should reconsider its dismissal of Plaintiffs' unreasonable

search claims because the Court incorrectly determined that Plaintiffs had conceded that the substance seized by Defendants on June 30, 2014 field-tested positive for cocaine. (*See* Pls.' Recon. Br., Dkt. 107, at 1–2; Plaintiffs' Supplemental Reconsideration Brief ("Pls.' Recon. Supp."), Dkt. 109, at 1–3.) Second, Plaintiffs assert that, if the Court reconsiders its dismissal of Plaintiffs' unreasonable search claims, it should also reconsider the dismissal of Plaintiffs' closely related claims for unreasonable detention. (*See* Pls.' Recon. Br., Dkt. 107, at 3; Pls.' Recon. Supp., Dkt. 109, at 4.) Third, Plaintiff Wade argues that the Court should reconsider its finding that his prosecution did not terminate in his favor and, in turn, its dismissal of his malicious prosecution claim. (Pls.' Recon. Br., Dkt. 107, at 2–3; Pls.' Recon. Supp., Dkt. 109, at 3–4.) Fourth, Plaintiffs argue that the Court should reconsider its dismissal of Plaintiffs' procedural due process claims because it incorrectly determined that Plaintiffs could have availed themselves of a meaningful post-deprivation remedy. (Pls.' Recon. Br., Dkt. 107, at 3; Pls.' Recon. Supp., Dkt. 109, at 4–5.) The Court addresses each asserted ground for reconsideration in turn.

## I.      Unreasonable Search Claims

In their complaint and summary judgment briefing, Plaintiffs asserted that the affidavit supporting Defendants' search warrant omitted material information that was necessary to the finding of probable cause and thus supported Plaintiffs' unreasonable search claims. (*See* Amended Complaint ("Am. Compl."), Dkt. 18, at ¶¶ 106–112; Plaintiff's Summary Judgment Opposition Brief ("Pls.' S.J. Opp. Br."), Dkt. 96, at 12–17.) In its August 29, 2018 Order, the Court granted summary judgment to Defendants on these claims. *Daniels*, 2018 WL 4119191, at *6–7.

### A.      Legal Standard

A Section 1983 plaintiff challenging a warrant on the ground that it deliberately or recklessly misled the issuing judge regarding the basis of probable cause "must make the same

showing that is required at a suppression hearing" under *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994). Specifically, a plaintiff must make a "substantial preliminary showing," *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) (internal quotations and citation omitted), that "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause or necessity finding," *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (brackets omitted) (quoting *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000)). When a warrant is based upon information obtained through the use of a confidential informant, the Court must assess whether probable cause exists to support a search warrant "by examining the 'totality of the circumstances' bearing upon [the] reliability" of information obtained through the use of a confidential informant. *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)). "The ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, 'there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause [or necessity].'" *Canfield*, 212 F.3d at 718 (quoting *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)). "The *Franks* standard is a high one," *Rivera*, 928 F.2d at 604, and "this Court must 'resolve any doubt about the existence of probable cause in favor of upholding the warrant,'" *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 465 (S.D.N.Y. 2008) (quoting *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998)).

## B.     The Court's Prior Decision

In its August 29, 2018 Order, the Court considered Plaintiffs' argument that Defendant Gladstone's affidavit in support of the search warrant "was defective because it 'reported the 'positive buys' made by CI-6 as supporting probable cause, but neglected to mention the

investigation's larger history (aged anonymous complaint, negative computer checks, long-term investigators' statements that [Plaintiff] Wade and the Apartment were not subjects, etc.) or Defendants' divergence from virtually all safeguards designed to ensure the veracity and integrity of their use of CI-6.'" *Daniels*, 2018 WL 4119191, at *6 (quoting Pls.' S.J. Opp. Br., Dkt. 96, at 11.) The Court found Plaintiffs' argument unavailing. *See Daniels*, 2018 WL 4119191 at *7.

Applying *Franks*, the Court assumed, *arguendo*, that Plaintiffs could meet the first prong of the *Franks* test, *i.e.*, that the claimed falsehoods were the result of the affiant's deliberate falsehood or reckless disregard for the truth, yet found that Plaintiffs had not established a genuine dispute of material fact as to the second prong, *i.e.*, that the alleged falsehoods or omissions were necessary to the issuing judge's probable cause determination. *See Daniels*, 2018 WL 4119191, at *6 ("Plaintiffs' claims 'fail under the 'corrected affidavit' doctrine because a hypothetical warrant affidavit, deleting the purported misstatements and including the challenged omissions, would not affect the probable cause determination.'" (quoting *Coderre v. City of Wallingford*, 668 F. App'x 399, 399–400 (2d Cir. 2016) (summary order))). In its analysis, the Court considered the relevance of two controlled buys by CI-6, Buy #5 and Buy #6, both of which field-tested positive for cocaine according to Defendants' records. *See id.* (*See also* Buy #5 Field Test Report, Dkt. 103-4; Buy #6 Field Test Report, Dkt. 103-5.) The Court stated that "Plaintiffs do not dispute that the rocky white substances CI-6 brought to Defendants following Buys #5 and #6 field-tested positive for cocaine." *Daniels*, 2018 WL 4119191, at *6. Nevertheless, the Court excluded Buy #5 from its considerations, in light of Plaintiffs' assertion that Defendant Baez threw away the positive field test for Buy #5. *See id.* Even when disregarding Buy #5, however, the Court held that Plaintiffs could not show that Defendants "had a basis for believing, at the time of [Plaintiffs'] arrest, that [Buy #6's] positive field test result was inaccurate or unreliable." *Id.* (quoting *Green*

*v. Webster*, 359 F. App'x 249, 251 (2010) (summary order)). Based on this analysis, the Court granted summary judgment to Defendants as to Plaintiffs' unreasonable search claims. *Id.* at *7.

###	C.	Ground for Reconsideration

As the basis for their reconsideration motion, Plaintiffs argue that the Court's statement that "Plaintiffs do not dispute that the rocky white substances CI-6 brought to Defendants following Buys #5 and #6 field-tested positive for cocaine" was incorrect. *Daniels*, 2018 WL 4119191 at *7. Plaintiffs argue that, by overlooking this "Field Test Fact Issue," the Court was unable to fully consider Plaintiffs' argument that, under the totality of the circumstances, a corrected affidavit reflecting the full history and context of Defendants' investigation would have been insufficient to support probable cause. (Pls.' Recon. Br., Dkt. 107, at 1–2.)

Indeed, the Court acknowledges that Plaintiffs did dispute whether the Buy #5 substance actually field-tested positive for cocaine, as well as whether it was ever field tested at all, based on the fact that the Buy #5 substance failed to test positive two years after Defendants first obtained it. (*See* Pls.' S.J. Opp. Br., Dkt. 96, at 13; *see also* Pls.' 56.1 Counter., Dkt. 97, ¶ 21 ("[The Buy #5 substance] was a non-controlled substance. There is a fact issue as to whether and/or how Defendants field tested baking soda—or whatever it was—as cocaine.")). Nevertheless, even when this factual dispute is incorporated into its analysis, the Court still finds that Plaintiffs have not made the "substantial preliminary showing" required to undermine Judge Calabrese's finding of probable cause. *Rivera*, 928 F.2d at 604.

As an initial matter, the Court notes that its August 29, 2018 Order excluded Buy #5 for the purpose of evaluating probable cause for the search warrant, finding that "there would still be probable cause for the search warrant based on the other positive controlled buy, Buy #6." *Daniels*, 2018 WL 4119191, at *6 (citing *Green*, 359 F. App'x at 251 ("A reasonably trustworthy field test that returns a 'positive' result for the presence of cocaine is a sufficient basis for probable cause.")).

15

Thus, the only question for the Court on reconsideration is whether the dispute regarding the Buy #5 field test means that Defendants "had a basis for believing" that the field test result for Buy #6 was not "reasonably trustworthy." *See Green*, 359 F. App'x at 251.

On this point, Plaintiffs offer pure conjecture. They assert that the conflicting test results for Buy #5, combined with the history of Defendants' investigation and departure from established protocols, are sufficient to raise the inference that Defendants misrepresented nearly every material aspect of the affidavit supporting the search warrant, up to and including their use of a confidential informant. (Pls.' Recon. Supp., Dkt. 109, at 1–3.) This assertion is insufficient to raise a triable issue of fact. While conflicting test results of the same substance may, in some circumstances, raise triable issues of fact, those circumstances do not exist here, where the non-conflicting (*i.e.*, confirmed) test results for Buy #6 are sufficient to support the search warrant's validity. Though the conflicting test results for Buy #5 may create metaphysical doubt as to whether the positive field-test for Buy #5 ever occurred, they do little to undermine the separate positive field test for Buy #6, for which contemporaneous records were created and which was confirmed by lab testing two years later (*see* Controlled Substance Analysis, Dkt. 89-30), or CI-6's identification of Plaintiff Wade out of a photo array (*see* Pls.' 56.1 Counter., Dkt. 97, ¶ 185; NYPD Inv. Docs., Dkt. 99-2, at 9). This evidence is not implicated by Plaintiffs' over-arching argument that the conflicting test results for Buy #5 and other facts relating to the investigation provide a basis for questioning the veracity or credibility of Detective Gladstone or the accuracy of his search warrant affidavit. Thus, stripping away all erroneous information and considering all material omissions as part of the totality of the circumstances, the Court again and still finds that these facts are sufficient to support probable cause for the search warrant executed by Defendants.

\*      \*      \*

Because Plaintiffs cannot demonstrate, other than through pure conjecture, that Defendants had a basis for believing that the Buy #6 field test was inaccurate or unreliable, the Court declines to reconsider its dismissal of Plaintiffs' unreasonable search claims.

## II. Plaintiffs' Unreasonable Detention Claims

Plaintiffs also move for reconsideration of the Court's dismissal of their unreasonable detention claims to the extent that the legality of Plaintiffs' detention rises and falls with the legality of the underlying search of Plaintiffs' apartment. (*See* Pls.' Recon. Br., Dkt. 107, at 3 ("As Defendants' four-hour on-scene seizure of Plaintiffs was search-related, the search and detention claims are tethered . . . .").) Because the Court denies Plaintiffs' motion for reconsideration as to Plaintiffs' unreasonable search claims, it need not reconsider the dismissal of Plaintiffs' unreasonable detention claims.

## III. Malicious Prosecution Claim

In the amended complaint, Plaintiff Wade also asserted a malicious prosecution claim against Defendant Gladstone. (Am. Compl., Dkt. 18, ¶¶ 120–131.) Wade based this claim on the fact that Gladstone issued him a DAT that listed Wade's alleged crime as criminal possession of marijuana in the fifth degree under New York Penal Law § 221.10(1), while Plaintiff Daniels was only charged with unlawful possession of marijuana, a violation of New York Penal Law § 221.05. (*Id.* ¶¶ 57–67.) In the August 29, 2018 Order, the Court denied Wade's motion for partial summary judgment as to his malicious prosecution claim and granted summary judgment to Gladstone. *Daniels*, 2018 WL 4119191, at *11.

### A. Legal Standard

In order to prevail on a claim for malicious prosecution in violation of § 1983, "a plaintiff is required to demonstrate: [(1)] the commencement or continuation of a criminal proceeding against [him]; [(2)] the termination of the proceeding in [his] favor; [(3)] 'that there was no

probable cause for the proceeding'; and [(4)] 'that the proceeding was instituted with malice.'"
*Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016) (quoting *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003)). In addition to these elements, a plaintiff proceeding under § 1983 must also "show a 'seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment.'" *Id.* (quoting *Washington v. Cty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004)).

### B. The Court's Prior Decision

In its August 29, 2018 Order, the Court noted that Wade "concedes that his marijuana possession charge pursuant to Section 221.05 was not favorably terminated and, therefore, cannot form the basis of his malicious prosecution claim." *Daniels*, 2018 WL 4119191, at *10. However, the Court also addressed Wade's argument that the original Section 221.10(1) class B misdemeanor charge in the DAT was favorably terminated when the DA's Office declined to prosecute that charge—in effect dismissing it—and decided to instead charge Wade with the less serious Section 221.05 violation. *Id.* at *10–11.

The Court analogized the KCDA's decision to charge Wade with a Section 221.05 violation instead of a Section 221.10(1) misdemeanor to forms of termination that do not constitute favorable termination for the purpose of a malicious prosecution claim, such as an ACD pursuant to New York Criminal Procedure Law § 170.55, a dismissal pursuant to New York Criminal Procedure Law § 170.30(1)(a) for failure to allege sufficient facts to support the charge, and a withdrawal or abandonment of the prosecution pursuant to a compromise with the accused. *Id.* at *11. The Court also found that the prosecutor's decision to charge Wade with a less serious offense was not a favorable termination, in part, because that decision was made "independent of any pressure exerted by police." *Id.* at *11 (quoting *Hartman v. Moore*, 547 U.S. 250, 263 (2006)).

The Court thus found that Wade could not establish the favorable termination element of his malicious prosecution claim and granted summary judgment in favor of Defendants.[16]

### C.     Grounds for Reconsideration

Plaintiff Wade seeks the Court's reconsideration of its finding that there was no favorable termination to support his malicious prosecution claim against Gladstone.  Wade argues that the Court overlooked and misapplied controlling Second Circuit case law that governs charge-specific analyses in malicious prosecution cases and thus failed to adequately evaluate Wade's claim.  (*See* Pls.' Recon. Supp., Dkt. 109, at 3; *see also* Plaintiff's Summary Judgment Brief,[17] Dkt. 84, at 12–17 (citing, *inter alia*, *Janetka v. Dabe*, 892 F.2d 187, 188 (2d Cir. 1989), and *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991)).)  Because the Court agrees that its August 29, 2018 Order did not properly apply the *Janetka* and *Posr* line of cases to Wade's claim of malicious prosecution, the Court grants reconsideration of its ruling and reviews the parties' respective motions for summary judgment *de novo*.  *Cf. Warehouse Wines & Spirits, Inc. v. Travelers Property Casualty Co. of Am.*, No. 13-CV-5712 (KBF), 2015 WL 13680642, at *1 (S.D.N.Y. May 11, 2015) (granting a motion for reconsideration and re-evaluating the underlying summary judgment motion *de novo*).

####      1.     Commencement

As the first element of a malicious prosecution claim under § 1983, a plaintiff must show "that the defendant commenced or continued a criminal proceeding against him."  *Kinzer*, 316 F.3d at 143.  The Second Circuit has long held that the issuance of a DAT commences a criminal

---

[16] Because of its dispositive ruling on this element, the Court did not analyze the four other elements of Wade's Section 1983 malicious prosecution claim, which are discussed in full *infra*.

[17] It is important to note that, in addition to opposing Defendants' motion for summary judgment on Wade's malicious prosecution claim, Plaintiffs also cross-moved for summary judgment in their favor on this claim, which the Court now partially grants.  (*See* Plaintiff's Summary Judgment Brief, Dkt. 84, at 11–22.)

proceeding under New York law. *See Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 199 (2d Cir. 2014) ("[T]he issuance of a DAT sufficiently initiates a criminal prosecution to sustain a claim of malicious prosecution."); *Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10*, 605 F.2d 1228, 1250 (2d Cir. 1979) ("[W]e believe that if a New York court faced the question before us it would rule that the issuance of an Appearance Ticket commences a prosecution for purposes of determining whether an action for malicious prosecution lies."); *see also Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016) (finding that the issuance of a DAT was sufficient to establish commencement for the purposes of both federal and state malicious prosecution claims).

Here, it is undisputed that Gladstone issued a DAT to Wade for criminal possession of marijuana in the fifth degree. (Pls.' 56.1, Dkt. 85, ¶ 15; Desk Appearance Ticket, Dkt. 86-8.) In their response to Plaintiff's 56.1 Statement, Defendants dispute the legal significance of the DAT for Wade's malicious prosecution claim. (*See* Defendants' 56.1 Counterstatement ("Defs.' 56.1 Counter."), Dkt. 94, ¶ 15 ("[D]efendants take exception to the characterization that the DAT 'charged' Wade, especially to the extent that that word is construed to assert that the NYPD's document has the same legal effect that an assistant district attorney's determination of appropriate criminal charges does.").) Nevertheless, they did not expressly argue in their summary judgment briefing that the issuance of a DAT is not an initiation of a criminal prosecution. (*See* Defendants' Summary Judgment Brief, Dkt. 91, at 19–21 (arguing that Wade cannot establish the favorable termination, lack of probable cause, malice, and deprivation elements of malicious prosecution, yet making no argument as to commencement); Defendants' Summary Judgment Opposition ("Defs.' S.J. Opp."), Dkt. 95, at 4–16.)

Defendants appear to make this argument implicitly, however, when they contend that Wade cannot establish favorable termination because a charge for criminal possession of marijuana in the fifth degree was never filed in court by the DA's Office. (*See* Defs.' S.J. Opp., Dkt. 95, at 9–10 (stating that Plaintiffs' argument would require the Court "to accept that Wade was ever actually 'prosecuted' on the § 221.10(1) charge" and asserting that "the decision to determine criminal charges rests solely with the prosecutor").)  This reasoning flies in the face of clear Second Circuit precedent.  In *Mitchell v. City of New York*, the Second Circuit found that a plaintiff established the commencement of a criminal prosecution where the defendant-officer issued a DAT, even though the KCDA declined to prosecute.  *See* 841 F.3d at 76, 79.  Because "there can be no question that [Gladstone] initiated a criminal proceeding against [Wade] by arresting him and then issuing him a DAT," *Cabrera v. City of New York*, No. 16-CV-1098 (GBD), 2017 WL 6040011, at *7 (S.D.N.Y. Dec. 4, 2017), Defendants' argument as to the commencement element of Wade's malicious prosecution claim is meritless.

Based on the undisputed facts, the Court finds that Plaintiffs have established the commencement element of Wade's malicious prosecution claim as a matter of law.  The Court therefore grants summary judgment in Plaintiffs' favor with respect to this element, which need not be proved at trial.

### 2.    Favorable Termination

For the second element of his malicious prosecution claim, Wade must show that the criminal proceeding initiated by Gladstone terminated in his favor.  *See Kinzer*, 316 F.3d at 143.  This is where the *Janetka* and *Posr* line of cases come into play, and it is this aspect of the Court's prior decision that is now being reconsidered.

For the purposes of a federal malicious prosecution claim, a proceeding terminates in a criminal defendant's favor "when its final disposition is such as to indicate [his] innocence."

*Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. 1997); *see also Lanning v. City of Glens Falls*, 908 F.3d 19, 28 (2d Cir. 2018) ("[A]bsent an affirmative indication that the person is innocent of the offense charged, the government's failure to proceed does not necessarily imply a lack of reasonable grounds for the prosecution." (brackets and internal quotation omitted)).  A proceeding need not result in an acquittal at trial in order to be favorably terminated, although acquittal is certainly sufficient.  *See Jimenez v. City of New York*, No. 14-CV-2994 (SAS), 2015 WL 5638041, at *5 (S.D.N.Y. Sept. 24, 2015).  Whether a termination is affirmatively indicative of innocence "depends on the nature and circumstances of the termination."  *Antic v. City of New York*, 273 F. Supp. 3d 445, 457 (S.D.N.Y. 2017) (quoting *Murphy*, 118 F.3d at 948).  "When a termination is indecisive because it does not address the merits of the charge, the facts surrounding the termination must be examined to determine whether the failure to proceed implies a lack of reasonable grounds for the prosecution."  *Williams v. City of New York*, No. 10-CV-9594 (CM) (DCF), 2012 WL 547508, at *8 (S.D.N.Y. Feb. 17, 2012) (internal quotations and citation omitted).

Additionally, the Second Circuit has instructed that district courts should evaluate claims of malicious prosecution on a charge-specific basis.  In *Janetka v. Dabe*, 892 F.2d 187 (2d Cir. 1989), the Second Circuit confronted a malicious prosecution claim where the plaintiff went to trial and was convicted of disorderly conduct, a violation, yet was acquitted of resisting arrest, a misdemeanor.  *Id.* at 189.  Because the charges were "distinct offenses involving distinct allegations" and elements, the plaintiff was allowed to proceed on a malicious prosecution claim based on the charge of resisting arrest because that particular charge was terminated in his favor and was a more serious charge than the charge on which he was convicted.  *Id.* at 190.  In support of this bifurcated analysis, the Second Circuit explained that a contrary rule would mean that

"police officers could add unsupported serious charges to legitimate minor charges with impunity," resulting in deprivations of liberty or property above and beyond those associated with the legitimate charges. *Id.*; *see also id.* ("Allowing police officers to add unwarranted misdemeanor charges to valid violation charges may force an accused to go to trial on the misdemeanor when he otherwise would plead to the violation."); *cf. Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991) ("If the rule were the one followed by the district court, an officer with probable cause as to a lesser offense could tack on more serious, unfounded charges which would support a high bail or a lengthy detention, knowing that the probable cause on the lesser offense would insulate him from liability for malicious prosecution on the other offenses.").

In the proceedings underlying this action, Gladstone issued a DAT that initially charged Wade with criminal possession of marijuana in the fifth degree in violation of New York Penal Law § 221.10(1), a class B misdemeanor. (*See* Pls.' 56.1, Dkt. 85, ¶ 15; Desk Appearance Ticket, Dkt. 86-8.) As the issuance of a DAT is sufficient to commence a criminal prosecution for the purposes of a federal malicious prosecution claim, *see Mitchell*, 841 F.3d at 79, Wade was, in fact, "charged" with violating § 221.10(1). *See also* Section III.C.1 *supra*. That charge was terminated when the KCDA chose to file a criminal complaint against Wade for a less serious charge, unlawful possession of marijuana under New York Penal Law § 221.05, which is only a violation. (*See* Complaint Room Screening Sheet, Dkt. 86-12, at ECF 19 (showing Wade's arrest charge under § 221.10(1), while listing the complaint charge as brought under § 221.05); Criminal Complaint, Dkt. 86-12, at ECF 21 (listing Wade's offense as "unlawful possession of marijuana").)

The KCDA's decision to decline to proceed with the § 221.10(1) charge initiated by Gladstone does not, on its face, "address the merits of the charge." *Williams*, 2012 WL 547508, at *8. Accordingly, the Court must look to the undisputed facts surrounding the termination to

determine whether the failure to proceed implies a lack of reasonable grounds for the prosecution, *i.e.*, provides an affirmative indication of Wade's innocence on the initial § 221.10(1) charge. *See Murphy*, 118 F.3d at 948 ("The answer to whether [a] termination is indicative of innocence depends on the nature and *circumstances* of the termination." (emphasis added)).

To violate § 221.10(1), a person must possess marijuana in a public place, and the marijuana must be burning or open to public view. *See* N.Y. Penal Law § 221.10(1). The undisputed facts affirmatively indicate that Wade was, in fact, innocent of this charge.

The marijuana at issue was recovered from the rear bedroom in the Apartment. (*See* Pls.' 56.1, Dkt. 85, ¶ 8; Defs.' 56.1 Counter., Dkt. 94, ¶ 8.) A bedroom is not a public place for the purposes of § 221.10(1). *See* N.Y. Penal Law § 240.00 ("'Public place' means a place to which the public or a substantial group of persons has access . . . ."). Gladstone, the arresting officer who issued the DAT to Wade and forwarded it to the DA's Office (Pls.' 56.1, Dkt. 85, ¶ 15; Defs.' 56.1, Dkt. 94, ¶ 41), testified in his deposition that he did not believe that Wade was guilty of violating § 221.10(1) (Gladstone Dep., Dkt. 86-3, at 139:22–140:16). Indeed, at the time he forwarded the § 221.10(1) charge to the KCDA, he knew that the charge was incorrect. (*Id.* at 140:22–141:6.) According to Gladstone, the incorrect charge occurred due to a miscommunication between himself and the officer who prepared the paperwork, but he declined to correct the charge because "we would have had to void this, and re-enter a new arrest and re-print Mr. Wade, which could have taken hours, plus essentially delaying his release for the unlawful possession of marijuana." (*Id.* at 171:18–172:7.) In light of Gladstone's testimony and the undisputed fact that the marijuana was recovered from a rear bedroom in the Apartment, there are affirmative indications that Wade was "innocent of the offense charged." *Lanning*, 908 F.3d at 28. Thus, the KCDA's "failure to proceed" on the § 221.10(1) misdemeanor charge and, instead, to charge Wade

with a lesser violation under § 221.05 "implies a lack of reasonable grounds" for Gladstone to have commenced proceedings for a violation of § 221.10(1). *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994)).

Based on the undisputed facts, the Court finds, as a matter of law, that the Section 221.10(1) charge that was commenced by Gladstone was terminated in Wade's favor when prosecutors failed to pursue it and instead brought a lesser charge under Section 221.05. This element need not be proved at trial.

### 3.    Probable Cause

To prevail on a § 1983 claim of malicious prosecution, a plaintiff must establish a lack of probable cause for the commencement or continuation of the proceeding. *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1155 (2d Cir. 1995). "The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases," *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013), as in the malicious prosecution context, probable cause is established where there are "facts and circumstances as would lead a reasonably prudent person to believe the plaintiff [is] guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). "The existence or nonexistence of probable cause . . . . is determined, at the earliest, as of the time [the] prosecution is commenced." *Rothstein v. Carriere*, 373 F.3d 275, 292 (2d Cir. 2004). And as with favorable termination, courts must conduct a charge-specific analysis; the Second Circuit will "not allow a finding of probable cause on [a distinct, lesser] charge to foreclose a malicious prosecution cause of action on charges requiring different, and more culpable, behavior." *Posr*, 944 F.2d at 100; *see also Morris v. Silvestre*, 604 F. App'x 22, 25 (2d Cir. 2015) (summary order) ("Particularly because [the] crimes are more serious and involve different elements, we respectfully conclude that the district court erred in not 'separately analyz[ing] the charges claimed to have been maliciously prosecuted.'" (quoting *Posr*, 944 F.2d at 100)); *Genevese v. Cty. of Suffolk*, 128 F.

Supp. 3d 661, 669 (E.D.N.Y. 2015) ("[I]n the context of a malicious prosecution claim, probable cause must relate to the specific crime charged in the criminal proceeding.").

Here, Wade was issued a DAT that listed his crime as a violation of New York Penal Law § 221.10(1). (Pls.' 56.1, Dkt. 85, ¶ 15; Defs.' 56.1, Dkt. 94, ¶ 41.) Despite this fact, the record makes clear that there was no probable cause to prosecute Wade for a violation of § 221.10(1). (*See* Defs.' 56.1, Dkt. 90, ¶ 36 (noting that "NYPD officers found one marijuana joint inside the bedroom where [Plaintiffs] slept"). *See also* N.Y. Penal Law § 221.10(1) ("A person is guilty of criminal possession of mari[j]uana in the fifth degree when he knowingly and unlawfully possesses mari[j]uana in a public place, as defined in [§] 240.00 of this chapter, and such mari[j]uana is burning or open to public view . . . ."); N.Y. Penal Law § 240.00 ("'Public place' means a place to which the public or a substantial group of persons has access . . . ."). Furthermore, Gladstone admitted under oath, that he knew at the time he issued the DAT to Wade that there was no probable cause to prosecute Wade for a violation of § 221.10(1). (*See* Gladstone Dep., Dkt. 86-3, at 140:22–141:6.) In light of these undisputed facts, Gladstone lacked probable cause to believe that Wade was guilty of criminal possession of marijuana in the fifth degree at the time that he issued the DAT to Wade and forwarded it to the KCDA.

Because the undisputed facts in this case show that Gladstone lacked probable cause to initiate criminal proceedings against Wade for a violation of New York Penal Law § 221.10(1), the Court grants summary judgment to Plaintiffs on this element of Wade's malicious prosecution claim, which need not be proved at trial.

4. Malice

The fourth element that a plaintiff seeking recovery under § 1983 for malicious prosecution must establish is "that the proceeding was instituted with malice." *Kinzer*, 316 F.3d at143. Malice does not have to be spite or hatred; it simply means "that the defendant must have commenced the

criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (internal quotations and citation omitted); *see also Dufort v. City of New York*, 874 F.3d 338, 353 (2d Cir. 2017) (reaffirming this rule for a federal claim of malicious prosecution under § 1983); *Perez v. Duran*, 962 F. Supp. 2d 533, 540 (E.D.N.Y. 2013) (stating the same). A lack of probable cause "tends to show that the accuser did not believe in the guilt of the accused." *Lowth*, 82 F.3d at 573 (internal quotations and citation omitted). Accordingly, a lack of probable cause for the prosecution "generally creates an inference of malice." *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003).

Here, Gladstone admits that he knew the Section 221.10(1) charge was improper, yet he processed the paperwork anyways because it would have been administratively inconvenient to properly process Wade. (Gladstone Dep., Dkt. 86-3, at 171:18–172:7.) In light of Gladstone's testimony, the lack of probable cause for the Section 221.10(1) prosecution, and the fact that Plaintiff Daniels, in contrast to Wade, was properly charged with the less serious offense, based on the same evidence and circumstances, a reasonable jury could find that Gladstone acted from "improper or wrongful motives" or "in reckless disregard of the rights of [Wade]." *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996). Accordingly, the malice element of Plaintiff's malicious prosecution claim may be submitted to a jury. *See Naim v. City of New York*, No. 10-CV-912 (FB) (RER), 2012 WL 2923308, at *3 (E.D.N.Y. July 18, 2012) ("Because malice may be proven circumstantially and a jury may infer malice from the absence of probable cause, the malice element is also a question for the jury." (brackets, quotations, and internal citations omitted)).

## 5. Deprivation

Because Wade brings his malicious prosecution claim under § 1983, he must also establish a fifth element: "a violation of his rights under the Fourth Amendment." *Manganiello v. City of*

*New York*, 612 F.3d 149, 161 (2d Cir. 2010). This element stems from the plurality opinion in *Albright v. Oliver*, 510 U.S. 266 (1994) (Rehnquist, C.J.), which the Second Circuit has applied to mean that "only violations of the Fourth Amendment [can] support § 1983 claims for malicious prosecution." *Washington v. Cty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004); *see also Albright*, 510 U.S. at 274 (noting that "the Fourth Amendment's relevance to the deprivations of liberty that go hand in hand with criminal prosecutions"). Applying this principle, courts generally hold that "[t]he Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person—*i.e.*, the right to be free of unreasonable or unwarranted restraints on personal liberty." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995). Though "unreasonable seizure[s] of the person" are the typical type of constitutional violations involved in malicious prosecution cases, it is "possible . . . for a plaintiff to premise a malicious prosecution claim on some other constitutional right." *Id.* at 116 & n.5; *see also Mejia v. City of New York*, 119 F. Supp. 2d 232, 253–54 (E.D.N.Y. 2000) ("In order to establish a claim for malicious prosecution under § 1983, a plaintiff must show . . . that the malicious prosecution led to a deprivation of liberty sufficient to constitute a 'seizure' within the meaning of the Fourth Amendment, or must otherwise establish that the malicious prosecution violated a right, privilege, or immunity secured by the Constitution and laws of the United States." (citing *Singer*, 63 F.3d at 116 n.5)).

As relevant here, the Fourth Amendment protects more than just personal liberty; it provides that "[t]he right of the people to be secure in their persons, houses, *papers*, *and effects*, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV (emphasis added). "A seizure [of property] occurs when the Government interferes in some meaningful way with the individual's possession of property." *United States v. Ganias*, 755 F.3d

125, 133 (2d Cir. 2014) (citing *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012)), *rev'd on other grounds*, 824 F.3d 199 (2d Cir. 2016) (*en banc*)).  Accordingly, Wade may maintain his malicious prosecution action provided he is able to show an unreasonable seizure of property pursuant to a legal process.  *See Poventud v. City of New York*, 750 F.3d 121, 130 (2d Cir. 2014) ("[M]alicious prosecution . . . permits damages for [constitutional violations] imposed pursuant to legal process.").

Wade primarily complains that he was effectively evicted from the Apartment as a result of the § 221.10(1) charge, which he argues triggered a process whereby NYCHA and the NYPD padlocked the apartment.  (Plaintiffs' Summary Judgment Reply ("Pls.' S.J. Reply"), Dkt. 100, at ECF 7–8.)  Wade, however, was not a formal tenant of the Apartment; rather, he appears to have been a mere licensee with permission from the actual leaseholder, Gloria O'Connor, to occupy the apartment.  (Wade Dep., 86-2, 20:4–25; Defs.' 56.1, Dkt. 90, ¶ 5; Pls.' 56.1 Counter., Dkt. 97, ¶ 5.)  *See Smith v. Cty. of Nassau*, No. 10-CV-4874 (MKB), 2015 WL 1507767, at *8 (E.D.N.Y. Mar. 31, 2015) ("A licensee is defined as 'a person who has a privilege to enter upon land arising from the permission or consent, express or implied, of the possessor of land but who goes on the land for his own purpose rather than for any purpose or interest of the possessor.'" (brackets omitted) (quoting *Gladsky v. Sessa*, No. 06–CV–3134 (ETB), 2007 WL 2769494, at *8 (E.D.N.Y. Sept. 21, 2007))).  A licensee has no continuing possessory interest in the premises to which he has been granted license to enter.  *Id*.  Accordingly, Wade suffered no constitutional injury cognizable under the Fourth Amendment when the Apartment was padlocked.

Wade also argues that he suffered a liberty deprivation through the requirement that he appear in court to face criminal charges.  (Pls.' S.J. Reply, Dkt. 100, at ECF 8.)  In their brief in opposition to Plaintiffs' motion for partial summary judgment, Defendants argue that Wade cannot

show that he suffered a meaningful deprivation of liberty consistent with the concept of a seizure under the Fourth Amendment because his two court appearances do not rise to the level of a Fourth Amendment seizure.[18]  (Defs.' S.J. Opp., Dkt. 95, 15–16.)   In support of this proposition, Defendants cite to *Faruki v. City of New York*, 517 F. App'x 1, 1 (2d Cir. 2013) (summary order), which found that a plaintiff with "no restriction on her other than a requirement that she appear in court on two occasions" had suffered "an insufficient deprivation of liberty to support a Fourth Amendment malicious prosecution claim."  The panel in *Faruki* relied on *Burg v. Gosselin*, 591 F.3d 95 (2d Cir. 2010), in which the Second Circuit held that "the issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure."  *Id.* at 98.  *Burg* involved a § 1983 unreasonable seizure claim where a canine control officer had received a complaint about the plaintiff's dog and issued a summons to her that required the plaintiff to appear in court at a later date.  *Id.* at 96.  Importantly, the panel in *Burg* noted that the plaintiff's "alleged offense, if a first offense, was an *infraction*" and that the plaintiff "was not handcuffed, removed from her home, restricted from leaving her property, or restricted from travel."  *Id.* (emphasis added).

Though *Burg* might initially appear to foreclose Wade's claim of malicious prosecution, the Second Circuit has subsequently questioned the applicability of *Burg*'s reasoning to the malicious prosecution context.  *See Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013) ("[W]e

---

[18] In light of the charge-specific analysis required by *Janetka* and *Posr*, explained *supra*, it is questionable whether both of Wade's court appearances can be attributed to the § 221.10(1) charge initiated by Gladstone.  Though not dispositive to the Court's ruling, the Court assumes that both court appearances were imposed pursuant to the Gladstone-initiated § 221.10(1) prosecution.  *Estate of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (stating that federal courts "are 'required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" (quoting *Stern v. Trs. Of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997))).

decline to apply [*Burg*'s] dictum to the different context of a plaintiff who was required to appear in court in connection with criminal proceedings initiated by the defendant police officer."); *see also Mazzone v. Town of Southamptom*, 283 F. Supp. 3d 38, 53 (E.D.N.Y. 2017) (noting that the law in the Second Circuit "regarding Fourth Amendment seizures in [the malicious prosecution] context is somewhat unsettled" as decisions since *Burg* "have muddied the waters"). Moreover, the facts that the Second Circuit confronted in *Burg* are distinguishable from the circumstances of this case. In *Burg*, the plaintiff was issued a summons for a mere infraction, which the Second Circuit noted did not impose burdens as significant as "when a person faces serious criminal charges." *Burg*, 591 F.3d. at 99 (quoting *Albright*, 510 U.S. at 278) (internal brackets omitted). Justice Ginsburg's concurrence in *Albright*, which *Burg* quotes extensively, is instructive in considering the scope of *Burg*'s holding. There, Justice Ginsburg stated:

> A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip. He is required to appear in court at the state's command. . . . Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense.

> A defendant incarcerated until trial no doubt suffers greater burdens. That difference, however, should not lead to the conclusion that a defendant released pretrial is not still "seized" in the constitutionally relevant sense. Such a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed "seized" for trial, so long as he is bound to appear in court and answer the state's charges. He is equally bound to appear, and is hence "seized" for trial, when the state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court.

*Albright*, 510 U.S. at 278–79 (Ginsburg, J., concurring).

In this case, Wade was issued a DAT for a class B misdemeanor, punishable with imprisonment, fines, and "all the attendant collateral consequences of having a criminal record." *Cabrera v. City of New York*, No. 16-CV-1098 (GBD), 2017 WL 6040011, at *9 (S.D.N.Y. Dec. 4, 2017) (distinguishing *Burg* where the plaintiff was charged with a class A misdemeanor); *see*

*also* N.Y. Penal Law § 221.10 ("Criminal possession of mari[j]uana in the fifth degree is a class B misdemeanor."); N.Y. Penal Law § 70.15 (providing for a term of imprisonment up to three months for class B misdemeanors); N.Y. Penal Law § 80.05 (providing for a fine of up to $500 for class B misdemeanors). The DAT was issued at Gladstone's discretion *in lieu* of detaining Wade until his court appearance. *See Cabrera*, 2017 WL 6040011, at *3 n.2 ("[R]ather than holding an arrestee in custody until a judge is available to conduct an arraignment, police officers have the discretion in certain cases to release the arrestee and issue him or her a so-called [DAT] directing the arrestee to return to the criminal court at some future date to be arraigned." (citing *Bryant v. City of New York*, 404 F.3d 128, 132 (2d Cir. 2005)); *see generally* N.Y. Crim. Proc. Law §§ 150.10(1), 150.20. Nevertheless, the DAT was intended to have the same effect as pre-trial detention, compelling Wade to appear in court to face criminal misdemeanor charges on a particular date, under penalty of additional criminal charges for failure to appear. *See* N.Y. Penal Law § 215.58(1) ("A person is guilty of failing to respond to an appearance ticket when . . . he does not appear personally in the court in which such appearance ticket is returnable on the return date thereof or voluntarily within thirty days thereafter."); *Farkas v. State*, 409 N.Y.S.2d 696, 698 n.3 (Ct. Claims 1978) ("'Appearance tickets' issued for the alleged commission of a misdemeanor may be deemed a process [that compels a defendant's appearance in court] in light of . . . [the] penalty [that] is prescribed for failure to appear on the return date."). This meaningful restraint on Wade's personal liberty constitutes a seizure sufficient to support his claim of malicious prosecution under § 1983.

*Mitchell v. City of New York*, 841 F.3d 72 (2d Cir. 2016), the case most closely analogous to this one, provides support for this determination. There, the Second Circuit considered a case in which the plaintiff had been arrested, handcuffed for approximately one hour, fingerprinted,

photographed, and issued a DAT for trespass, a violation under New York law. *Id.* at 76; *see* N.Y. Penal Law § 140.05. The plaintiff appeared in court only once, but the KCDA had already declined to file a criminal complaint on the trespass charge initiated by the defendant officer. *Mitchell*, 841 F.3d. at 76; *see also Mitchell v. City of New York*, No. 12-CV-2674 (LAK), 2014 WL 535046, at *2 n.29 (S.D.N.Y. Feb. 11, 2014). In those circumstances, the Second Circuit reserved judgment on "the question of whether [the plaintiff's] single court appearance constituted a seizure under the Fourth Amendment for purposes of her Section 1983 malicious prosecution claim." *Mitchell*, 841 F.3d at 80; *see also id.* ("[W]e leave the question for another day.").

Notably, the district court in *Mitchell* had relied on *Burg* for its deprivation of liberty analysis. *See Mitchell*, 2014 WL 535046, at *5 ("Melinda Mitchell has failed to allege facts or adduce any evidence demonstrating that she was seized, for Fourth Amendment purposes, under *Burg*. Her only claim is that the police issued her a DAT requiring her presence in court a single time."). The Second Circuit did not comment on the district court's analysis, affirming the dismissal of the plaintiff's malicious prosecution claims on grounds that were not considered by the district court. *See Mitchell*, 841 F.3d at 79–80 ("[The plaintiff's] claim fails . . . at the fourth prong[] because she has not alleged or proffered any facts that the DAT was issued with malice.").

In light of the Second Circuit's reasoning in *Mitchell* and the undisputed facts in this case, the Court finds that Wade has demonstrated, as a matter of law, "a loss of liberty as a result of [Gladstone's] actions." *Cabrera*, 2017 WL 6040011, at *7; *see also id.* (denying cross-motions for summary judgment where the court determined that the plaintiff could demonstrate a loss of liberty where he was "held in police custody following his arrest for approximately four hours and thereafter appeared in court on criminal charges"); *Norton v. Town of Islip*, No. 12-CV-4463 (PKC), 2016 WL 264930, at *4 & nn.6–7 (E.D.N.Y. Jan. 21, 2016) (discussing the Second

Circuit's approach to deprivation of liberty in § 1983 malicious prosecution cases). This element need not be proved at trial.

*    *    *

Accordingly, upon reconsideration, the Court finds that Plaintiff Wade may proceed to trial with his Fourth Amendment claim for malicious prosecution against Defendant Gladstone under § 1983. The Court further finds that Wade has established, as a matter of law, four of the five elements of this claim, leaving only the element of malice to be demonstrated by a preponderance of the evidence to the jury at trial.[19]

## IV. Procedural Due Process Claims

Plaintiffs also seek reconsideration of the Court's dismissal of their procedural due process claims, which was premised on Defendants' alleged refusal to give Plaintiffs the keys to the padlock on the Apartment door after the search of the Apartment and Plaintiffs' subsequent arrests. (Pls.' S.J. Opp. Br., Dkt. 96, at 25–26); *Daniels*, 2018 WL 4119191, at *12 (granting summary judgment in Defendants' favor on Plaintiffs' procedural due process claims).

### A. Legal Standard

To sustain a procedural due process claim under the Fourteenth Amendment, a plaintiff must allege that he or she: (1) had a protected liberty or property interest and (2) was deprived of that interest without due process. *See Johnson v. City of New York*, No. 16-CV-2879 (PKC) (LB), 2018 WL 1175139, at *3 (E.D.N.Y. Mar. 5, 2018); *Roman-Malone v. City of New York*, No. 11-CV-8560 (PAC), 2013 WL 3835117, at *3 (S.D.N.Y. July 25, 2013) ("To state a claim for a violation of procedural due process, Plaintiff must allege that [he] was deprived a protected interest

---

[19] Plaintiff Wade did not move for reconsideration of the Court's dismissal of his related failure to intervene claims against Defendants Anghel and Baez. *Daniels*, 2018 WL 4119191, at *11 n.19. Accordingly, those claims remain dismissed.

in liberty or property, without adequate notice or opportunity to be heard."). "Deprivation of property by a state actor, whether intentional or negligent, does not give rise to a claim under § 1983 so long as the law of that state provides for an adequate post-deprivation remedy and the deprivation was the result of a 'random and unauthorized' act." *David v. N.Y. Police Dep't 42nd Precinct Warrant Squad*, No. 02-CV-2581 (DC), 2004 WL 1878777, at *5 (S.D.N.Y. Aug. 23, 2004) (collecting cases); *see also Davis v. New York*, 311 F. App'x 397, 400 (2d Cir. 2009) (summary order); *Johnson*, 2018 WL 1175139, at *3.

### B.      The Court's Prior Decision

In its August 29, 2018 Order, the Court determined that "Plaintiffs do not assert that their alleged deprivation was due to an established state procedure," and therefore it considered whether the state provided an adequate post-deprivation remedy. *Daniels*, 2018 WL 4119191, at *12. The Court then identified adequate post-deprivation remedies "that Plaintiffs could have used to obtain the keys to the padlock or regain access to the Apartment, such as, bringing a state law claim[, *i.e.*, negligence, replevin, or conversion,] in the Court of Claims." *Id.* (citing, *inter alia*, *Davis*, 311 F. App'x at 400). The Court granted summary judgment to Defendants on this basis. *Id.*

### C.      Grounds for Reconsideration

Plaintiffs argue that the Court should reconsider its grant of summary judgment to Defendants on their procedural due process claims because it improperly stated that New York state law provided an adequate post-deprivation remedy through state law claims in the New York Court of Claims. (*See* Pls.' Recon. Br., Dkt. 107, at 3; Pls.' Recon. Supp., Dkt. 109, at 4–5.). While Plaintiffs' reconsideration motion is correct to the extent that it points out that the Court of Claims is an appropriate venue only for claims against the State of New York, *see Barrington v. New York*, 806 F. Supp. 2d 730, 739 (S.D.N.Y. 2011) (stating that "the jurisdiction of the Court of Claims is generally limited to claims for damages against the State, including suits that result from

the torts of its officers and employees while acting in such capacities" (internal quotations and citation omitted)), this fact does not alter the Court's conclusion. To obtain the keys to the padlock or to regain access to the Apartment, Plaintiffs could have brought an action for conversion, negligence, or replevin against Defendants in New York Supreme Court.[20] N.Y. Const. art. VI, § 7(a) ("The supreme court shall have general original jurisdiction in law and equity and the appellate jurisdiction herein provided."); N.Y. Gen. Mun. Law § 50-e (setting forth requirements for notices of claim against municipalities). Thus, adequate post-deprivation remedies were available to Plaintiffs, which satisfies due process. *Galarza v. Monti*, 327 F. Supp. 3d 594, 600 (S.D.N.Y. 2018) ("[T]he plaintiff can only sustain a due process claim if he was not provided with a meaningful post-deprivation remedy. . . . The plaintiff's failure to initiate any of these causes of action does not convert his cause of action into a constitutional due process claim." (internal quotations and citations omitted)). Accordingly, because Plaintiffs have not met their burden on reconsideration to identify overlooked matters "that might reasonably be expected to alter the conclusion reached by the Court," *Shrader*, 70 F.3d at 257, the Court declines to reconsider its dismissal of Plaintiffs' procedural due process claims.

## CONCLUSION

For the reasons stated, the Court grants in part and denies in part Plaintiffs' motion for reconsideration. Reconsideration is granted as to Plaintiff Wade's malicious prosecution claims, which will proceed to trial and as to which only malice must be proved at trial. Reconsideration is denied as to Plaintiffs' claims of unreasonable search, unreasonable detention, and procedural

---

[20] Plaintiffs argue that even if a post-deprivation remedy, such as an Article 78 proceeding, was available to them, their individual-capacity claims under § 1983 should still survive. Because the cases cited by Plaintiff involve the application of *res judicata*, they are do not alter the Court's determination that Plaintiffs did not suffer a property loss redressable under § 1983.

due process violations.  The parties shall submit a joint pre-trial order within thirty (30) days of this Order.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: July 31, 2019
       Brooklyn, New York